# EXHIBIT E

SUBLICENSE, MANUFACTURE AND DISTRIBUTION AGREEMENT

BY AND BETWEEN

BRASSICA PROTECTION PRODUCTS LLC

AND

CAUDILL SEED & WAREHOUSE CO., INC.

d/b/a CAUDILL SEED CO.

# TABLE OF CONTENTS

**Page**

| | | |
|---|---|---|
| ARTICLE 1 | DEFINITIONS | 1 |
| ARTICLE 2 | GRANT OF RIGHTS | 5 |
| ARTICLE 3 | MANUFACTURE OF PRODUCTS | 6 |
| ARTICLE 4 | MARKETING AND PROMOTION | 7 |
| ARTICLE 5 | FEES, ROYALTIES AND COSTS | 8 |
| ARTICLE 6 | BOOKS, RECORDS, AUDITS | 9 |
| ARTICLE 7 | PATENTS AND OTHER INTELLECTUAL PROPERTY | 9 |
| ARTICLE 8 | INFORMATION EXCHANGE | 11 |
| ARTICLE 9 | PRODUCT RECALL | 12 |
| ARTICLE 10 | TERM; TERMINATION | 12 |
| ARTICLE 11 | REPRESENTATIONS AND WARRANTIES | 14 |
| ARTICLE 12 | INDEMNIFICATION; INSURANCE | 15 |
| ARTICLE 13 | CONFIDENTIALITY | 16 |
| ARTICLE 14 | MISCELLANEOUS | 17 |

i

# AGREEMENT

This SUBLICENSE, MANUFACTURE AND DISTRIBUTION AGREEMENT (the "**Agreement**") is made as of December 6, 2004, by and between BRASSICA PROTECTION PRODUCTS LLC, a Delaware limited liability company ("**BPP**") located at 600 East Lombard Street, Suite 503, Baltimore, Maryland 21202, and CAUDILL SEED & WAREHOUSE CO., INC. d/b/a CAUDILL SEED CO., a Kentucky corporation ("**CSC**") located at 1402 W. Main Street, Louisville, Kentucky 40203.

## WITNESSETH

WHEREAS, BPP has the exclusive worldwide license to use and exploit certain BPP Patents and Patent Rights (as hereinafter defined) from The Johns Hopkins University ("JHU"); and

WHEREAS, subject to the terms and conditions below, BPP wishes to grant to CSC and CSC is willing to accept from BPP, a non-exclusive sublicense to use the BPP Patents, Patent Rights and BPP Know-How, and a non-exclusive license to use the Trademarks (as hereinafter defined) for the sole and exclusive purpose of manufacturing, distributing and selling the Product (as hereinafter defined) in the Territory (as hereinafter defined).

NOW THEREFORE, in consideration of the mutual covenants and conditions contained in this Agreement, and other good and valuable consideration the receipt of which is hereby acknowledged, and intending to be legally bound hereby, the parties agree as follows:

## ARTICLE 1
## DEFINITIONS

1.1.     "Act" means the Federal Food Drug and Cosmetic Act (21 U.S.C. Section 301 et seq.) as amended from time to time.

1.2.     "Adverse Events" shall have the meaning set forth in Section 8.2.

1.3.     "Affiliate" means any corporation, company, partnership, licensee, joint venture or other entity which controls, is controlled by or is under common control with CSC. The term "control" means the direct or indirect ownership of at least fifty percent (50%) of the voting or equity interests or the power or right to direct the management and affairs of the business whether through the ownership of voting securities, by contract, resolution, regulation or otherwise.

1.4.     "BPP Know-How" means all current and future data and proprietary rights of any type whatsoever (other than patents or patent applications, including the BPP Patents or Patent Rights), in any tangible or intangible form whatsoever, that is owned (or to the extent owned) by BPP or that BPP has the unrestricted right to use, that is material to the production, manufacture, storage, filling, packaging and shipping of the Product, including, without limitation, technology, Labeling, inventions, practices, methods, techniques, specifications, drawings, plans, formulations, formulae, knowledge, skill, experience, technical and non-

technical data, test data (including test or stability data), results of studies, technical drawings and related copyrights, consumer and market research data and other similar information.

1.5.    "BPP Patents" or "Patent Rights" means:

(a)    The following issued patents:

(i)    "Cancer chemoprotective food products" U.S. Patent No. 5, 968,505 granted on October 19, 1999 to JHU;

(ii)    "Chemoprotective isothiocyanates" U.S. Patents No. 5,411,986 granted on May 2, 1995 to JHU; U.S. Re. Patent No. 36,784 granted on July 18, 2000;

(iii)    "Method of preparing a food product from cruciferous seeds," U.S. Patent No. 5,725,895 granted on March 10, 1998 to JHU;

(iv)    "Method of preparing a food product from cruciferous sprouts," U.S. Patent No. 5,968,567 granted on October 19, 1999 to JHU;

(v)    "Cancer chemoprotective food products" U.S. Patent No. 6,177,122;

(vi)    "Cancer chemoprotective food products" U.S. Patent No. 6,242,018;

(vii)    "Development of novel highly chemoprotective crucifer germplasm" U.S. Patent No. 6,521,818;

(viii)    "Treatment of helicobacter with isothiocyanates" U.S. Patent No. 6,737,441;

(b)    The following patent applications:

(i)    U.S. Patent Application Serial No. 08/528,858 filed on September 15, 1995;

(ii)    International PCT Application Serial No. PCT/US96/14866, filed September 13,1997 and assigned to JHU; and

(c)    The inventions disclosed and claimed on all of the issued patents and patent applications listed in subsections (a) and (b) and all continuations, divisions and reissues based thereon.

1.6.    "Budget" shall have the meaning set forth in Section 4.5.

1.7.    "Confidential Information" shall have the meaning set forth in Section 13.2.

2

1.8.   "CSC Patents and Know-How" means (a) all U.S. and foreign patents and patent applications issued to, or filed by, CSC or any of its Affiliates pertaining to the methods or processes by which a powder or other substance containing extracted or purified glucosinolate or isothiocyanate is created; (b) the inventions disclosed and claimed on all of the issued patents and patent applications referred to in clause (a) and all continuations, divisions and reissues based thereon; and (c) all data and proprietary rights of any type whatsoever (other than patents or patent applications), in any tangible or intangible form whatsoever, that is owned (or to the extent owned) by CSC or any of its Affiliates or that CSC or any of its Affiliates has the unrestricted right to use, that is relevant to the production, manufacture, storage, filling, packaging and shipping of the Product, including, without limitation, technology, inventions, practices, methods, techniques, specifications, drawings, plans, formulations, formulae, knowledge, skill, experience, technical and non-technical data, test data (including test or stability data), results of studies, technical drawings and related copyrights, consumer and market research data and other similar information.

1.9.   "Disability" means the inability of Dan Caudill to perform his duties as the chief executive officer of CSC as a result of incapacity, despite any reasonable accommodation required by law, due to bodily injury, disease or any other physical or mental illness, which inability continues for a period of ninety (90) days within any one hundred eighty (180) day period.

1.10.   "Event of Default" shall have the meaning set forth in Section 10.3.

1.11.   "FDA" means the United States Food and Drug Administration and any successor agency or authority thereto.

1.12.   "Finished Product" means capsules, tablets, pills or similar delivery conveyors that contain extracted or purified glucosinolate or isothiocyanate that (a) are not a food and (b) do not require the approval of the FDA or any other U.S. or Canadian government agency or authority in order to be sold in the retail market (other than approvals relating to Product claims and Labeling), which are produced and/or manufactured using BPP Know-How and the BPP Patents or Patent Rights.

1.13.   "GMP" means current good manufacturing practices applicable in the United States and Canada.

1.14.   "Gross Sales" means gross sales revenues and fees derived from sales of Ingredient Product or Finished Product, as the case may be, by CSC or its Affiliates.

1.15.   "Indemnitee" shall have the meaning set forth in Section 12.3.

1.16.   "Indemnitor" shall have the meaning set forth in Section 12.3.

1.17.   "Ingredient Product" means extracted or purified glucosinolate or isothiocyanate to be included as an ingredient in a capsule, tablet, pill or similar form that is (a) not a food and (b) does not require the approval of the FDA or any other U.S. or Canadian government agency or authority in order to be sold in the retail market (other than approvals

3

relating to Product claims and Labeling), which is produced and/or manufactured using BPP Know-How and the BPP Patents or Patent Rights.

1.18.   "Inventory" shall have the meaning set forth in Section 10.4(b).

1.19.   "JHU License Agreement" means the License Agreement, effective March 10, 1998, between JHU and BPP, as the same has been amended from time to time.

1.20.   "Joint IP" means all data and proprietary rights of any type whatsoever, in any tangible or intangible form whatsoever, that are jointly developed by CSC and BPP in connection with the manufacture, distribution and sale of the Product in accordance with the terms of this Agreement, including, without limitation, trade names, trademarks, copyrights, technology, inventions, practices, methods, techniques, specifications, drawings, plans, formulations, formulae, knowledge, skill, experience, technical and non-technical data, test data (including test or stability data), results of studies, technical drawings and related copyrights, consumer and market research data and other similar information.

1.21.   "Labeling" means any and all material used to label either the Product, the Packaging or any promotional materials.  All Labeling shall include the number of the applicable patent and appropriate Trademarks.

1.22.   "Laboratory" shall have the meaning set forth in Section 3.2.

1.23.   "Law" means all federal, state and local laws of the United States, including, without limitation, executive orders and the Act.

1.24.   "Losses" shall have the meaning set forth in Section 12.1.

1.25.   "Marketing Costs" means all out-of-pocket costs and expenses arising out of, relating to, in connection with or in association with the advertising, marketing, public relations and promotional activities conducted by CSC for the Product and in accordance with the terms of this Agreement.

1.26.   "Marketing Plan" shall have the meaning set forth in Section 4.5.

1.27.   "Minimum Royalty" shall have the meaning set forth in Section 10.2(a).

1.28.   "Net Sales" means Gross Sales less refunds, returns, freight, gross receipts taxes and sales taxes, if separately identified on an invoice.

1.29.   "Other IP Rights" shall have the meaning set forth in Section 7.3.

1.30.   "Packaging" means all material used in packaging, promotional materials or accompanying the Product, including, without limitation primary containers, cartons, shipping cases and inserts.

1.31.   "Product" means (a) Ingredient Product and (b) Finished Product.

4

1.32.   "Quarterly Payment" shall have the meaning set forth in Section 5.2.

1.33.   "Records" shall have the meaning set forth in Section 6.1.

1.34.   "Regulations" means any regulations, rules, guidelines and procedures promulgated by a governmental agency or authority relating to the manufacture, testing, filling, packaging, Labeling, storing, shipping and disposing of the Product and the operation of manufacturing facilities.

1.35.   "Sell-Off Period" shall have the meaning set forth in Section 10.4(c).

1.36.   "Specifications" means the specifications for the Ingredient Product and the Finished Product set forth in Exhibit A attached hereto or other such specifications as may be established from time to time in accordance with Section 3.8 hereof.

1.37.   "Territory" means the United States of America and Canada.

1.38.   "Term" shall have the meaning set forth in Section 10.1.

1.39.   "Trademarks" means the trademarks and trademark applications listed on Schedule 1.35 hereto.

## ARTICLE 2
## GRANT OF RIGHTS

2.1.   General.  Subject to the terms and conditions of this Agreement, BPP hereby grants to CSC a non-exclusive, non-transferable sublicense during the Term to use and exploit the BPP Patents and Patent Rights to produce, manufacture, distribute and sell the Product in the Territory.  Without limiting the foregoing, CSC shall not distribute, sell or otherwise transfer any Product outside of the Territory nor distribute, sell or otherwise transfer any Product to any party who CSC knows, or should be reasonably expected to know, intends to distribute, sell or otherwise transfer any Product outside of the Territory.  In addition, CSC shall not distribute, sell or otherwise transfer to any person or entity (a) any unlabeled Finished Product unless the purchaser agrees to abide by the terms of Sections 4.2, 4.3(b) and 4.4 of this Agreement or (b) any Ingredient Product for inclusion in another product unless such other person or entity agrees in writing to such provisions as BPP may request with respect to the matters addressed in Articles 3, 8, 12 and 13, and Sections 4.2, 4.3, 4.4,  and 9.1 of this Agreement.

2.2.   Sublicensing.  CSC may not further sublicense to others its rights under this Agreement without the prior written approval of BPP.  Notwithstanding the foregoing, BPP acknowledges that CSC intends to enter into agreements with one or more entities to provide for the manufacture of certain portions of the Product for and on behalf of CSC, and that in connection with such agreements, it may be necessary to sublicense to such entities certain of CSC's rights under this Agreement to produce and manufacture (but not distribute, sell or otherwise transfer) the Product.  BPP shall not unreasonably withhold its consent to any such sublicense, provided that such sublicensee has no further right to sublicense.

5

## ARTICLE 3
## MANUFACTURE OF PRODUCTS

3.1.  Standards.  CSC agrees to produce or caused to be produced, manufacture or cause to be manufactured, fill, test, package, label, store, ship, supply, dispose and otherwise handle the Product, and to perform its obligations hereunder, in material compliance with applicable Laws, Regulations, GMPs and in strict compliance with the Specifications. CSC shall, at its own expense, maintain any and all licenses, permits and consents (including, without limitation, facility licenses and permits) required by any governmental authority, Laws, Regulations and GMPs necessary or required to produce, manufacture, fill, test, package, label, store, ship, supply, dispose and otherwise handle the Product.

3.2.  Manufacturing Facility.  CSC shall produce or cause to be produced, manufacture or cause to be manufactured, fill, test, package, label, store, ship, supply, dispose and otherwise handle the Product in strict compliance with the Specifications at its manufacturing facilities located in the Territory and shall cause such facilities to remain qualified by the applicable governmental authorities and in compliance with all applicable Laws, Regulations and GMPs. In order to ensure that the Product meets BPP's strict quality control guidelines, CSC shall test the Product at a laboratory (the "**Laboratory**") that conforms to the specifications, including the specific equipment, set forth on the attached **Exhibit A** unless otherwise approved in writing by BPP.

3.3.  Seeds.  In connection with the production of the Product, CSC shall use only broccoli seeds which meet the protocol, specifications and guidelines as set forth on **Exhibit B** attached hereto, which may be modified by BPP in its reasonable discretion from time to time upon reasonable notice to CSC.

3.4.  Packaging; Expiration Dating.  CSC agrees, and will require purchasers of the Product for resale in the retail market, to label and package all Product with Labeling and Packaging approved in advance and in writing by BPP, including with respect to expiration dating and use of Trademarks. In addition, any claims that CSC or any such purchaser intends to make on the Labeling and/or Packaging of the Product with respect to health benefits of the Product must be pre-approved by BPP as required by Section 4.3(b) hereof.

3.5.  Warranty.  CSC warrants and represents that, at the time of delivery of the Product to a third party, the Product (i) will have been produced, manufactured, filled, tested, packaged, labeled, stored, shipped, supplied, disposed of and otherwise handled in accordance with the Specifications, applicable GMPs, this Agreement and all applicable Laws or Regulations, (ii) will have been produced, manufactured, filled, tested, packaged, labeled and stored in facilities approved by the applicable governmental authorities in the Territory and (iii) will not be adulterated or misbranded under applicable Laws or Regulations.

3.6.  Inspection.  CSC shall permit BPP representatives to enter CSC's facilities, including, without limitation, the Laboratory, upon reasonable prior notice and at reasonable intervals, during normal business hours for the purpose of making quality assurance audits of those facilities and of the procedures and processes used by CSC in performing its obligations under this Agreement.

6

NYDOCS/1179842.2

3.7.    Samples.  CSC shall prepare and maintain, or cause to be prepared and maintained, file samples, properly stored, from each lot or batch of Product manufactured and shipped hereunder, in compliance with Laws, Regulations and GMPs pertaining thereto.  Within ten (10) days after the end of each month, CSC shall provide BPP with sufficient samples of the Product (identical to the Product placed in the stream of commerce for sale) so that BPP may test the sample Product to confirm (i) CSC's compliance with the terms of this Agreement and (ii) the chemoprotective content of the Product.  Promptly following receipt of an invoice therefor, CSC shall reimburse BPP for the direct cost of such testing.

3.8.    Product Specifications Amendments.  BPP may amend or supplement the Specifications unilaterally at any time for the purpose of complying with Laws, Regulations or GMPs.  Upon reasonable prior notice (and subject to CSC's approval, not to be unreasonably withheld), BPP may also amend or supplement the Specifications for any other reasonable business purpose.

3.9.    Manufacturing Process; Duty to Report.  If an event occurs during the production of any Product batch which is likely to affect the safety, efficacy or regulatory status of the Product, CSC shall notify BPP as soon as reasonably possible.  BPP and CSC shall consult with each other as to the disposition of all affected batches of the Product.

3.10.   Safety Procedures.  CSC shall maintain and enforce safety procedures for the production, manufacture and handling of the Product that comply in all respects with applicable occupational safety and health requirements.

## ARTICLE 4
## MARKETING AND PROMOTION

4.1.    Duty to Market.  CSC shall use reasonable commercial efforts to market, promote, distribute and sell the Product, using such media as it shall reasonably determine to promote, market, distribute and sell the Product throughout the Territory.

4.2.    Restricted Internet Sales.  CSC shall have no right to promote, market, distribute or sell the Product via the Internet to any person or entity that is located outside of the Territory.

4.3.    Approval Required.  (a) No advertisement or other promotion may be broadcast, conducted or otherwise exploited, other than in accordance with the Marketing Plan, described in Section 4.5 below, or with BPP's prior written permission (both as to the advertisement or promotion itself and the manner (e.g., medium or publication) for exploitation). CSC may re-use approved advertisements or promotions (in the form and manner as approved) without having to obtain additional approval from BPP.

(b)     Without limiting the foregoing, CSC must obtain BPP's prior express written approval of any claims, including, without limitation, any health claims or claims asserting that the Product is beneficial to a consumer, that CSC intends to make with respect to the Product, whether such claims are oral or written, and whether or not appearing on Labeling,

7

Packaging, advertising, publicity or promotional materials. Claims which are not approved within two (2) weeks of submission shall be deemed not approved. CSC shall not use any claims that have not been approved in connection with the Product.

4.4.    JHU Name. CSC shall not use the name of THE JOHNS HOPKINS UNIVERSITY or THE JOHNS HOPKINS HEALTH SYSTEM, or any part or contraction thereof, or the name of the inventors of the BPP Patent or Patent Rights in any materials whatsoever, including, without limitation, Labeling, Packaging, advertising, publicity or promotional materials, without at least fifteen (15) days' prior written notice of the use and BPP's and JHU's prior express written consent. BPP shall assist CSC in seeking to obtain JHU's consent.

4.5.    Marketing Plan; Budget; Marketing Costs. CSC shall submit to BPP an annual plan (the "**Marketing Plan**") at least two (2) months prior to the commencement of each calendar year, beginning with 2005, setting forth CSC's planned advertising, marketing and promotional activities, including promotion at trade events, for the upcoming year (including market research, sales and distribution audits), together with a budget (the "**Budget**") therefor. The Budget shall provide for expenditures for Marketing Costs during the upcoming year by CSC which shall be no less than 10% of actual Gross Sales for the preceding calendar year. BPP shall have the right to approve each proposed Marketing Plan and Budget (which approval shall not be unreasonably withheld). The Marketing Plan shall be subject to the approval of BPP, which approval shall not be unreasonably withheld. Upon request, CSC shall provide BPP with a summary of actual advertising, marketing and promotion for the twelve (12) month period preceding such request. The Marketing Plan and Budget shall be deemed Confidential Information of CSC.

4.6.    Marketing Personnel. CSC shall employ at least one individual with experience in the sales and marketing of supplements on a full time basis to implement the Marketing Plan.

## ARTICLE 5
## FEES, ROYALTIES AND COSTS

5.1.    Initial License Fee. In consideration of the license and sublicense granted to CSC hereunder, CSC shall pay to BPP upon the execution of this Agreement an initial fee of Ninety-Five Thousand Dollars ($95,000) by certified check or wire transfer of immediately available funds to an account designated by BPP.

5.2.    Payment of Royalties. With respect to all Net Sales after the earlier of (a) 18 months from the date of this Agreement and (b) the date that CSC's aggregate Net Sales exceed $1,000,000, CSC shall pay to BPP (i) eight percent (8%) of CSC's Net Sales of Finished Product and (ii) sixteen percent (16%) of CSC's Net Sales of Ingredient Product. Royalty payments shall be made quarterly within twenty-five (25) days after each calendar quarter (the "**Quarterly Payment**").

8

5.3.    Payment and Statement Due Dates.  At the time of each Quarterly Payment (the 25th day of the month following each calendar quarter, e.g., the 25th of January, April, July and October), together with the Quarterly Payment, CSC shall deliver a detailed statement for such applicable quarter setting forth Gross Sales, Net Sales, royalties due, Marketing Costs and such other sales information as BPP may reasonably request. The fourth quarterly statement shall also include a summary of the foregoing sales and royalty information for the preceding calendar year.

5.4.    Currency.  All payments made hereunder shall be made in United States Dollars.

## ARTICLE 6
## BOOKS, RECORDS, AUDITS

6.1.    Records.  CSC shall maintain, or cause to be maintained, complete and accurate records, files and books of account, including, without limitation, Laboratory records (collectively "**Records**"), containing all data reasonably required for a full and accurate verification of the performance of its obligations under this Agreement. All such Records shall be deemed Confidential Information of CSC.

6.2.    Manufacturing Records.  CSC shall maintain in such form readily available and comprehendible to BPP, all Records relating to the production, manufacture, packaging, labeling, storage, shipment, supplying and disposition of each Product batch.

6.3.    Financial Records.  CSC shall retain during the term of this Agreement and for four (4) years thereafter, all Records relating to the computation and verification of Net Sales. CSC shall keep Records relating to Net Sales in accordance with generally accepted accounting principles consistently applied.

6.4.    Audit.  Without limiting BPP's inspection rights, upon at least ten (10) business days' prior written notice, BPP (or its representative) or JHU (or its representative) may cause to have audited and make copies of any Records (but not more than once a year) during regular business hours to confirm CSC's compliance with the terms of this Agreement, including, without limitation, the calculation of royalties. In the event of underpayment by CSC, CSC shall promptly pay BPP all amounts underpaid, together with interest due on such underpaid amounts (at the interest rate of two percent (2%) above the then existing prime lending rate announced by Citibank in New York) from the payment due date until the actual date of payment without prejudice to any other claim or remedy. The cost of such audit shall be borne by BPP, unless such audit reveals a discrepancy of greater than two percent (2%) in CSC's favor, in which case CSC shall bear such cost.

## ARTICLE 7
## PATENTS AND OTHER INTELLECTUAL PROPERTY

7.1.    Prosecution and Maintenance.  BPP shall prepare, file, prosecute and maintain the BPP Patents and Patent Rights in the Territory. CSC shall have no right to prepare,

9

prosecute, file or maintain any BPP Patents and Patent Rights (or patent within the BPP Patents and Patent Rights) without the prior express written consent of BPP and JHU.

    7.2.   Patent Enforcement. Each party shall promptly notify the other in writing of any actual or suspected infringement of any of the BPP Patents and Patent Rights. As between the parties, BPP shall have the right to enforce the BPP Patents and Patent Rights in the Territory against any such third party infringer. BPP and CSC shall each bear fifty percent (50%) of the expense of enforcing such BPP Patents and Patent Rights and CSC shall promptly pay BPP its share of such expenses following a request therefor. BPP shall control, settle (provided no settlement shall include in its terms a sublicense of the BPP Patents or Patent Rights to the infringer unless the exclusive sublicense granted to CSC under this Agreement has become a non-exclusive sublicense in accordance with Section 2.3 hereof) or defend such suit and recover, for its own account, any damages, awards or settlements resulting therefrom; provided, however, that BPP shall pay to CSC, out of any such recovery, (i) to the extent the recovery equals or exceeds the aggregate enforcement expenses incurred by BPP and CSC, all of CSC's enforcement expense; (ii) to the extent the recovery is less than the aggregate enforcement expenses incurred by BPP and CSC, one-half of such recovery and (iii) an amount equal to the lesser of (a) fifty percent (50%) of the balance of such recovery and (b) the portion of such recovery attributable to the lost profit of CSC resulting from such infringement. Upon BPP's request, CSC shall cooperate with BPP, and if necessary, be named by BPP as a sole complainant or co-complainant in any action against any infringer of the BPP Patents and Patent Rights. CSC shall have the right to enforce the CSC Patents and Know-How against any third party infringer. CSC shall bear the expense of enforcing such CSC Patents and Know-How.

    7.3.   Enforcement of Other IP Rights. Each party shall promptly notify the other in writing of any actual or suspected infringement of any of the intellectual property rights, other than the BPP Patents and Patent Rights (including, but not limited to, the Trademarks and BPP Know-How) (the "**Other IP Rights**"). As between the parties, BPP, at its sole expense, shall enforce the Other IP Rights in the Territory against any third party infringer. BPP shall control, settle or defend such suit and recover, for its own account, any damages, awards or settlements resulting therefrom. Upon BPP's request and at BPP's sole expense, CSC shall cooperate with BPP, and if necessary, be named by BPP as a sole complainant or co-complainant in any action against any infringer of the Other IP Rights.

    7.4.   Ownership. As between the parties, BPP owns (or via the JHU License Agreement, controls) all right, title and interest in and to any intellectual property related to or embodied by the Product, including, without limitation, all BPP Patents and Patent Rights and patent applications of any nature whatsoever. CSC shall not acquire or assert any right in the BPP Patents or Patent Rights (except for the sublicense granted hereunder), Trademarks (except for the limited license granted hereunder), or any derivation or adaptation thereof, or BPP Know-How, or register (or seek to register) any BPP trademark or any derivation, adaptation or confusingly similar variation thereof. As between the parties, CSC owns all right, title and interest in and to the CSC Patents and Know-How. BPP shall not acquire or assert any right in the CSC Patents and Know-How. If any Joint IP is developed in connection with the manufacture, distribution and sale of the Product in accordance with the terms of this Agreement,

10

the parties shall negotiate in good faith documents, instruments and agreements with respect to each party's rights in the Joint IP and the protection of such rights.

      7.5.    <u>Trademarks</u>.  BPP hereby grants CSC a limited license to use the Trademarks in connection with the Product and related advertising or promotion.  BPP shall be responsible for the selection, registration and maintenance of all Trademarks used in connection with the Product.  CSC shall not acquire or assert any right, title, and interest in and to any such Trademarks (except for the limited license granted hereunder).

# ARTICLE 8
# INFORMATION EXCHANGE

      8.1.    <u>Government Communications</u>.  CSC shall promptly (but in any event not later than five (5) days after the date of the communication) provide BPP with copies of all material communications with any governmental agency regarding the Product or the facilities, procedures or processes used in connection with the Product (including, without limitation, Adverse Event reports and safety reports).  If a governmental agency or regulatory authority is commencing or threatening seizure of the Product, CSC shall inform BPP in writing within 24 hours of such notice.  Material communications include any letters, reports or other documents received by, or sent to any, governmental agency or regulatory authority that relate to the Product, the facilities (including the Laboratory), processes or procedures.  BPP shall be solely responsible for all communications with governmental agencies or authorities throughout the world, except in connection with CSC's obtaining and maintaining any license, permit or approval necessary for the manufacture or sale of the Product.

      8.2.    <u>Adverse Event Reporting</u>.  During the term of this Agreement and for one (1) year thereafter (or longer as required by Laws and Regulations), CSC shall (i) provide prompt written notice to BPP of information in or coming into its possession or control concerning side effects, injury, toxicity or sensitivity reaction ("**Adverse Events**") associated with the Product, whether or not determined to be attributable to the Product, (ii) notify BPP by telephone and facsimile within 24 hours after CSC first becomes aware of any Adverse Event that gives cause for concern or is unexpected or that is fatal, life-threatening (as it occurred), permanently disabling, requires (or prolongs) hospitalization, represents a significant hazard, or is a cancer or a congenital anomaly or represents an overdose, or any other circumstance that might necessitate a recall, expedited notification of the FDA or any other relevant regulatory authorities or a significant change in the Labeling of the Product, including, without limitation, any deviation from the specified environmental conditions for shipping or storage of Product.

      8.3.    <u>Customer Communications</u>.  CSC shall maintain files of all customer communications, including, without limitation, written (in any form, <u>e.g.</u>, by letter or email) or oral communications, along with separately maintained complaint files.  CSC shall report promptly (but in any event within five (5) days after the date of the complaint) to BPP any and all complaints related to the Product and shall supply to BPP all documents in connection with such complaints.  BPP and CSC shall cooperate in reviewing, responding and interacting with the governmental agencies and/or authorities with regards to all complaints. Each party will cooperate reasonably with the other party in connection with a party's investigation of an

11

Adverse Event. CSC shall report other customer communications to BPP on a regular basis to be determined by the parties.

## ARTICLE 9
## PRODUCT RECALL

9.1.    Notification or Recall. If any governmental agency or regulatory authority issues or requests a recall or takes similar action in connection with the Product, or BPP reasonably determines after consultation with CSC that an event has occurred which may result in the need for a recall or market withdrawal, the party notified of or wishing to call such recall or similar action shall, within 24 hours of such notice or decision, advise the other party thereof by telephone or facsimile, after which CSC shall work to effect an appropriate course of action.

9.2.    Recall Expenses. CSC shall bear the full expenses of both parties incurred in such recall. Recall expenses include the expenses of notification, shipping, return, replacement (if possible) and destruction of recalled Product (including Product which cannot be shipped due to the condition causing the recall).

## ARTICLE 10
## TERM; TERMINATION

10.1.    Term. This Agreement shall commence on December 6, 2004 and continue thereafter until the earliest of (i) the expiration of the last patent included in the BPP Patents, (ii) the determination by a court or administrative agency of competent jurisdiction that all claims of the last patent within the BPP Patents is invalid or unenforceable or (iii) the date this Agreement is terminated in accordance with Section 10.2 hereof (the "**Term**").

10.2.    Termination.

(a)    BPP Termination. BPP may terminate this Agreement at any time upon written notice (i) for an Event of Default (as defined below) which CSC has not cured to the reasonable satisfaction of BPP within (A) five (5) days of BPP's written notice for Events of Default relating to a change of control of CSC or failure to pay amounts due (Sections 10.3 (b) and (c) below) or (B) 30 days of BPP's written notice for all other Events of Default; (ii) if the first commercial sale of Product into the retail market does not occur prior to July 1, 2005; or (iii) if the royalties paid by CSC to BPP under Section 5.2 of this Agreement are less than $50,000 for the six month period commencing on the date that is 18 months after the date of this Agreement or $100,000 for the twelve month period commencing on the date that is 24 months after the date of this Agreement, and for each twelve month period thereafter ($50,000 for such six month period and $100,000 for each such twelve month period being the "**Minimum Royalty**"), unless within 25 days after the end of the applicable period, CSC pays to BPP the amount by which the Minimum Royalty for the applicable period exceeds the royalties paid by CSC to BPP under Section 5.2 of this Agreement for the applicable period.

(b)    CSC Termination. CSC may terminate this Agreement upon one year's written notice without incurring a penalty.

12

(c)     Termination for Insolvency.  A party may terminate this Agreement upon written notice if the other party becomes insolvent or is unable to satisfy its obligations as they become due, makes a general assignment, arrangement or composition with or for the benefit of its creditors, institutes or has instituted against it a proceeding seeking a judgment of insolvency or bankruptcy or similar relief (which in the case of an involuntary proceeding only, is not dismissed or discharged within 30 days of the institution thereof), seeks to dissolve, wind-up or liquidate or a petition or proceeding to dissolve, wind-up or liquidate the other party is instituted.

10.3.     Event of Default.  Each of the following events shall constitute an "**Event of Default**" by CSC:

(a)     Loss of a License:  loss of any applicable license, permit or consent necessary in the conduct of CSC's business of producing, manufacturing, selling or distributing Product;

(b)     Change of Control:  a change of control of CSC in violation of Section 14.3 below;

(c)     Quarterly Payment:  failure to pay the Quarterly Payment when due;

(d)     Advertising and Promotion:  failure to spend the amount contemplated by the Marketing Plan as set forth in Section 4.5 above;

(e)     Quality Control:  material breach of an obligation relating to the Laboratory or manufacture of the Product;

(f)     Material Breach:  any other material breach of this Agreement.

10.4.     Post-Termination.

(a)     Reversion.  Except as otherwise provided herein, upon expiration or termination of this Agreement, all rights herein granted to CSC shall revert to BPP and CSC shall cease the production, manufacture, distribution, sale, use or advertisement of the Product.

(b)     Re-purchase Option.  Upon termination, CSC will promptly deliver to BPP a schedule of CSC's then existing inventory of Product (the "**Inventory**").  BPP shall have the right, but not the obligation, to purchase all or any portion of the Inventory at cost.  BPP may exercise its purchase option by providing written notice to CSC within 30 days of receipt of the Inventory schedule.  If the option is exercised, CSC must promptly deliver all Inventory for which the option has been exercised to BPP.  BPP will pay CSC for such Inventory within 30 days of receipt thereof.  Subject to Section 10.4(c), CSC shall promptly destroy all Product not repurchased by BPP.

(c)     Sell-Off Period.  If BPP elects to terminate this Agreement other than pursuant to Sections 10.2(c), 10.3(a) or 10.3(c), and provided BPP does not elect to

13

repurchase CSC's Inventory, CSC may sell-off its Inventory (on a non-exclusive basis in its ordinary course of business) for a limited period of 90 days (the **"Sell-Off Period"**) from the date of such termination. CSC may not promote or advertise the Product during the Sell-Off Period.

          (d)    <u>Return of Information</u>. Upon termination of this Agreement, without prejudice to the rights or remedies available to either party, each party shall immediately thereafter return to the other party all of the other party's **"Confidential Information"** (as defined in Section 13.2 below) and copies thereof (whatever the format) except for copies that must be retained in order to comply with Laws or Regulations (but only for so long as such retention is required thereunder).

          10.5.   <u>Non-Compete</u>. During the term of this Agreement, CSC agrees that neither CSC nor any of its Affiliates will produce, manufacture, distribute, sell, or otherwise handle extracted or purified glucosinolate or isothiocyanate or products containing extracted or purified glucosinolate or isothiocyanate except on behalf of BPP.

          10.6.   <u>Continuing License of BPP Know-How and Trademarks</u>. Upon expiration or termination of the Term pursuant to Section 10.1(i) or (ii), BPP shall grant to CSC a continuing, perpetual sublicense to use the BPP Know-How and a license to use the Trademarks then in existence for the sole and exclusive purpose of manufacturing, selling and marketing the Product. Such license shall be substantially upon the same terms and conditions set forth in this Agreement, except that the royalty to be paid by CSC to BPP as set forth in Section 5.2 hereof shall be reduced to 4% of CSC's Net Sales of Finished Product and 8% of CSC's Net Sales of Ingredient Product.

          10.7.   <u>License of CSC Patents and Know-How</u>. Upon termination of this Agreement, CSC shall grant to BPP a perpetual, royalty-free license, with a right to sublicense, to use and exploit the CSC Patents and Know-How to produce, manufacture, distribute and sell products containing extracted or purified glucosinolate or isothiocyanate.

## ARTICLE 11
## REPRESENTATIONS AND WARRANTIES

          11.1.   <u>Representations and Warranties</u>. Each party represents and warrants to the other party as follows: (i) it has full corporate or limited liability company power and authority and has taken all corporate or limited liability company action necessary to enter into and perform this Agreement; (ii) the execution and performance by it of its obligations hereunder will not constitute a breach of, or conflict with, any of its organizational or constitutional documents, or any agreement, injunction, judgment or other document, by which it is bound; and (iii) this Agreement is its legal, valid and binding obligation, enforceable against it in accordance with the terms and conditions hereof.

          11.2.   <u>CSC</u>. CSC represents and warrants that it has never been and is not currently under investigation by any governmental entity for violation of any Laws or Regulations pertaining to the production, manufacture, distribution or sale of a nutraceutical supplement or any other product intended for human consumption.

14

11.3.  <u>BPP</u>.  BPP represents and warrants to CSC that CSC's use of Trademarks specifically required by BPP (<u>e.g.</u>, on the Labeling or Packaging) will not infringe the rights of any third party.

11.4.  <u>Disclaimer; Limitation on Liability</u>.  (a) BPP DOES NOT MAKE ANY REPRESENTATIONS OR WARRANTIES WITH RESPECT TO THE VALIDITY OF ANY PATENTS OR THAT THE PRACTICE UNDER SUCH PATENTS SHALL BE FREE OF INFRINGEMENT. THE BPP PATENTS AND PATENT RIGHTS ARE PROVIDED "AS IS."

(b)  CSC ACKNOWLEDGES THAT NEITHER BPP NOR JHU MAKES ANY REPRESENTATIONS OR WARRANTIES WITH RESPECT TO THE PERFORMANCE OF THE PRODUCT, INCLUDING WITH RESPECT TO ITS SAFETY, EFFICACY OR COMMERCIAL VIABILITY. BPP DISCLAIMS ALL WARRANTIES WITH REGARD TO THE PRODUCT, EXPRESS OR IMPLIED, INCLUDING, WITHOUT LIMITATION, WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.

(c)  NOTWITHSTANDING ANYTHING TO THE CONTRARY, BPP FURTHER DISCLAIMS ALL LIABILITY FOR DAMAGES OF ANY NATURE WHATSOEVER, INCLUDING DIRECT, SPECIAL, INCIDENTAL, CONSEQUENTIAL OR LOSS OF PROFITS, AND RELATED COSTS (EVEN IF BPP HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES OR COSTS) ARISING OUT OF OR IN CONNECTION WITH THE PRODUCTION, MANUFACTURE, DISTRIBUTION OR SALE OF THE PRODUCT. CSC ASSUMES ALL RESPONSIBILITY AND LIABILITY FOR LOSS OR DAMAGE CAUSED BY THE PRODUCT.

## ARTICLE 12
## INDEMNIFICATION; INSURANCE

12.1.  <u>Indemnification of CSC</u>.  Subject to Section 11.4 above, BPP agrees to defend, and hold CSC, its Affiliates and their respective officers, directors, employees, agents and representatives, harmless from and against any damages, suits, claims, actions, demands, liabilities, expenses or losses, including reasonable legal expenses and attorneys' fees (collectively "**Losses**") arising out of (a) any breach of this Agreement by BPP, (b) any negligent or intentionally wrongful act or omission of BPP or its employees or (c) actions taken by CSC prior to an occurrence of an Event of Default pursuant to BPP's specific written instructions to CSC. The foregoing obligation shall be limited to the extent such Loss arises out of events or circumstances which are subject to CSC's indemnification obligation under Section 12.2 below or to the extent such Loss is primarily caused by the negligence or willful misconduct of CSC or its employees.

12.2.  <u>Indemnification of BPP</u>.  CSC agrees to defend and hold BPP, its Affiliates and their respective officers, directors, employees, agents or representatives, harmless from and against any Losses arising out of (a) any breach of this Agreement by CSC, (b) the negligent or intentionally wrongful act or omission by CSC or its employees or (c) the advertisement, production, manufacture, distribution or sale of the Product. The foregoing

15

obligation shall be limited to the extent such Loss arises out of events or circumstances which are subject to BPP's indemnification obligation under Section 12.1 above, or to the extent such Loss is primarily caused by the negligence or willful misconduct of BPP or its employees.

        12.3.  <u>Indemnification Procedure</u>.  The party requesting indemnification (the "**Indemnitee**") shall notify the other party (the "**Indemnitor**") promptly.  The Indemnitor shall control the defense, investigation or handling of the claim for which indemnification is sought; provided, however, that, with respect to all claims, the Indemnitor shall not settle or consent to judgment without the Indemnitee's approval (not to be unreasonably withheld).  The Indemnitor may settle or consent to judgment on any claim without approval to the extent the settlement or judgment pertains to monetary damages only.  The Indemnitee shall cooperate with the Indemnitor, and may participate, at the Indemnitee's expense, in the defense of such claim.  If the Indemnitor does not assume the defense of such claim within 60 days of notice thereof, the Indemnitee may conduct such defense with counsel of the Indemnitee's choice and may settle such case upon approval by the Indemnitor, not to be unreasonably withheld.

        12.4.  <u>Insurance</u>.  CSC shall maintain insurance during the term of this Agreement with policy limits and coverage as are customary in its business and reasonably adequate to cover all perils customarily protected against in performing its obligations hereunder, including, without limitation, occurrences during the policy.  CSC shall name BPP as an additional insured.  Prior to commencing production or manufacture of the Product, CSC shall furnish BPP with certificates of insurance evidencing the foregoing coverage, which certificates must provide that the insurer will provide 30 days' written notice prior to any cancellation.

**ARTICLE 13**
**CONFIDENTIALITY**

        13.1.  <u>Confidentiality</u>.  During the term of this Agreement and for five (5) years thereafter, each party shall maintain in strict confidence the Confidential Information (as defined below) of the other party.  A party may not use the Confidential Information of the other party for any purpose other than the purposes expressly permitted by this Agreement, and shall not disclose such Confidential Information to any third party (including, without limitation, in connection with any publications, presentations or other disclosures) except those employees who have a need to know such Confidential Information to achieve the purposes of this Agreement and who have entered into an agreement prohibiting further use or disclosure of the information.  Each party shall ensure that any person to whom it discloses the other party's Confidential Information is informed of the confidential nature of and duty not to disclose the information.

        13.2.  <u>Definition</u>.  "**Confidential Information**" of a party means all of such party's proprietary, technical information, marketing information, scientific data, "confidential"-marked or designated information, and all other information which a reasonable person would treat confidentially.  Confidential Information shall not include any information which the receiving party can prove: (a) was known or in the possession of the receiving party prior to the date of its actual receipt from the disclosing party; (b) is readily available to the public other than through any act or omission of the receiving party in breach of this Agreement or any other

16

agreement between the parties; (c) was disclosed by a third party not under an obligation of confidentiality to the disclosing party; or (d) was subsequently independently developed by the receiving party without use of the Confidential Information as demonstrated by competent written records.

## ARTICLE 14
## MISCELLANEOUS

14.1.    <u>Notices</u>. Notices to a party under this Agreement must be in writing and delivered by hand, certified mail postage prepaid and return receipt requested, Federal Express (or other similar reputable overnight carrier) or facsimile (provided that a copy is sent on the same date the facsimile is sent), addressed to the party at the addresses set forth below (or such other address as may be designated by such party by notice pursuant to this section). The notice shall be deemed received on the earlier of (i) the local date of the actual receipt of such notice, or (ii) three (3) business days from the date the notice was sent to the other party.

If to BPP:

Brassica Protection Products LLC
600 East Lombard Street
Fifth Floor, Suite 503
Baltimore, Maryland 21202
Attention: Mr. Antony Talalay
Facsimile No.: (410) 837-9245

with a courtesy copy to:

Bingham McCutchen LLP
399 Park Avenue
New York, New York 10022
Facsimile No.: (212) 702-3625
Attn: Floyd I. Wittlin, Esq.

If to CSC:

Caudill Seed Co., Inc.
1402 W. Main Street
Louisville, Kentucky  40203
Attention:  Mr. Dan Caudill
Facsimile No.:

with a courtesy copy to:

Patrick J. Welsh
Greenebaum Doll & McDonald PLLC
3500 National City Tower
Louisville, Kentucky  40202
Facsimile No.: (502) 540-2228

14.2.    <u>Relationship of the Parties</u>.  The parties are independent principals and neither is an agent, representative, employee, franchisee or joint venturer of the other.  Neither party may make any statements, claims, representations or warranties, or enter into any agreements for or on behalf of the other.  The parties understand and agree that each is an independent principal and not an agent, representative, employee, partner, joint venturer, or franchisor or franchisee of the other in the performance of this Agreement.

14.3.    <u>Assignment</u>.  This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.  CSC may not assign or transfer this Agreement without the prior written consent of BPP.  Any assignment or transfer made without consent shall be void *ab initio*.  For purposes of this Agreement, assignment or transfer includes any assignment, transfer or change of control by a party in connection with the

17

merger, consolidation, or sale of substantially all of the assets or stock of the assigning party, or reorganization affecting substantially all of the assets, stock or voting control of the assigning party relating to the subject matter of this Agreement. Notwithstanding anything contained herein to the contrary, BPP shall not unreasonably withhold its consent to the assignment or transfer of substantially all of the stock or voting control of CSC following the death or Disability of Dan Caudill; provided, however, the reasons that BPP may reasonably withhold its consent include, among others, that the transferee does not have substantial experience in the field of nutraceutical supplements

14.4.    No Waiver; Remedies.  A waiver shall only be effective if set forth in writing and signed by the party charged with such waiver.  No waiver of any breach or failure to perform shall be a waiver of any future breach or failure to perform or of any other provision of this Agreement.  All remedies provided for hereunder shall be cumulative of and in addition to any and all other remedies, at law or in equity, which either party may have, and the exercise of any one or more of such remedies shall not preclude the exercise of any others.  Both parties agree that their remedies at law for enforcement of this Agreement are inadequate and that as such the Agreement may be specifically enforced by either party.

14.5.    Governing Law; Severability.  This Agreement shall be governed by and interpreted in accordance with the laws of the State of New York applicable to agreements made and to be performed entirely within such State.  The parties (i) irrevocably submit to the exclusive jurisdiction of the courts of the State of New York and the United States District Court located in the Borough of Manhattan in New York City; (ii) waive (a) any objection to the laying of venue in any such court, (b) any claims that a proceeding brought in any such court has been brought in an inconvenient forum and (c) any objection that any such court does not have jurisdiction over them; and (iii) irrevocably appoint the Secretary of State of the State of New York to receive service of process in any proceeding brought in any such court.  If a court of competent jurisdiction holds any provision in this Agreement to be invalid, void or unenforceable, then the remainder of this Agreement, or the application of such provision to the parties or to circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby and shall be enforced to the fullest extent permitted by law.  The parties agree to renegotiate any such invalid, void or unenforceable provision in good faith in order to provide a reasonably acceptable alternative consistent with the basic purposes of this Agreement.

14.6.    Entire Agreement.  This Agreement and the Exhibits attached hereto constitute the entire agreement between the parties with respect to the subject matter hereof, and all prior agreements, whether written or oral, are superseded hereby.  This Agreement may be amended only in writing executed by the parties.

14.7.    Equitable Adjustment of Economic Terms.  If a source of either glucosinolate or glucoraphanin that is not covered by the BPP Patents or the BPP Know-How is commercially introduced into the nutritional supplement market and such commercial introduction has a material adverse effect upon the economic benefits derived by CSC under this Agreement, then, the parties shall agree to an equitable adjustment of the economic terms of this Agreement to address the commercial introduction of such alternate source of glucosinolate or glucoraphanin..

18

14.8.    <u>Survival</u>.  The following Sections shall survive termination of this Agreement:  10.4, 10.5, 10.6, 12.1, 12.2, 12.3 and 13.1.

14.9.    <u>Counterparts; Headings</u>.  This Agreement may be executed in any number of counterparts, each of which when so executed shall be deemed to be an original and all of which when taken together shall constitute one and the same instrument. The captions and headings are for convenience of the parties and in no way define the scope of this Agreement.

[Remainder of page intentionally left blank.]

19

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date and year first written above.

**BRASSICA PROTECTION PRODUCTS LLC**

**CAUDILL SEED & WAREHOUSE CO., INC. d/b/a CAUDILL SEED CO.**

By: _____

By: _____

Name: AUTONY TALALAY

Name: S. Dan Caudill

Title: CEO

Title: CEO

EXHIBIT A

LABORATORY SPECS/EQUIPMENT

A-1

**EXHIBIT B**

## SPECIFICATIONS FOR THE PRODUCT

B-1

NYDOCS/1179842.2

Schedule 1.35

## TRADEMARKS

**Pending Applications:**

| Mark/Country | Application Number; Date Filed | Status |
|---|---|---|
| BROCCOSPROUTS (United States) | Appl. No. 75/271,113 Filed: April 4, 1997 | Statement of Use filed on July 31, 2000 |
| SGS (United States) | Appl. No. 75/843,007 Filed: November 8, 1999 | Application pending. |

**Registrations:**

| Mark/Country | Registration Number; Date Registered | Status |
|---|---|---|
| BRASSICA PROTECTION PRODUCTS + DESIGN (United States) | Reg. No. 2,252,002 Reg. Date: June 8, 1999 | Section 8 & 15 Affidavits due on 6/8/2005; Renewal due 6/8/2009 |
| BROCCOSPROUTS (United States) | Reg. No. 2,243,413 Reg. Date: May 4, 1999 | Section 8 & 15 Affidavits due on 5/4/2005; Renewal is due 5/4/2009. |

NYDOCS/1179642.2