LEXSEE

WILBUR SILVERMAN AND CJL INVESTMENT COMPANY, Plaintiffs, v.
NATHAN APTEKAR, Defendant

No. 89 Civ. 2353 (TPG)

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF
NEW YORK

1990 U.S. Dist. LEXIS 10844

August 21, 1990, Decided
August 21, 1990, Filed

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiffs, two partners in a partnership with defendant, filed an action against defendant for alleged improprieties in the management of the partnership. Defendant filed a motion seeking to transfer the action, which was filed in the U.S. District Court for the Southern District of New York, to the Southern District of Texas pursuant to 28 U.S.C.S. § 1404(a). Plaintiffs moved to enjoin a pending Texas state court action.

**OVERVIEW:** The parties were involved in a partnership giving rise to plaintiffs' allegations against defendant for mismanagement of the partnership. The partnership was involved in purchasing real estate but developed financial problems which plaintiffs alleged were due to defendant's mismanagement. Defendant commenced an action in Texas state court. The partnership agreement included a forum selection clause which provided that the partnership agreement would be construed under the laws of the State of New York and that the State of New York would be designated as venue for any and all actions. Plaintiffs filed a motion to enjoin the pending Texas state action while defendant filed a motion seeking to transfer venue to the Southern District of Texas. All of the partnership's transactions took place in Texas. The court granted the motion to transfer venue pursuant to Fed. R. Civ. P. 1404(a), noting that other factors overrode the substantial weight given to the selection of New York as the forum in the partnership agreement. The court denied plaintiffs' motion for an injunction enjoining the Texas

state court action.

**OUTCOME:** The court granted the motion to transfer the action but denied defendant's motion to enjoin a Texas state court action.

LexisNexis(R) Headnotes

Civil Procedure > Venue > Federal Venue Transfers > General Overview
[HN1]See 28 U.S.C.S. § 1404(a).

Civil Procedure > Venue > Federal Venue Transfers > Convenience Transfers
Contracts Law > Contract Conditions & Provisions > Forum Selection Clauses
[HN2]The United States Supreme Court has held that the existence of a forum selection clause does not prevent the court from transferring the action to another district. Though a "significant factor," the Supreme Court noted that the forum-selection clause, which represents the parties' agreement as to the most proper forum, should receive neither dispositive consideration nor no consideration but rather the consideration for which Congress provided in 28 U.S.C.S. § 1404(a).

Civil Procedure > Venue > Federal Venue Transfers > Convenience Transfers
Civil Procedure > Venue > Individual Defendants

1990 U.S. Dist. LEXIS 10844, *

[HN3]28 U.S.C.S. § 1404 allows the court to transfer the case only to a district where "it might have been brought." The transferee forum must have proper venue and jurisdiction over the defendant in the action.

JUDGES: [*1] Thomas P. Griesa, United States District Judge.

OPINION BY: GRIESA

OPINION

*OPINION*

Defendant moves to transfer this action to the Southern District of Texas pursuant to 28 U.S.C. § 1404(a). Plaintiffs oppose the transfer and cross-move to enjoin defendant from proceeding in a related action in Texas state court.

Defendant's initial motion was to dismiss for lack of subject matter and personal jurisdiction and, in the alternative, to transfer. In subsequent moving papers, entitled "Defendant's First Amended Motion," defendant only asserts the transfer issue. Since the jurisdictional motions have been abandoned, the court will only address the transfer application.

Defendant's motion to transfer is granted. Plaintiff's motion for an injunction is denied.

FACTS

This action is brought by two partners against a third partner for alleged improprieties in the management of the partnership.

The partnership, Baythorne Associates, was created in 1978 to purchase, improve and lease real estate in Houston, Texas. The original partners were Morris Silverman, Jonathan and Susanna Levin, and defendant Nathan Aptekar. At some point, Morris Silverman transferred his interest to plaintiff CJL Investment Co., a partnership [*2] in which his three children are partners, and the Levins transferred their interest to their uncle, plaintiff Wilbur Silverman. It should be noted that Wilbur Silverman and Morris Silverman are not related.

Apparently, it was agreed among the original partners that Wilbur Silverman and Morris Silverman would contribute capital to Baythorne to purchase real

estate and that Aptekar would manage the property.

At some point, Morris and Wilbur Silverman loaned Baythorne over $ 1,000,000. With these funds, Aptekar assembled parcels of real estate in Houston, had the partnership purchase the parcels, and supervised the construction of a warehouse on the property. He then managed the warehouse for Baythorne.

Apparently Baythorne ran into financial difficulties. Plaintiffs blame the problems on Aptekar's mismanagement. In contrast, Aptekar claims that adverse economic conditions and Morris Silverman's failure to advance the partnership further funds caused the financial problems.

On April 7, 1989 plaintiffs filed this action. Plaintiffs allege, among other things, that Aptekar 1) failed to keep proper books and records; 2) failed to investigate zoning laws and regulations in Texas; 3) caused [*3] a delay in the conveyance of property; 4) neglected to assemble a large enough parcel of land for the warehouse; 5) engaged in self-dealing; 6) encumbered the property without the consent of the partners; and 7) diverted partnership funds. Plaintiffs seek an accounting, dissolution of the partnership, and damages.

One month earlier, on March 2, 1989, Aptekar had commenced an action in a Texas state court against CJL Investment Co., a plaintiff in the present action, as well as Morris Silverman. In the Texas state court action, Aptekar alleges that following Baythorne's financial difficulties, Morris Silverman unlawfully obtained control of Baythorne's assets and rendered Aptekar's interest in the partnership worthless. It is this state court action that plaintiffs seek to enjoin.

A substantial factual dispute exists over whether Aptekar had signed a partnership agreement that contains a forum selection clause designating New York as the venue for an action arising out of any partnership disputes. As discussed below, the existence of a forum selection agreement is a significant factor in determining whether the court should transfer the action from the allegedly agreed upon venue in [*4] New York to another district. Plaintiffs attach to their motion papers the partnership agreement signed by Aptekar on page seven, the last page. Page six of the agreement includes the following:

This agreement shall be construed and interpreted in

accordance with the laws of the State of New York and the State of New York shall be designated venue for any and all actions interposed by any party hereto. In consideration of the covenants and agreements set forth herein each party hereto consents to the jurisdiction of any local, state, or federal court located within the State of New York . . . .

Aptekar denies having signed a seven-page partnership agreement that included this clause. Aptekar has filed an affidavit stating that he simply signed the signature page, returned it to the other partners, but was never shown the preceding pages. He claims that at some point he had seen the complete partnership agreement and that it was only three pages and did not include a forum selection clause. Aptekar has not produced this three page agreement. Apparently he did not keep a copy of it.

Aptekar's affidavit presents some difficulties. He does not explain when or where he signed the alleged [*5] three page agreement. Moreover, the signature page of the partnership agreement which defendant admits having signed is numbered "-7-" not "-3-." Also, the drafters of the partnership agreement, Lorin Silverman and Wilbur Silverman, both state that the partnership agreement was seven pages long and that it included a forum selection clause. Wilbur Silverman was defendant's attorney at the time.

For purposes of these motions the court will assume that Aptekar signed a partnership agreement which included a forum selection clause designating New York.

DISCUSSION

The legal principles governing a motion to transfer are well known. 28 U.S.C. § 1404(a) provides that:

{HN1}For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought.

Plaintiffs argue that the forum selection clause in favor of New York should be determinative. The court disagrees. {HN2}The Supreme Court has held that the existence of a forum selection clause does not prevent the court from transferring the action to another district. *See Stewart Organization, Inc. v. Ricoh Corp.,* 487 U.S. 22 (1988). [*6] Though a "significant factor," the Supreme Court noted that the "forum-selection clause, which

represents the parties' agreement as to the most proper forum, should receive neither dispositive consideration . . . nor no consideration . . . , but rather the consideration for which Congress provided in § 1404(a)." *Id.* at 29, 31. Therefore, the forum selection clause is one factor, albeit a significant one, which weighs against transferring the action out of New York.

However, in this case, the court holds that other factors override the substantial weight given to the selection in the partnership agreement of a New York forum.

All of the allegations in the complaint concern activities that occurred in Texas. The complaint alleges that Aptekar breached his fiduciary duty by mismanaging the partnership, engaging in self-dealing, encumbering the property without consent, and failing to keep accurate books and records - all in Texas.

Most of the non-party witnesses who are expected to testify about these alleged acts live and work in and around Houston. Gary Kass and Daniel Trevino, Jr. are likely to testify about Aptekar's activity during the purchase of the warehouse property. Also, [*7] Howard Holsenback, a Houston real estate developer, has personal knowledge of how Aptekar managed the warehouse. Individual tenants of the warehouse are also expected to testify. Moreover, Clita Gerhardt, Baythorne's accountant, will testify about Aptekar's management of the partnership's finances. Specifically, she has knowledge of what financial information Aptekar disclosed to or concealed from his other partners. Finally, Stuart Jacobson, a former bank president, is expected to testify about who had knowledge of his bank's lien on the partnership's property. All these witnesses are located in the Houston area.

Plaintiffs state they need to call several New York witnesses. However, of the four potential witnesses named, plaintiffs admit that two will likely appear voluntarily in an action in Texas. The other two are merely rebuttal witnesses to counter the testimony of Aptekar's Texas accountant.

To the extent there is physical evidence, it is in Houston as well. All of the partnership's financial and bank records are there as are public records concerning the purchase and development of the warehouse.

Another factor is that there is already litigation in

Texas about the subject [*8] matter.

The only remaining question is whether the action could have been brought originally in the Southern District of Texas. [HN3]The statute allows the court to transfer the case only to a district where "it might have been brought." The transferee forum must have proper venue and jurisdiction over the defendant in the action. The court finds that it does. Because the present action arises from tortious activities allegedly committed in Texas and because Aptekar is a resident of the Southern District of Texas, the Southern District of Texas is a proper forum for this action.

Finally, as to plaintiff's cross-motion to enjoin the related Texas state court action, the court declines to enjoin Aptekar from proceeding in state court. Such an injunction is prohibited by the Anti-Injunction Act. 28 U.S.C. § 2283. This case does not fall into any of the three narrow exceptions to the general rule prohibiting federal courts from enjoining state court actions. See Lou v. Belzberg, 834 F.2d 730, 739-40 (9th Cir. 1987).

For the reasons discussed above, the action is transferred to the United States District Court for the Southern District of Texas. The motion to enjoin the Texas state court [*9] action is denied.

SO ORDERED.

LEXSEE

MITSUI SUMOTOMO INSURANCE CO., Plaintiff, - against - NIPPON EXPRESS
U.S.A. (ILLINOIS), INC., Defendant.

03 Civ. 2774 (LAK)

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF
NEW YORK

2003 U.S. Dist. LEXIS 15761; 2005 AMC 1651

September 10, 2003, Decided

DISPOSITION:    Defendant's motion to transfer
granted.

CASE SUMMARY:

PROCEDURAL POSTURE: Plaintiff underwriter
brought an action against defendant non-vessel owning
cargo carrier (carrier) for the carrier's alleged failure to
deliver part of a shipment. The carrier brought an action
to transfer pursuant to 28 U.S.C.S. § 1404(a) or, in the
alternative, to dismiss for failure to join indispensable
parties.

OVERVIEW: The underwriter brought an action as the
subrogated cargo underwriter of a shipment of electrical
goods from Japan to Illinois via the carrier for the
carrier's alleged failure to deliver part of the shipment.
The carrier moved to transfer the action to the Northern
District of Illinois pursuant to 28 U.S.C.S. § 1404(a) or,
in the alternative, to dismiss for failure to join
indispensable parties. The court granted the carrier's
motion to transfer, stating that the balance favored
heavily in favor of the carrier. All of the potential
witnesses relating to liability were located in and around
Chicago. None were in the New York area. From the
standpoint of evidence and convenience of proof, there
was no significant case for retaining the action in the
court.

OUTCOME: The court granted the carrier's motion to
transfer.

LexisNexis(R) Headnotes

*Civil Procedure > Venue > Federal Venue Transfers >
Convenience Transfers*
[HN1]Under 28 U.S.C.S. § 1404(a), a district court may
transfer an action to any other district in which the action
might have been brought if the transfer would be in the
interest of justice and serve the convenience of parties
and witnesses. In considering whether a transfer would be
for the convenience of the parties and witnesses and in
the interest of justice, the plaintiff's choice of forum is
entitled to substantial weight and will not be disturbed
lightly. Where, however, the plaintiff is an alien or a
stranger with no connection to the forum, the degree of
deference accorded its choice is diminished. Whatever
the degree of deference, however, considerations
pertinent to assessing the balance of convenience include
(1) the convenience to the parties, (2) the convenience to
the witnesses, (3) the relative ease of access to sources of
proof, (4) the availability of process to compel the
attendance of unwilling witnesses, (5) the cost of
obtaining willing witnesses, (6) the practical problems
indicating where the case can be tried more expeditiously
and inexpensively, and (7) the interests of justice.

COUNSEL: [*1] For Mitsui Sumitomo Insurance Co,
Ltd, PLAINTIFF: Richard F Salz, Barra & Salz, New
York, NY USA.

JUDGES: LEWIS A. KAPLAN, United States District
Judge.

OPINION BY: LEWIS A. KAPLAN

Page 1

Case 1:07-cv-07844-SAS    Document 15-17    Filed 11/20/2007    Page 6 of 45

2003 U.S. Dist. LEXIS 15761, *1; 2005 AMC 1651

OPINION

ORDER

LEWIS A. KAPLAN, *District Judge.*

Plaintiff brings this action as the subrogated cargo underwriter of a shipment of electrical goods from Japan to Bolingbrook, Illinois, via defendant, a non-vessel owning cargo carrier, for defendant's alleged failure to deliver part of the shipment. Defendant Nippon Express U.S.A. (Illinois), Inc. ("Nippon"), moves to transfer the action to the Northern District of Illinois pursuant to 28 U.S.C. § 1404(a) or, in the alternative, to dismiss for failure to join indispensable parties.

*Facts*

Plaintiffs insured, Sony Computer Entertainment America ("Sony"), shipped nine containers of goods from Japan to Bolingbrook under Nippon's way bill number TYUS2738468, which contained a forum clause stating that:

> "Disputes arising under this bill of lading shall be decided in accordance with the law of the United States of America, and no action shall be brought against the carrier except in the United States District Court in New York, [*2] NY USA."

The circumstances of the loss of the container are disputed. This much, however, is clear. Nippon arranged to have Hanjin Shipping Co., Ltd. ("Hanjin"), an ocean carrier, transport the cargo from Japan to Tacoma, Washington, and then inland to Chicago. Hanjin in turn contracted with Norfolk Southern Railway Company to perform the rail carriage from Tacoma to Chicago. It engaged Jam Trucking, Inc. ("Jam") to move the containers from the Chicago rail yard, which was operated by Omni Rail Intermodal, Inc. ("Omni") to Sony in Bolingbrook. The container in question was transported from Japan to Tacoma and thence to the rail yard in Chicago where it was picked up by a trucker who falsely presented himself as an employee of Jam. The imposter then was allowed by Omni to leave the yard with the container.

Following discovery of the loss, the parties engaged

in a race to the courthouse. On April 14, 2003, Nippon brought an action in the Northern District of Illinois against plaintiff, Hanjin, Norfolk, Omni and Jam for a declaratory judgment. As soon as plaintiff learned of the Chicago action, it commenced this suit.

While the parties disagree as to the precise standard that governs [*3] liability in this action, it is perfectly clear that there are no witnesses in or within subpoena range of this district. Certainly anyone with personal knowledge relating to the circumstances of the delivery of the container to the imposter and the imposter's departure from Omni's yard are in or within subpoena range of the Northern District of Illinois.

*Discussion*

[HN1]Under Section 1404(a), a district court may transfer an action to any other district in which the action might have been brought if the transfer would be in the interest of justice and serve the convenience of parties and witnesses. "In considering whether a transfer would be for the convenience of the parties and witnesses and in the interest of justice, 'the plaintiff's choice of forum is entitled to substantial weight and will not be disturbed lightly.'" *Schechter v. Tauck Tours, Inc.,* 17 F. Supp. 2d 255, 260 (S.D.N.Y. 1998) (quoting *Thunder Island, Inc. v. A.G. Sport, Inc.,* 1997 U.S. Dist. LEXIS 14652, No. 97 Civ. 4136(LAK), 1997 WL 599414, at *1 (S.D.N.Y. Sept.26, 1997)). Where, however, the plaintiff is an alien or a stranger with no connection to the forum, the degree of deference accorded its choice is [*4] diminished. *See Guidi v. Inter-Continental Hotels Corp.,* 224 F.3d 142, 145 (2d Cir. 2000); *Capital Currency Exchange, N.V. v. Nat. Westminsterbank, PLC,* 155 F.3d 603, 609 (2d Cir. 1998), *cert. denied,* 526 U.S. 1067, 143 L. Ed. 2d 545, 119 S. Ct. 1459 (1999); *Murray v. British Broadcasting Corp.,* 81 F.3d 287, 289 (2d Cir. 1996); *Revson v. Claire's Stores, Inc.,* 120 F. Supp. 2d 322, 327 (S.D.N.Y. 2000). Whatever the degree of deference, however, considerations pertinent to assessing the balance of convenience "include (1) the convenience to the parties, (2) the convenience to the witnesses, (3) the relative ease of access to sources of proof, (4) the availability of process to compel the attendance of unwilling witnesses, (5) the cost of obtaining willing witnesses, (6) the practical problems indicating where the case can be tried more expeditiously and inexpensively, and (7) the interests of justice." *Schechter,* 17 F. Supp. 2d at 260 (citing *Karvious v. Amer. Kennel Club,* 949 F. Supp. 220,

221 (S.D.N.Y. 1996)).

The parties tacitly acknowledge that this action might have [*5] been brought in the Northern District of Illinois, which is hardly surprising in view of the fact that Nippon is an Illinois corporation and thus subject to personal jurisdiction and venue there. Preliminarily, however, the Court must address the significance of the forum selection clause upon which plaintiff relies in this case.

Clauses such as this certainly are a factor on Section 1404(a) motions. But the Supreme Court has made clear that they "should receive neither dispositive consideration . . . nor no consideration . . ., but rather the consideration for which Congress provided in § 1404(a).". *Stewart Organization, Inc. v. Ricoh Corp.*, 487 U.S. 22, 31, 101 L. Ed. 2d 22, 108 S. Ct. 2239 (1988). In other words, the parties' agreement that New York is the appropriate forum is pertinent but not controlling.

Passing then to the considerations typically controlling on Section 1404(a) motions, it is readily apparent that the balance heavily favors Nippon. Cutting in Mitsui's favor is the fact that its selection of this forum is entitled to deference, despite its foreign incorporation, both because that is the forum the parties chose and because its principal U.S. [*6] claims office is here. Cutting against it, however, is the fact that all of the potential witnesses relating to liability are located in and around Chicago; none is in the New York area. Indeed, from the standpoint of evidence and convenience of proof, there is no significant case for retaining the action here. All of the factors enumerated in *Schechter*, to the extent they are relevant at all, favor transfer save the circumstance that litigation here arguably would be modestly more convenient to plaintiff because its claims office is here. But the overriding consideration, in the Court's view, is which forum better would serve the interests of justice by affording an easier and more accurate means of ascertaining the critical facts. In view of the overwhelming superiority of a Chicago forum from that point of view, the factors favoring plaintiff's choice of this forum readily are overcome. [1]

    [1]   In view of the gamesmanship involved, the Court does not consider the pendency of the Illinois action in resolving this motion.

[*7] *Conclusion*

For the foregoing reasons, defendant's motion is granted to the extent that this action is transferred to the Northern District of Illinois pursuant to 28 U.S.C. § 1404(a).

SO ORDERED.

Dated: September 10, 2003

Lewis A. Kaplan

United States District Judge

LEXSEE



Cited
As of: Nov 20, 2007

KENNETH LIGHT, Plaintiff, -against- RICHARD TAYLOR, Defendant.

05 Civ. 5003 (WHP)

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF
NEW YORK

2007 U.S. Dist. LEXIS 5855; Copy. L. Rep. (CCH) P29,312

January 29, 2007, Decided
January 29, 2007, Filed

COUNSEL: [*1] David B. Rigney, Esq., Law Offices of David B. Rigney, New York, NY, Counsel for Plaintiff.

Brian D. Caplan, Esq., Labaton Sucharow & Rudoff LLP, New York, NY; Paul A. Ledford, Esq., Paul A. Ledford, PLC, Grand Haven, MI, Counsel for Defendant.

JUDGES: William H. Pauley III, U.S.D.J.

OPINION BY: William H. Pauley III

OPINION

WILLIAM H. PAULEY III, District Judge:

Plaintiff Kenneth Light ("Light") brings this copyright infringement action against Defendant Richard Taylor ("Taylor"), alleging that Taylor downloaded, modified and republished Light's copyrighted image of Senator John F. Kerry. Taylor moves to dismiss the Complaint for lack of personal jurisdiction. For the following reasons, Taylor's motion to dismiss is granted.

*BACKGROUND*

Taylor is a Michigan resident. (Affidavit of Richard Taylor, dated Sept. 9, 2005 "Taylor Aff.") P 2.) He has never lived in New York and neither owns property nor holds any bank accounts in the state. (Taylor Aff. PP 2, 11.) Taylor is employed as a marketing agent for a Michigan insurance agency. He also runs a Michigan-based sole proprietorship called Registered Media that engages in parody and satire with a politically conservative bent. [*2] (Taylor Aff. P 4.) Registered Media has a website that is free to the public. (Compl. P 3; Taylor Aff. Ex. 1.) The website, registeredmedia.com, is operated by Taylor out of Michigan and hosted by a company based in Arizona. (Taylor Aff. P 8 & Exs. 4-5.) Taylor posts parodies on the website and provides links to an independent site through which visitors can purchase merchandise exhibiting Taylor's work. In addition, Taylor distributes parodies via e-mail and posts his images on freerepublic.com, a website operated and hosted by companies based in California. (Taylor Aff. PP 6-7 & Exs. 2-3.)

The Complaint alleges that Taylor's website "is national and international in scope and . . . specifically targets and avails itself of the opportunity of transacting business in New York." (Compl. P 3.) The website itself states that Taylor "has created literally thousands of images that have been e-mailed, posted, linked, blogged and printed all over the world from Fox News to Time Magazine." (Compl. P 3.) Both Fox News and Time Magazine are based in New York.

Light, a resident of California, is a freelance
Page 1

documentary photographer who earns revenue by licensing his photographs to various image [*3] archives, many of which are based in New York. (Affidavit of Kenneth Light, dated Nov. 3, 2005. ("Light Aff.") PP 3, 8.) In June 1971, Light photographed John Kerry at a rally in Mineola, New York. (Light Aff. P 4.) In February 2004, as Kerry campaigned for president, Light registered the image with the United States Copyright Office and licensed the image to the Corbis Corporation ("Corbis") for inclusion in its digital image archive. (Compl. P 2; Light Aff. PP 1, 5.) Corbis is based in Seattle, Washington and its website, corbis.com, is hosted by an Idaho company. (Taylor Aff. P 9 & Exs. 6-7.) Once included in the Corbis database, Light's photograph bore a legend stating that it had been copyrighted by Light and Corbis. (Compl. Ex. A.)

Taylor subscribed to Corbis in August 2003. (Compl. P 4; Affidavit of Jeremy Calkins, dated December 6, 2005 ("Calkins Aff.") P 2.) Jeremy Calkins, a Corbis customer service employee, claims that by becoming a Corbis subscriber, Taylor acknowledged and accepted the terms of Corbis' site usage agreement (the "Corbis User Agreement"), including a provision by which subscribers consent to the exclusive jurisdiction of the State and Federal Courts [*4] of New York for the resolution of any disputes relating to their subscriber agreements. (Calkins Aff. P 2.) However, neither Light nor Calkins has produced a copy of Taylor's registration form with Corbis, or the version of the Corbis User Agreement that Taylor allegedly acknowledged. (Calkins Aff. Ex. A.)

After Corbis included Light's photograph in its database, Taylor downloaded a thumbnail copy of the image from corbis.com, removed the copyright notice and merged the image with a photograph of Jane Fonda. (Compl. P 4 & Ex. B; Taylor Aff. P 9; Calkins Aff. P 3.) The composite image inaccurately depicts John Kerry and Jane Fonda appearing together at the Mineola rally. (Comp. Ex. B.) Taylor then altered the copyright legend and attributed the photo to the Associated Press. (Compl. P 4, Ex. B.) Taylor posted the doctored image on registeredmedia.com and freerepublic.com, although the image only appeared on the latter website for two hours. (Compl. P 5; Taylor Aff. P 13.) Taylor did not distribute the image through his subscriber e-mail list. (Reply Affidavit of Jonathan Ross, dated December 14, 2005 Ex. 2.) The Complaint alleges that Taylor posted the image to the websites [*5] "with the knowledge, intent and expectation that the false composite image would be accessed and published by major print and television media 'all over the world,' and particularly in national media based in New York." (Compl. P 5.) Indeed, other websites and media outlets, including those based in New York, reproduced the image and incorrectly represented that it was an accurate image of John Kerry and Jane Fonda appearing together. (Compl. P 5; Light Aff. P 7.)

Taylor represents that he "neither received nor requested any compensation for the creation, publication or distribution of the derivative image of which Plaintiff complains." (Taylor Aff. P 12.) Light attests that Taylor's actions have "effectively destroyed the integrity, identity and any commercial market for the Kerry image, both in New York and nationally, since in the public's mind the original image has been superseded by, and completely confused with, the false, composite creation of the defendant." (Light Aff. P 7.)

## DISCUSSION

On a motion to dismiss for lack of personal jurisdiction, the plaintiff bears the burden of establishing the court's jurisdiction over the defendant. *Kernan v. Kurz-Hastings, Inc.*, 175 F.3d 236, 240 (2d Cir. 1999). [*6] "Where a court has chosen not to conduct a full-blown evidentiary hearing on the motion, the plaintiff need make only a *prima facie* showing of jurisdiction through its own affidavits and supporting materials." *Grand River Enters. Six Nations, Ltd. v. Pryor*, 425 F.3d 158, 165 (2d Cir. 2005) (internal quotations and citations omitted). The Court must "view all the allegations in the light most favorable to [the] plaintiff[] and resolve all doubts in plaintiff['s] favor." *Schultz v. Ocean Classroom Found., Inc.*, No. 01 Civ. 7487 (DAB), 2004 U.S. Dist. LEXIS 3903, 2004 WL 488322, at *3 (S.D.N.Y. Mar. 15, 2004) (internal quotations and citations omitted).

District courts must look to the law of the forum state to determine whether the court has jurisdiction over a non-domiciliary defendant. *Bensusan Rest. Corp. v. King*, 126 F.3d 25, 27 (2d Cir. 1997). The court must conduct a two-part inquiry: "First, it must determine whether the plaintiff has shown that the defendant is amenable to service of process under the forum state's laws; and second, it must assess whether the court's assertion of jurisdiction under these laws comports with the requirements of due process. [*7] " *Metro. Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 567 (2d Cir. 1996).

Light argues that this Court has personal jurisdiction over Taylor under N.Y. C.P.L.R. §§ 302(a)(1) and 302(a)(3)(ii), as well as the forum selection clause in the Corbis subscriber agreement.

*I. C.P.L.R. 302(a)(1)*

N.Y. C.P.L.R. § 302(a)(1) confers jurisdiction over a non-domiciliary defendant if he "transacts any business within the state or contracts anywhere to supply goods or services in the state." "A nondomiciliary 'transacts business' under [C.P.L.R. § ] 302(a)(1) when he purposefully avails [himself] of the privilege of conducting activities within [New York], thus invoking the benefits and protections of its laws." *CutCo Indus., Inc. v. Naughton*, 806 F.2d 361, 365 (2d Cir. 1986) (internal citations and quotation marks omitted). New York courts look to the "totality of the circumstances" to determine whether this standard is met, but even a single transaction of business may be sufficient. However, for section 302(a)(1) to apply, the cause of action must arise "out of the subject matter of the business transacted" within New York. *Viacom Int'l, Inc. v. Melvin Simon Prods.*, 774 F. Supp. 858, 862 (S.D.N.Y. 1991); [*8] *see also Citigroup Inc. v. City Holding Co.*, 97 F. Supp. 2d 549, 564 (S.D.N.Y. 2000) ("[C.P.L.R. § 302(a)(1)] requires a strong nexus between the plaintiff's cause of action and the defendant's in state conduct.") (internal quotations omitted).

Maintaining a website that may be accessed by residents of New York is by itself insufficient to confer personal jurisdiction. *See Bensusan*, 126 F.3d at 29. However, certain internet activity may satisfy the prerequisites of C.P.L.R. § 302(a)(1); the analysis depends on the degree of interactivity in the defendant's internet use. As Judge Sweet has summarized:

> At one end [of the spectrum] are cases where the defendant makes information available on what is essentially a "passive" web site. This use of the internet has been analogized to an advertisement in a nationally-available magazine or newspaper, and does not without more justify the exercise of jurisdiction over the defendant. At the other end of the spectrum are cases in which the defendant clearly does business over the Internet, such as where it knowingly and repeatedly

transmits computer files to other states. Finally, occupying [*9] the middle ground are cases in which the defendant maintains an interactive web site which permits the exchange of information between users in another state and the defendant, which depending on the level and nature of the exchange may be a basis for jurisdiction.

*Citigroup*, 97 F. Supp. 2d at 565 (citations omitted).

Light argues that Taylor is subject to the personal jurisdiction of this Court for two reasons: First, because his website seeks to attract New York customers for his consulting business and provides opportunities to e-mail him; and second, because Taylor regularly sends e-mails to his New York subscribers. Each of these arguments is without merit.

Light's first argument fails because he did not allegedly do anything with the Kerry-Fonda image other than post it to two websites. Merely posting information on a website is an inherently passive act, which "has been analogized to an advertisement in a nationally-available magazine or newspaper, and does not without more justify the exercise of jurisdiction over the defendant." *Citigroup*, 97 F. Supp. 2d at 565; *see also Suge Realty Corp. v. Bernhart Interests, Ltd.*, No. 02 Civ. 0725 (LAK), 2002 U.S. Dist. LEXIS 6691, 2002 WL 603035, at *2 (S.D.N.Y. Apr. 18, 2002) [*10] (posting of information on a website insufficient to confer jurisdiction under C.P.L.R. § 302(a)(1)). Accordingly, posting the Kerry-Fonda image to two websites is by itself insufficient to establish personal jurisdiction over Taylor.

Light's second argument fails because the Complaint does not allege that the Kerry-Fonda image was distributed via e-mail. As noted, the cause of action must arise "out of the subject matter of the business transacted within New York" to constitute a basis for jurisdiction under C.P.L.R. § 302(a)(1). *Viacom*, 774 F. Supp. at 862; *see also Citigroup*, 97 F. Supp. 2d at 564. Because there is no allegation of an e-mail distribution of the Kerry-Fonda image to a recipient in New York, C.P.L.R. § 302(a)(1) does not provide a basis for personal jurisdiction over Taylor. This is so regardless of whether Taylor had subscribers in New York who received other e-mails from him.

Page 3

## II. C.P.L.R. 302(a)(3)(ii)

N.Y. C.P.L.R. § 302(a)(3)(ii) confers jurisdiction over a non-domiciliary defendant if "he commits a tortious act without the state causing injury to person or property within [*11] the state . . . if he . . . expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce." Thus, to establish this Court's personal jurisdiction over Taylor, Light must show two things: first, that Taylor caused him a foreseeable injury in New York; and second, that Taylor derives substantial revenue from interstate commerce. This Court need not decide the issue of foreseeable injury because Light has not established the second prerequisite of jurisdiction under C.P.L.R. § 302(a)(3)(ii) -- i.e., a showing that Taylor derives substantial revenue from interstate commerce.

There is no specific dollar threshold at which revenue becomes "substantial" for purposes of C.P.L.R. § 302(a)(3)(ii). Instead, courts look either to the percentage of a party's overall revenue derived from interstate commerce, or to the absolute amount of revenue generated by a party's activities in interstate commerce. Neither approach is binding on the court, as each case must be decided based on its own set of facts. *Parienta v. Scott Meredith Literary Agency, Inc.*, No. 90 Civ. 0547 (PKL), 1991 U.S. Dist. LEXIS 1607, 1991 WL 19857, at *4 (S.D.N.Y. Feb. 11, 1991) [*12] ; *Ronar, Inc. v. Wallace*, 649 F. Supp. 310, 316-17 (S.D.N.Y. 1986). Irrespective of the approach chosen, the main concern is the "overall nature of the defendant's business and the extent to which he can fairly be expected to defend lawsuits in foreign forums." *Parienta*, 1991 U.S. Dist. LEXIS 1607, [WL], at *6; *see also Barricade Books, Inc. v. Langberg*, 95 Civ. 8906 (NRB), 2000 U.S. Dist. LEXIS 18279, 2000 WL 1863764, at *6 (S.D.N.Y. Dec. 19, 2000).

Light contends that Taylor earns substantial revenue from interstate commerce because he receives commissions on products sold through his website on cafepress.com. [1] However, in the five years prior to the filing of the instant motion Taylor earned only $ 336 in commissions on total sales of $ 1,523. (Affirmation of David B. Rigney, dated December 7, 2005 Ex. C.) Although Taylor's total revenue during the relevant five-year period is not before the Court, there can be little doubt that $ 336 represents a *de minimis* percentage, as

well as a miniscule amount in absolute terms. Accordingly, this Court finds that Taylor does not earn substantial revenue from interstate commerce sufficient to confer jurisdiction [*13] under C.P.L.R. § 302(a)(3)(ii). *See Cortlandt Racquet Club v. Oy Saunatec, Ltd.*, 978 F. Supp. 520, 528 (S.D.N.Y. 1997) (holding $ 358,000 in revenue over a five-year period was not "substantial" in absolute terms for purposes of C.P.L.R. § 302(a)(3)(ii)); *Ronar*, 649 F. Supp. at 317 (holding same with respect to annual revenue of $ 6,500).

> 1   Apparently, Taylor also earns commissions from Google Advertising each time a visitor to his website clicks on one of the posted advertisements. However, Taylor has not disclosed the amount of such revenue and Light does not contend that it is "substantial" for purposes of C.P.L.R. § 302(a)(3)(ii). (Tr. at 15:10-24.)

## III. Forum Selection Clause

Light contends that he is a third-party beneficiary of the Corbis User Agreement who can invoke its forum selection clause. [2] Taylor argues that the Corbis User Agreement does not apply to copyright disputes, and that in any event, Light is not a third-party beneficiary.

> 2   Viewing the facts in the light most favorable to Plaintiff, this Court assumes for purposes of the instant motion that Taylor entered into a Corbis User Agreement with a forum selection clause identical to the one that has been presented to the Court.

[*14]   The Second Circuit adheres to a broad policy in favor of enforcing contractual forum selection clauses. *See, e.g., Bense v. Interstate Battery Sys.*, 683 F.2d 718, 721-22 (2d Cir. 1982); *Dan-Dee Int'l, Ltd. v. Kmart Corp.*, No. 99 Civ. 11689 (DC), 2000 U.S. Dist. LEXIS 13411, 2000 WL 1346865, at *5 (S.D.N.Y. Sept. 19, 2000) (citing cases). However, this general rule can be overcome if the forum selection clause does not encompass the claims at issue, *see, e.g., Roby v. Corp. of Lloyd's*, 996 F.2d 1353, 1361 (2d Cir. 1993); *Direct Mail Prod. Servs. v. MBNA Corp.*, No. 99 Civ. 10550 (SHS), 2000 U.S. Dist. LEXIS 12945, 2000 WL 1277597, at *5-6 (S.D.N.Y. Sept. 7, 2000), or if the underlying suit does not arise out of the contract containing the clause, *see, e.g., Corcovado Music Corp. v. Hollis Music, Inc.*, 981 F.2d 679, 681-82 (2d Cir. 1993); *Bense*, 683 F.2d at

Page 4

720; Cheever v. Academy Chicago, Ltd., 685 F. Supp. 914, 917 (S.D.N.Y. 1998); Dan-dee 2000 U.S. Dist. LEXIS 13411, [WL], at *5. The Court considers each of these issues in turn.

## A. Breadth of the Forum Selection Clause

The determination of whether a forum selection [*15] clause encompasses specific claims depends on the language of the clause. Roby, 996 F.2d at 1361. When a forum selection clause is worded broadly, the clause may apply to actions not directly related to a breach of the underlying contract. See Bense, 683 F.2d at 720 (holding that a forum selection clause stating it applied to "any suits or causes of action arising directly or indirectly from this agreement" encompassed an anti-trust claim where the defendant allegedly terminated the contract because plaintiff refused to take part in price-fixing; Roby, 996 F.2d at 1361 (finding that a forum selection clause stating that it applied to all claims "arising out of" the contract was applicable not only to a breach of contract action, but also to related securities and antitrust claims). Alternatively, when a clause is worded narrowly, the forum selection clause applies only to disputes directly concerning the underlying contract. See Bon Jour Group v. Elan-Polo, Inc., No. 96 Civ. 6705 (PKL), 1997 U.S. Dist. LEXIS 10283, 1997 WL 401814, at *2 (S.D.N.Y. July, 16 1997) (holding that a forum selection clause stating it applied to "litigation between [*16] the parties concerning the alleged breach of this Agreement . . . ." encompassed only plaintiff's breach of contract claim and not a related fraud claim).

The forum selection clause in the Corbis Usage Agreement provides, in relevant part: "Any dispute regarding this Agreement shall be governed by the laws of the State of New York . . . . The parties agree to accept the exclusive jurisdiction of the state and federal courts located in New York, USA." (Calkins Affidavit, Ex. D at 4). The language of the clause is thus similar to the language in Bon Jour Group, in that it applies only to "litigation . . . concerning . . . this Agreement." Such

language is narrow in focus and does not encompass independent copyright claims.

## B. Nature of the Underlying Claims

Similarly, Light's claims in this action do not arise out of the Corbis User Agreement. The Corbis User Agreement is merely a site usage agreement, and the Complaint does not allege that Taylor violated it, much less seek damages for any violation. Rather, the Complaint alleges that Taylor violated United States copyright law. (Complaint PP 6-8). Accordingly, Light's copyright claim in this action cannot be said to arise [*17] under the Corbis User Agreement. See Corcavado, 981 F.2d at 682 (refusing to enforce a forum selection clause on the ground that the plaintiff had sued for copyright infringement and had not alleged breach of contract); Cheever, 690 F. Supp. at 285 (refusing to enforce a forum selection clause where the rights asserted arose from copyright law and not from the contract); Dan-dee int'l, 2000 U.S. Dist. LEXIS 13411, [WL] at *5 (holding that a forum selection clause did not encompass a copyright action where the plaintiff sought monetary and injunctive relief under federal statutes, as opposed to damages for breach of contract).

Because Light's claims do not arise under the Corbis User Agreement, this Court need not determine whether Light was a third-party beneficiary of that Agreement.

## CONCLUSION

For the foregoing reasons, Taylor's motion to dismiss is granted. The Clerk of Court is directed to mark this case closed.

Dated: January 29, 2007

New York, New York

SO ORDERED:

William H. Pauley III, U.S.D.J.

LEXSEE



Cited
As of: Oct 26, 2007

CUNO, INC. and MOSHE GERSHENSON, Plaintiffs, -against- HAYWARD
INDUSTRIAL PRODUCTS, INC., Defendant.

03 Civ. 3076 (MBM)

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF
NEW YORK

2005 U.S. Dist. LEXIS 8886

May 11, 2005, Decided
May 10, 2005, Filed

DISPOSITION:    [*1] Motion to transfer granted.

CASE SUMMARY:

PROCEDURAL POSTURE: Plaintiffs, an inventor and
licensee, sued defendant company alleging patent
infringement on two patents owned by the inventor and
licensed to the licensee. The company moved to dismiss
on the basis of a forum selection clause pursuant to Fed.
R. Civ. P. 12(b)(3), or alternatively, to transfer the action
to the District of New Jersey pursuant to 28 U.S.C.S. §
1404(a).

OVERVIEW: The inventor designed and developed
filters and filter products. After the inventor's
employment was terminated at another business he
continued to work on filter designs and eventually
developed a novel filter element assembly. The inventor
worked as an independent consultant and eventually as an
employee for the company. The inventor stopped
working for the company after he obtained a patent for
his designs. The court found that disputed questions of
fact existed as to whether the inventor conceived or
developed the designs underlying the patents before or
after execution of the non-disclosure agreement and the
agreement manifested the parties' intent that such

disputes should be resolved in New Jersey. The forum
selection clause was enforceable against the licensee
because its rights were derivative of and dependent on the
inventor's rights under the agreement. Transfer was the
sensible option for enforcement of the forum selection
clause because the company was headquartered in New
Jersey and the inventor had worked in New Jersey for
over 30 years. Plaintiffs failed to show that enforcement
would be unreasonable and unjust.

OUTCOME: The company's motion to transfer was
granted.

LexisNexis(R) Headnotes

*Contracts Law > Breach > General Overview*
*Contracts Law > Contract Conditions & Provisions >*
*Forum Selection Clauses*
*Contracts Law > Contract Interpretation > General*
*Overview*
[HN1]A forum selection clause should not be defeated by
artful pleading of claims not based on the contract
containing the clause if those claims grow out of the
contractual relationship, or if "the gist" of those claims is
a breach of that relationship. Where the relationship

2005 U.S. Dist. LEXIS 8886, *1

between the parties is contractual, the pleading of alternative non-contractual theories of liability should not prevent enforcement of such a bargain as to the appropriate forum for litigation. The rule has been extended to tort and other claims that ultimately depend on the existence of a contractual relationship between the parties, or if resolution of the claims relates to interpretation of the contract, or if the claims involve the same operative facts as a parallel claim for breach of contract. Regardless of the differences in terminology, one common thread running through these various formulations is the inquiry whether the plaintiff's claims depend on rights and duties that must be analyzed by reference to the contractual relationship.

*Contracts Law > Contract Conditions & Provisions > Forum Selection Clauses*
[HN2]Where a forum selection clause is written broadly claims beyond those alleging breaches of the contract that contains the clause are covered.

*Contracts Law > Contract Conditions & Provisions > Forum Selection Clauses*
*Copyright Law > Conveyances > Licenses > General Overview*
*Patent Law > Jurisdiction & Review > Subject Matter Jurisdiction > Appeals*
[HN3]The United States Court of Appeals for the Federal Circuit holds that a forum selection clause in a licensing agreement applies to an action for breach of contract masquerading as patent infringement.

*Contracts Law > Contract Conditions & Provisions > Forum Selection Clauses*
[HN4]It is well established that a range of transaction participants, parties and non-parties, should benefit from and be subject to forum selection clauses. In order to bind a non-party to a forum selection clause, the party must be "closely related" to the dispute such that it becomes "foreseeable" that it will be bound. A non-party is "closely related" to a dispute if its interests are "completely derivative" of and directly related to, if not predicated upon the signatory party's interests or conduct.

*Civil Procedure > Venue > Federal Venue Transfers > General Overview*
*Contracts Law > Contract Conditions & Provisions >*

*Forum Selection Clauses*
[HN5]In determining whether to dismiss or transfer a case, the court must weigh which is the more efficient and just means of enforcing the forum selection clause. Where a forum selection clause allows such a choice, courts in the Southern District of New York have dismissed the case in lieu of transfer.

*Civil Procedure > Jurisdiction > Subject Matter Jurisdiction > Jurisdiction Over Actions > Exclusive Jurisdiction*
*Copyright Law > Civil Infringement Actions > Jurisdiction & Venue > General Overview*
*Patent Law > Jurisdiction & Review > Subject Matter Jurisdiction > General Overview*
[HN6]Federal claims for patent infringement lie within the exclusive jurisdiction of the federal courts. 28 U.S.C.S. § 1338(a).

*Civil Procedure > Venue > Individual Defendants*
*Copyright Law > Civil Infringement Actions > Jurisdiction & Venue > General Overview*
*Patent Law > Jurisdiction & Review > Personal Jurisdiction & Venue > Place of Business & Residence*
[HN7]28 U.S.C.S. § 1400(b) states that federal patent infringement claims may be brought in the judicial district where the defendant resides, or where the defendant has committed acts of infringement and has a regular and established place of business.

*Civil Procedure > Venue > Federal Venue Transfers > General Overview*
[HN8]See 28 U.S.C.S. § 1404(a).

*Civil Procedure > Venue > Federal Venue Transfers > Convenience Transfers*
*Contracts Law > Contract Conditions & Provisions > Forum Selection Clauses*
*Contracts Law > Defenses > Fraud & Misrepresentation > General Overview*
[HN9]In the context of 28 U.S.C.S. § 1404(a), the general rule is that forum selection clauses are enforced, unless it can be shown that enforcement would be unreasonable and unjust, or that the clause is otherwise invalid for such reasons as fraud or overreaching. Also, once a mandatory forum selection clause is deemed valid, the burden shifts to the plaintiff to demonstrate exceptional facts

2005 U.S. Dist. LEXIS 8886, *1

explaining why he should be relieved from his contractual duty.

COUNSEL: ARTHUR DRESNER, ESQ., (Attorney for Plaintiffs), REED SMITH LLP, New York, NY.

THOMAS J. GOODWIN, ESQ., WILLIAM J. HELLER, ESQ., (Attorneys for Defendant), MCCARTER & ENGLISH LLP, New York, NY.

JUDGES: Michael B. Mukasey, U.S. District Judge.

OPINION BY: Michael B. Mukasey

OPINION

OPINION AND ORDER

MICHAEL B. MUKASEY, U.S.D.J.

Plaintiffs Moshe Gershenson ("Gershenson") and Cuno Incorporated ("Cuno") sues Hayward Industrial Products, Inc. ("Hayward") for infringement of two patents allegedly owned by Gershenson and licensed to Cuno. Hayward moves to dismiss on the basis of a forum selection clause pursuant to Fed. R. Civ. P. 12(b)(3) or alternatively, to transfer the action to the United States District Court for the District of New Jersey pursuant to 28 U.S.C. § 1404(a) (2000). [1] For the reasons set forth below, the motion to transfer is granted.

> 1  It is not clear which rule governs motions to dismiss based on enforcement of a forum selection clause. The Second Circuit has left the question open because "there is no existing mechanism with which forum selection enforcement is a perfect fit." *New Moon Shipping Co. v. Man B&W Diesel AG*, 121 F.3d 24, 29 (2d Cir. 1997) (recounting that such motions have been analyzed under Rules 12(b)(1) (for lack of subject matter jurisdiction), 12(b)(3) (for improper venue), and 12(b)(6) (for failure to state a claim)). Plaintiffs do not contest this procedural issue. Because they submit materials outside the pleadings, I treat Hayward's motion to dismiss based on the forum selection clause under Rule 12(b)(3). *See Jockey Int'l, Inc. v. M/V "Leverkusen Express"*, 217 F. Supp. 2d 447, 450-51 (S.D.N.Y. 2002); *J. B. Harris, Inc. v. Razei Bar Indus., Ltd.*, 37 F. Supp. 2d 186, 188 (E.D.N.Y. 1998) (considering motion under Rule 12(b)(3) based on

weight of authority and fact that Second Circuit in *New Moon Shipping* considered materials beyond the pleadings, which is allowed under Rule 12(b)(3)).

[*2] I.

The following relevant facts are either undisputed or presented in the light most favorable to plaintiffs.

From 1969 to 1977, Gershenson worked for GAF Corporation ("GAF") as a mechanical engineer. (Declaration of Moshe Gershenson ("Gershenson Decl.") P2) In that capacity, Gershenson was responsible for the design and development of, among other things, filters and filter products. (*Id.* P3) On January 31, 1997, GAF terminated Gershenson's employment. (*Id.* P5) Gershenson continued working on filter designs by himself and eventually developed a novel filter element assembly for use in liquid filtration systems. (*Id.* P6; Declaration of Robert Davis ("Davis Decl.") P4)

Gershenson then approached Hayward's President, Robert Davis, about the possibility of performing consulting services for Hayward. (*Id.* P9) Hayward is a New Jersey corporation that manufactures and sells filtration devices in the United States. (Compl. P4) Hayward was eager to hire Gershenson as an employee, but Gershenson preferred to begin as a consultant. (Gershenson Decl. P9)

Hayward's Director of Engineering, Walter Booth, asked Gershenson to sign a non-disclosure agreement in connection with [*3] his consulting work for the company. (*Id.* P10) In reviewing the agreement, Gershenson was concerned about language stating that he would be an employee, rather than a consultant, to Hayward. (*Id.* P11) He thus wrote the words "Moshe Gershenson, consultant" in a blank field intended to designate his workplace. (*Id.*) Gershenson was concerned also about language in the agreement assigning his intellectual property rights to Hayward. (*Id.*) He claims that in particular, he wanted to protect his rights in the filter element assembly he had conceived before he tendered his consulting services. (*Id.*)

On the other hand, Davis was concerned that the filter design "had been developed by [Gershenson] during the course of his employment with GAF [] and that GAF [] may have the rights to the invention." (Declaration of Robert Davis in Further Supp. of Hayward's Mot. to

Page 3

Dismiss ("Second Davis Decl.") P3) Gershenson replied that although he had conceived the design while he was employed at GAF, he developed it "on his own time." (*Id.* P4) "Having no reason to question the veracity of Mr. Gershenson's statement," Davis signed the agreement. (*Id.* P5)

The executed [*4] copy of the non-disclosure agreement, dated February 10, 1997, provided, in relevant part:

> 3. [Gershenson] hereby agrees to assign to the Corporation the entire right, title and interest in and to any and all inventions, trade secrets, improvements, plans and specifications: (i) which he/she alone, or in conjunction with others, may make, conceive or develop; and (ii) which relate to or derive from any subject matter or problem with respect to which the undersigned shall have become informed by reason of his/her relations with the Corporation or any Affiliate, or to any product or process involved in the business of the Corporation or any Affiliate.
>
> . . .
>
> 11. Any actions, claims or lawsuits (whether in law or equity) arising out of or relating to this contract, shall be brought only in courts located in the State of New Jersey and shall be governed *and enforced* by the laws of the State of New Jersey. New Jersey shall be the sole and exclusive forum for the resolution of all disputes arising under or relating to this Agreement. The employee hereby consents to the jurisdiction of the State and/or Federal District Courts of New Jersey.

(2/10/97 Non-disclosure [*5] Agreement, Gershenson Decl. Ex. 1 (hereinafter, the "Non-disclosure Agreement")) (emphasis in original) A separate rider, signed by Hayward and Gershenson and also dated February 10, 1997, provided as follows:

> Paragraph 3 of the Non Disclosure Agreement is modified to add the

following language:

> However it is understood and agreed that, as to any ideas for inventions, trade secrets, improvements, plans and specifications which have been entirely conceived (though not yet reduced to prototype) prior to his employment with Hayward, [Gershenson] shall retain the right to any such inventions, trade secrets, improvements, plans and specifications.

(Rider to Non-disclosure Agreement ("Rider"), Gershenson Decl. Ex. 1)

Gershenson worked as a consultant to Hayward until January 1, 1998, when he became a full-time employee of the company. (Gershenson Decl. P13)

On September 2, 1997, while working as a consultant to Hayward and after signing the Non-disclosure Agreement, Gershenson filed a provisional patent application for the filter design. (*Id.* P14; Davis Decl. P7; Ex. A to Declaration of Sanjiv Chokshi ("Chokshi Decl.")) After filing the application, Gershenson [*6] discussed with Davis the possibility that Hayward would manufacture and sell the filter element assembly. (Gershenson Decl. P14) However, before disclosing the details of the design to Hayward, Gershenson asked the company to sign a letter agreement. (*Id.* P15) Davis signed the agreement and dated it September 5, 1997 (9/5/97 Letter Agreement, Gershenson Decl. Ex. 2 (hereinafter, the "September 1997 Agreement")). The September 1997 Agreement stated that Gershenson

> would like to disclose the features and advantages of my invention to [Hayward] solely for [its] evaluation and consideration of a possible business arrangement between us that would provide [Hayward] the opportunity and rights to make and sell this filter element assembly.

(*Id.*) It further provided that, "as a condition of [Gershenson's] disclosing the confidential details of [his] invention to [Hayward], and in consideration of the opportunity for [Hayward] to make such evaluation. . . . the information shall not be used by [Hayward] except

Page 4

for the purpose described above." (*Id.*) When Davis signed the September 1997 Letter Agreement, he stated that Hayward would evaluate the new [*7] filter design and inform Gershenson if the company wanted to acquire the right to market it. (Gershenson Decl. P18)

In October 1999, Hayward purchased all outstanding stock of GAF's subsidiaries involved in the business of "certain liquid filtration systems." (Second Davis Decl. P2)

On February 29, 2000, the United States Patent and Trademark Office ("USPTO") awarded Gershenson Patent Number 6,030,531, entitled Filter Element Assembly (the "'531 Patent"). (Compl. P8; Gershenson Decl. P18) The '531 Patent evolved from the provisional patent application that Gershenson had filed on September 2, 1997. (Chokshi Decl. P2; U.S. Patent Number 6,030,531, Compl. Ex. A at 1) Gershenson gave Davis a copy of the '531 Patent and asked him whether Hayward had any interest in the new filter design. (Gershenson Decl. P19) Almost one year later, Davis sent Gershenson a letter agreement, dated January 29, 2001, which made reference to an earlier proposal by Hayward to "continue the financial support of completing the current in-process work for the development of your filter bag design U.S. Patent Number 6,030,531." (1/29/01 Letter Agreement, Gershenson Decl. Ex. 3 (hereinafter "January 2001 Agreement") [*8] at 1; Gershenson Decl. P20) The January 2001 Agreement contained various details about Hayward's efforts to help develop Gershenson's filter element assembly. (January 2001 Agreement at 1-2) It further stated:

> On or about April 1, 2001, Hayward [] will have reached a conclusion of considering the pursuit of fully marketing this product as a Hayward [] product.

> Should Hayward [] decide to market this product as a Hayward product, a licensing agreement allowing Hayward to produce and sell this product will be submitted to you for your approval.

(*Id.*) Hayward and Gershenson never entered into "any agreement under which Hayward would be allowed to produce and sell [the] filter design." (Gershenson Decl. P22)

On May 29, 2001, the USPTO awarded Gershenson Patent Number 6,238,560, entitled "Collapsible Filter Assembly" (the "'560 Patent"). The '560 Patent, like the '531 Patent, evolved from the provisional patent application that Gershenson filed on September 2, 1997. (Compl. PP8, 9; Chokshi Decl. P2; U.S. Patent Number 6,238,560, Compl. Ex. B, at 1)

Plaintiffs claim that Cuno, a Connecticut corporation that designs, manufactures, and markets filtration [*9] products, is the exclusive licensee of the disputed patents. (Compl. PP2, 10) Gershenson believes "that Hayward has a manufacturing facility for the infringing product in North Carolina." (Gershenson Decl. P23)

On May 1, 2003, Gershenson and Cuno sued Hayward for patent infringement, alleging that Hayward "is making, using, offering to sell and/or selling . . . filtration products, including but not limited to the HayFlow(R) Filtration System" that infringe their rights in the '531 and '560 Patents. (Compl. P12) They seek damages and injunctive relief.

II.

Hayward moves to dismiss based on enforcement of the forum selection clause contained in the Non-disclosure Agreement. [2] Plaintiffs argue that the forum selection clause is inapplicable because: (1) their claims are purely for patent infringement and do not arise out of the Non-disclosure Agreement; and (2) Hayward proffers no evidence that it owns the disputed patents.

> [2]  On its face, the forum selection clause is mandatory rather than permissive; the language plainly states "'the parties' intent to make jurisdiction exclusive.'" *John Boutari & Son v. Attiki Importers*, 22 F.3d 51, 52-53 (2d Cir. 1994) (quoting *Docksider, Ltd. v. Sea Tech., Ltd.*, 875 F.2d 762, 764 (9th Cir. 1989)). Therefore, if the clause is found to encompass the claims in this action, the claims must be dismissed under Rule 12(b)(3) absent a clear showing from plaintiffs that "enforcement would be unreasonable and unjust, or that the clause [is] invalid for such reasons as fraud or overreaching." *M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 15, 32 L. Ed. 2d 513, 92 S. Ct. 1907 (1972); *see New Moon Shipping Co. v. MAN B&W Diesel AG*, 121 F.3d 24, 29 (2d Cir. 1997). Plaintiffs do not challenge the reasonableness, fairness, or validity of the forum selection clause.

[*10] At this stage, the critical issue between the parties is whether Gershenson conveyed, intentionally or otherwise, the rights to what eventually became the '531 and '560 Patents. Because the invention "was a work of progress from its initial inception . . . to the filing date of the Final Application on July 14, 1998," Hayward contends that "it is not possible that Gershenson could have 'conceived of and perfected' the invention prior to executing the Agreement" on February 10, 1997. (Hayward Reply at 9) Hayward points to discrepancies between the Provisional Application and Final Application submitted by Gershenson to the USPTO in asserting that Gershenson did not provide the USPTO "with all of the required information relating to the invention" until several months into his relationship with Hayward. (Hayward Reply at 9) Hence, under the Non-Disclosure Agreement, Hayward argues that it owns the rights to the patented designs.

Plaintiffs respond that without evidence "that Mr. Gershenson conceived of the new filter design after signing the [] Non-disclosure Agreement or beginning his employment with Hayward," the Rider excludes the filter design from the scope of the Non-disclosure [*11] Agreement. (Pls.' Opp'n at 12) They point also to the September 1997 and January 2001 documents, which contemplate "separate business arrangements [that] would have to be made if [Hayward] desired rights to make and sell the new filter design" covered by the disputed patents. (Id. at 13) Hence, according to plaintiffs, "it is inconceivable that [Hayward] would have entered into those two additional agreements" if it already owned the patents pursuant to the first Non-disclosure Agreement. (Id.) Hayward responds that it was not until its analysis of the Provisional and Final Applications for the patents that it realized Gershenson "could not possibly have conceived of and perfected the invention" before the execution of the first agreement. (Hayward Reply at 10)

It should be noted first that under the Rider, Gershenson need not have "conceived and perfected" the design before signing the Non-disclosure Agreement in order to have retained the rights to it. Instead, he retains the right to items which have been conceived "though not yet reduced to prototype" before his employment with Hayward. (Rider) Regardless, it is because of both parties' reliance on language from [*12] both the main Agreement and the Rider that the forum selection clause applies to this dispute. It is true that plaintiffs do not

mention the Non-disclosure Agreement in their complaint. More telling, however, is plaintiffs' response to the instant motion, in which they rely on the Rider as the source of retained rights in the disputed patents. (Pls.' Opp'n at 12) [HN1]"A forum selection clause should not be defeated by artful pleading of claims not based on the contract containing the clause if those claims grow out of the contractual relationship, or if 'the gist' of those claims is a breach of that relationship." *Anselmo* v. *Univision Station Group, Inc.*, 1993 U.S. Dist. LEXIS 428, No. 92-1471, 1993 WL 17173, at *2 (S.D.N.Y. Jan. 15, 1993) (quoting *Bense* v. *Interstate Battery Sys.*, 683 F.2d 718, 720 (2d Cir. 1982)); *see also Hugel* v. *Corp. of Lloyd's*, 999 F.2d 206, 209 (7th Cir. 1993) ("where the relationship between the parties is contractual, the pleading of alternative non-contractual theories of liability should not prevent enforcement of such a bargain [as to the appropriate forum for litigation]") (quoting *Coastal Steel Corp.* v. *Tilghman Wheelabrator, Ltd.*, 709 F.2d 190, 203 (3d Cir. 1983)). [*13] The rule has been extended to tort and other claims that

> ultimately depend on the existence of a contractual relationship between the parties, or if resolution of the claims relates to interpretation of the contract, or if the [] claims involve the same operative facts as a parallel claim for breach of contract. Regardless of the differences in terminology, one common thread running through these various formulations is the inquiry whether the plaintiff's claims depend on rights and duties that must be analyzed by reference to the contractual relationship.

*Direct Mail Prod. Servs.* v. *MBNA Corp.*, 2000 U.S. Dist. LEXIS 12945, No. 99-10550, 2000 WL 1277597, at *6 (S.D.N.Y. Sept. 7, 2000) (citations omitted); *see also Brennan* v. *Phyto-Riker Pharms., Ltd.*, 2002 U.S. Dist. LEXIS 10910, No. 01-11815, 2002 WL 1349742, at *4 (S.D.N.Y. June 20, 2002).

Also, [HN2]where the forum selection clause is written broadly, as it is here, claims beyond those alleging breaches of the contract that contains the clause are covered. Where a clause applies by its terms to "any suits or causes of action directly or indirectly from this AGREEMENT," the Second Circuit has ruled that the clause encompasses a [*14] federal antitrust claim

premised on allegations that the defendant had terminated the contract because plaintiff had refused to participate in a price-fixing plan. *Bense*, 683 F.2d at 720; *see also Roby v. Corp. of Lloyd's*, 996 F.2d 1353, 1361 (2d Cir. 1993) (forum selection clause applicable to claims "arising out of" contractual relationship was "not restricted to pure breaches of the contracts containing the clauses" but also covered related securities and antitrust claims). Similarly, the Supreme Court in *Scherk v. Alberto-Culver Co.*, 417 U.S. 506, 519-20, 41 L. Ed. 2d 270, 94 S. Ct. 2449 (1974), held that a arbitration provision covering all controversies and claims "arising out of" a contract for the sale of a business governed securities law violations related to that sale.

Before any patent infringement claim is decided, it must be determined whether the patents that plaintiffs claim Hayward is infringing are the same rights that plaintiffs transferred to Hayward by the terms of the Non-disclosure Agreement or ones that remained with Gershenson pursuant to the Rider. There remain factual disputes as to whether Gershenson "conceived or developed" the [*15] designs underlying the patents before or after execution of the Non-disclosure Agreement. The September 1997 and January 2001 Agreement bear on the closely related issue of how much information the parties had regarding the filter design and its development at the time they signed the Non-disclosure Agreement. The Non-disclosure Agreement manifests the clear intent of the parties that such a dispute should be resolved in New Jersey.

Plaintiffs rely on *Corcovado Music Corp. v. Hollis Music, Inc.*, 981 F.2d 679 (2d Cir. 1993), to argue that where the claim at issue is one for patent infringement rather than for breach of contract, a forum selection clause in a contract transferring ownership rights need not be honored. More on point with the facts in this case is *Warner & Swasey Co. v. Salvagnini Transferica S.p.A.*, 633 F. Supp. 1209 (W.D.N.Y.), *aff'd*, 806 F.2d 1045 (Fed. Cir. 1986). *See also Corcovado*, 981 F.2d at 682 (where Second Circuit specifically distinguished *Warner & Swasey* from the *copyright* claims at issue in *Corcovado*). [HN3]The Federal Circuit in *Warner & Swasey* held that a forum selection [*16] clause in a licensing agreement applied to "an action for breach of contract masquerading as patent infringement." *Corcovado*, 981 F.3d at 682 (describing *Warner & Swasey*). Moreover, unlike in *Corcovado*, the suit was between the same two parties who agreed to the forum

selection clause and "centered on the interpretation of the document containing that clause." *Id.* The Federal Circuit held that "although the cause of action pleaded is patent infringement, this action is ultimately based on alleged breach of the licensing agreement by the defendants." 633 F. Supp. at 1211.

The forum selection clause is enforceable against Cuno as well.[HN4] "It is well established that 'a range of transaction participants, parties and non-parties, should benefit from and be subject to forum selection clauses.'" *Int'l Private Satellite Partners, L.P. v. Lucky Cat Ltd.*, 975 F. Supp. 483, 485-486 (W.D.N.Y. 1997) (quoting *Graham Tech. Solutions, Inc. v. Thinking Pictures, Inc.*, 949 F. Supp. 1427, 1434 (N.D.Cal. 1997)). "In order to bind a non-party to a forum selection clause, the party must be 'closely related' to the dispute [*17] such that it becomes 'foreseeable' that it will be bound." *Nanopierce Techs., Inc. v. Southridge Capital Mgmt. LLC*, 2003 U.S. Dist. LEXIS 21858, No. 02-0767, 2003 WL 22882137, at *5 (S.D.N.Y. Dec. 4, 2003) (quoting *Lipcon v. Underwriters at Lloyd's, London*, 148 F.3d 1285, 1299 (11th Cir. 1998)). A non-party is "closely related" to a dispute if its interests are "completely derivative" of and "directly related to, if not predicated upon" the signatory party's interests or conduct. *Lipcon*, 148 F.3d at 1299 (11th Cir. 1998) (quoting *Dayhoff, Inc. v. H.J. Heinz Co.*, 86 F.3d 1287, 1297 (3d Cir. 1996)). Such is the case here with Cuno, whose rights as licensee of the disputed patents are derivative of and depend on Gershenson's rights under the Non-disclosure Agreement.

III.

The remaining question is whether the forum selection clause, combined with other facts in this case, favors dismissal under Fed. R. Civ. P. 12(b)(3) or transfer to another federal district court under 28 U.S.C. § 1404(a).

[HN5]In determining whether to dismiss or transfer a case, the court must weigh which is [*18] the more efficient and just means of enforcing the forum selection clause. *See Licensed Practical Nurses, Technicians & Health Care Workers of New York, Inc. v. Ulysses Cruises, Inc.*, 131 F. Supp.2d 393, 409 (S.D.N.Y. 2000). The clause in this case permits suit in both New Jersey federal district court and in the New Jersey state courts. Where a forum selection clause allows such a choice, courts in this district have dismissed the case in lieu of transfer. *See, e.g., GMAC Commer. Credit v. Dillard*

Page 7

2005 U.S. Dist. LEXIS 8886, *18

Dep't Stores, 198 F.R.D. 402, 409 (S.D.N.Y. 2001); HNY Assocs., L.L.C. v. Summit Resort Props., 2001 U.S. Dist. LEXIS 5310, No. 01-428, 2001 WL 456250, at *3 (S.D.N.Y. Apr. 30, 2001) (citing cases). Dismissal in these cases was appropriate because transfer to the federal district court would have "deprived plaintiff of its right under the forum selection clause of [the] contract to bring suit in *either* state or federal court." *GMAC Commercial Credit,* 198 F.R.D. at 409 (emphasis in original).

However, this rationale does not apply here because plaintiffs bring [HN6]federal claims for patent infringement, which lie within [*19] the exclusive jurisdiction of the federal courts. *See* 28 U.S.C. § 1338(a). Hence, the hypothetical availability of New Jersey state court does not present an issue.

Instead of dismissing the case and forcing plaintiffs to re-file their complaint in the District of New Jersey, transfer presents a more sensible option for enforcing the forum selection clause. As an initial matter, venue in the District of New Jersey is proper because Hayward is incorporated and has its principal place of business in New Jersey. *See* [HN7]28 U.S.C. § 1400(b) (federal patent infringement claims may be brought "in the judicial district where the defendant resides, or where the defendant has committed acts of infringement and has a regular and established place of business").

Section 1404(a) provides:[HN8]

> For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought.

28 U.S.C. § 1404(a). [HN9]In the context of Section 1404(a), the general rule is that forum selection clauses are enforced, see *Weiss v. Columbia Pictures Television,* 801 F. Supp. 1276, 1278 (S.D.N.Y. 1992), [*20] unless it can be shown that enforcement "would be unreasonable

and unjust, or that the clause is otherwise invalid for such reasons as fraud or overreaching." *Bense,* 683 F.2d at 721-22. Also, "once a mandatory forum selection clause is deemed valid, the burden shifts to the plaintiff to demonstrate exceptional facts explaining why he should be relieved from his contractual duty." *Weiss,* 801 F. Supp. at 1278.

Plaintiffs fail to show why the District of New Jersey would be inconvenient to the parties and material witnesses, how access to proof would be affected, or how "the interest of justice" would be compromised by transfer of the case to the District of New Jersey. If anything, the facts militate in favor of transfer to New Jersey. Gershenson, although now domiciled in New York, worked for GAF in New Jersey for over 30 years and neither he nor Cuno has demonstrated that litigating in New Jersey would be inconvenient. Both Hayward and GAF are headquartered in New Jersey and it appears that New Jersey would be the more convenient venue for access to proof and witnesses.

Hence, plaintiffs have failed to demonstrate "exceptional circumstances" that [*21] would require relief from their contractual burden, and the forum selection clause, as agreed to by the parties, should control. Because transfer is the more efficient and just means of enforcing the forum selection clause here, the Clerk will transfer this case to the District of New Jersey.

* * *

For the reasons set forth above, the Clerk is directed to transfer this case to the District of New Jersey.

SO ORDERED:

Dated: New York, New York

May 11, 2005

Michael B. Mukasey

U.S. District Judge

LEXSEE



Caution
As of: Oct. 26, 2007

DIRECT MAIL PRODUCTION SERVICES LIMITED, a company organized
under the laws of England, Plaintiff, - against - MBNA CORPORATION, a
Maryland corporation, MBNA AMERICA BANK, N.A., a national bank,
HARTE-HANKS DATA TECHNOLOGIES, INC., a Massachusetts corporation,
Defendants.

99 Civ. 10550 (SHS)

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF
NEW YORK

2000 U.S. Dist. LEXIS 12945; Copy. L. Rep. (CCH) P28,149

September 6, 2000, Decided
September 7, 2000, Filed

**DISPOSITION:** [*1] Defendants' motion to dismiss the complaint granted, and the complaint dismissed for lack of jurisdiction with condition.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Defendants moved to dismiss plaintiff's federal and English copyright infringement, misappropriation of trade secrets, and intentional interference with business relationships complaint pursuant to Fed. R. Civ. P. 12(b) on the basis of a forum selection clause in an agreement between plaintiff and one of the defendants.

**OVERVIEW:** Plaintiff brought an action against defendants asserting claims for federal and English copyright infringement, misappropriation of trade secrets, and intentional interference with business relationships. The complaint alleged one defendant, acting on instructions from another, transmitted to a credit reporting company, who was plaintiff's competitor, proprietary databases of prospective credit card customers. Defendants filed a motion to dismiss, seeking to enforce a forum selection clause which was contained

in an agreement between plaintiff and the defendant who instructed the other to transfer the information. The court found, because the other defendants were sufficiently closely related to the contract that it was foreseeable they would be bound, all the defendants could properly assert the forum selection clause in their defense. Second, the forum selection clause encompassed all of the claims asserted by plaintiff. Finally, since plaintiff did not argue the forum selection clause was procured by fraud and overreaching, and since plaintiff was an English corporation that already brought suit in England, enforcement of the clause would be reasonable.

**OUTCOME:** The court granted the motion to dismiss, finding the forum selection clause was enforceable because the other defendants had standing to enforce the clause as beneficiaries of the contract, because the claims were encompassed in the agreement, and because it was reasonable to enforce the agreement where plaintiff already brought suit against one defendant in England.

LexisNexis(R) Headnotes

2000 U.S. Dist. LEXIS 12945, *1; Copy-L. Rep. (CCH) P28,149

*Civil Procedure > Jurisdiction > Jurisdictional Sources > General Overview*
*Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Motions to Dismiss*
[HN1]At the initial stage of litigation, a party seeking to establish jurisdiction need only make a prima facie showing by alleging facts which, if true, would support the court's exercise of jurisdiction. Accordingly, the facts must be viewed in the light most favorable to the plaintiff, and a disputed fact may be resolved in a manner adverse to the plaintiff only after an evidentiary hearing.

*Contracts Law > Contract Conditions & Provisions > Forum Selection Clauses*
*Contracts Law > Third Parties > Beneficiaries > Claims & Enforcement*
[HN2]A non-party may invoke a forum selection clause if the non-party is closely related to one of the signatories. In particular, the relationship between the non-party and the signatory must be sufficiently close so that the non-party's enforcement of the forum selection clause is foreseeable by virtue of the relationship between the signatory and the party sought to be bound.

*Contracts Law > Third Parties > Beneficiaries > Claims & Enforcement*
*Contracts Law > Third Parties > Beneficiaries > Types > Intended Beneficiaries*
[HN3]In discerning whether parties are closely related, the Second Circuit looks to whether the non-signatory is an intended beneficiary entitled to enforce the clause in question. A third party will have an enforceable right if the promised performance will be of pecuniary benefit to him and the contract is so expressed as to give the promisor reason to know that such benefit is contemplated by the promisee as one of the motivating causes of his making the contract.

*Copyright Law > Civil Infringement Actions > General Overview*
*Trade Secrets Law > Civil Actions > General Overview*
*Trade Secrets Law > Misappropriation Actions > General Overview*
[HN4]It defies reason to suggest that a plaintiff may circumvent forum selection clauses merely by stating claims under laws not recognized by the forum selected in the agreement. Rather, whether the clause encompasses these claims depends on the language of the clause itself, the interpretation of which is a question of federal law.

*Contracts Law > Breach > General Overview*
*Contracts Law > Contract Conditions & Provisions > Forum Selection Clauses*
*Contracts Law > Contract Interpretation > General Overview*
[HN5]A forum selection clause should not be defeated by artful pleading of claims not based on the contract containing the clause if those claims grow out of the contractual relationship, or if the gist of those claims is a breach of that relationship. Thus, the circuit courts hold that a contractually-based forum selection clause will also encompass tort claims if the tort claims ultimately depend on the existence of a contractual relationship between the parties, or if resolution of the claims relates to interpretation of the contract, or if the tort claims involve the same operative facts as a parallel claim for breach of contract.

*Contracts Law > Contract Conditions & Provisions > Forum Selection Clauses*
[HN6]Regardless of the duty sought to be enforced in a particular cause of action, if the duty arises from the contract, the forum selection clause governs the action.

*Contracts Law > Contract Conditions & Provisions > Forum Selection Clauses*
[HN7]A mandatory forum-selection clause does not oust the jurisdiction of the court, but rather requires the court to determine whether the party resisting enforcement of the clause has shown the clause to be unreasonable or unfair under the circumstances.

*Contracts Law > Contract Conditions & Provisions > Forum Selection Clauses*
*Contracts Law > Defenses > Fraud & Misrepresentation > General Overview*
*Contracts Law > Defenses > Public Policy Violations*
[HN8]Forum selection clauses are unreasonable or unjust: (1) if their incorporation into the agreement was the result of fraud or overreaching; (2) if the complaining party will for all practical purposes be deprived of his day in court due to the grave inconvenience or unfairness of the selected forum; (3) if the fundamental unfairness of the chosen law may deprive the plaintiff of a remedy; or

2000 U.S. Dist. LEXIS 12945; *1; Copy. L. Rep. (CCH) P28,149

(4) if the clauses contravene a strong public policy of the forum state.

COUNSEL: For DIRECT MAIL PRODUCTION SERVICES LIMITED, plaintiff: Barry G. Magidoff, Paul J. Sutton, Thelen, Reid & Priest L.L.P., New York, NY.

For DIRECT MAIL PRODUCTION SERVICES LIMITED, plaintiff: David B. Novitski, Thelen, Reid & Priest L.L.P., Los Angeles, CA.

JUDGES: Sidney H. Stein, U.S.D.J.

OPINION BY: Sidney H. Stein

OPINION

STEIN, District Judge:

Plaintiff Direct Mail Production Services Limited ("Direct Mail") brought this action against defendants MBNA Corporation and MBNA America Bank, N.A. (collectively, "MBNA America") as well as defendant Harte-Hanks Data Technologies, Inc. ("Harte-Hanks") asserting claims for federal and English copyright infringement, misappropriation of trade secrets, and intentional interference with business relationships. In particular, the complaint alleges that Harte-Hanks, acting on instructions from MBNA America, transmitted to Equifax Europe (UK) Limited ("Equifax") -- a direct competitor of Direct Mail -- proprietary databases of prospective credit card customers that Direct Mail had provided to an English corporation, MBNA Direct [*2] Limited ("MBNA Direct") -- a company related to the MBNA entities -- pursuant to a separate licensing agreement between Direct Mail and MBNA Direct.

Defendants have moved to dismiss the complaint pursuant to Fed. R. Civ. P. 12(b) on the basis of a forum selection clause in the agreement between Direct Mail and MBNA Direct. For the reasons set forth below, defendants' motion should be granted and the complaint dismissed.

BACKGROUND

According to the complaint, defendant MBNA America Bank, N.A. is a United States bank that claims to be "the largest independent credit card lender in the world." It is both a subsidiary of defendant MBNA Corporation, a Maryland corporation, as well as the

parent of MBNA International Bank Limited ("MBNA IBL"), an English corporation, which in turn is the parent of MBNA Direct Limited, another English corporation. Both MBNA America Bank, N.A. and its parent "regularly conduct[]" business in the Southern District of New York. Defendant Harte-Hanks Data Technologies, Inc. is a Massachusetts corporation that "regularly does business" in this District. See Compl. PP 6-11.

Plaintiff Direct Mail Production Services Limited, formerly known [*3] as Quantum Direct Limited, is an English corporation engaged "in the business of gathering information,' and creating databases and systems for scoring, screening, and improving the selection of prospective customers to be solicited for credit card services." Id. PP 5, 12. Beginning in November 1994, Direct Mail and MBNA Direct negotiated a written agreement that was signed in January 1996. See id. P 15; Decl. of Christopher Charlesworth, dated Feb. 28, 2000, Ex. 1 (the "Agreement"). Pursuant to the Agreement, Direct Mail would create databases of prospective customers by screening persons listed on the English electoral rolls based on past credit history and the results of prior mailings, and would forward these databases to third-party "secure mail houses" responsible for mailing the actual solicitations to the prospects on behalf of MBNA Direct. See Compl. P 15. The Agreement contained detailed provisions governing the use and ownership of the databases, see Agreement at 6-10, PP 6, 9, and explicitly contemplated that the databases would be used for the benefit of related MBNA corporations, see id. at 2-3, 8, preamble & PP 1, 9.3. The Agreement also contained [*4] the following forum selection clause: "THIS Agreement shall be governed by and construed in accordance with English law and the parties hereto agree that the English courts shall have exclusive jurisdiction." Id. at 13, P 16.

In September 1996, MBNA Direct and Direct Mail made arrangements for the delivery of databases to Harte-Hanks, a secure mail house, for the purpose of preparing solicitations to be mailed to prospective credit card customers. Direct Mail prepared databases containing the names, addresses, and mailing history of the twenty million most attractive prospects and sent them to Harte-Hanks. See Compl. PP 20-23. Allegedly, however, Harte-Hanks copied the databases, created derivative records based on information in the databases that was proprietary to Direct Mail, and then, acting on instructions from MBNA America, sent some or all of the

original databases and derivative records to MBNA America as well as to Equifax Europe (UK) Limited, a competitor of Direct Mail. As a result, Equifax was able to replace the services previously provided by Direct Mail without having to incur the cost of developing the information in the original databases and derivative works [*5] on its own. According to the complaint, defendants undertook these actions knowing that the databases contained proprietary information owned by Direct Mail and that arrangements between Direct Mail and MBNA Direct prohibited transmission of this information to third parties other than specified secure mail houses, of which Equifax was not one. See id. PP 25-29.

Direct Mail subsequently brought suit against Equifax in England, alleging similar facts and asserting claims for breach of contract, copyright infringement, and breach of confidence. That litigation is scheduled to go to trial in late 2000 or early 2001. See Decl. of Margaret Tofalides, dated Feb. 2, 2000, P 6. Approximately seventeen months after the initiation of the British litigation, Direct Mail filed the present action against MBNA America and Harte-Hanks in the Southern District of New York. The complaint asserts copyright infringement in violation of federal and English statutes and common law claims of misappropriation of trade secrets and intentional interference with business relationships.

## DISCUSSION

### I. Motion to dismiss

MBNA America and Harte-Hanks move to dismiss the complaint on [*6] the grounds that the forum selection clause in the Agreement between Direct Mail and MBNA Direct dictates that Direct Mail must bring its claims against them in the courts of England. Such a clause implicates the jurisdiction of this Court over the action. See New Moon Shipping Co. v. Man B&W Diesel AG, 121 F.3d 24, 28 (2d Cir. 1997). "[HN1]At the initial stage of litigation, a party seeking to establish jurisdiction need only make a prima facie showing by alleging facts which, if true, would support the court's exercise of jurisdiction." Id. at 29 (citing Marine Midland Bank, N.A. v. Miller, 664 F.2d 899, 904 (2d Cir. 1981)). Accordingly, "the facts must be viewed in the light most favorable to the plaintiff," and "[a] disputed fact may be resolved in a manner adverse to the plaintiff only after an evidentiary hearing." Id. (citations omitted).

### II. Forum selection clause

The forum selection clause in the Agreement between Direct Mail and MBNA Direct states, "THIS Agreement shall be governed by and construed in accordance with English law and the parties hereto agree that the English courts shall have exclusive jurisdiction. [*7] " Agreement at 13, P 16. On its face, the forum selection clause is mandatory rather than permissive, since the language plainly indicates "the parties' intent to make jurisdiction exclusive." John Boutari & Son v. Attiki Importers, 22 F.3d 51, 52-53 (2d Cir.1994) (quoting Docksider, Ltd. v. Sea Tech., Ltd., 875 F.2d 762, 764 (9th Cir.1989)). Therefore, if the clause is found to encompass the parties and the claims in this action, then this Court must dismiss the action for lack of jurisdiction, see id., absent a clear showing from Direct Mail that "enforcement would be unreasonable and unjust, or that the clause [is] invalid for such reasons as fraud or overreaching," M/S Bremen v. Zapata Off-Shore Co., 407 U.S. 1, 15, 32 L. Ed. 2d 513, 92 S. Ct. 1907 (1972); see New Moon Shipping Co., 121 F.3d at 29; 17 Moore's Federal Practice § 111.78[1], at 111-243.

### A. Parties to the action

The first difficulty defendants face in invoking the forum selection clause is the undisputed fact that none of the defendants was a signatory to the Agreement containing the clause. However, [HN2]a non-party may nonetheless invoke [*8] such a clause if the non-party is "closely related" to one of the signatories. In particular, "the relationship between the non-party and the signatory must be sufficiently close so that the non-party's enforcement of the forum selection clause is 'foreseeable' by virtue of the relationship between the signatory and the party sought to be bound." In re Lloyd's Am. Trust Fund Lit., 954 F. Supp. 656, 670 (S.D.N.Y. 1997), certification granted, 1997 U.S. Dist. LEXIS 11937, No. 96 Civ. 1262, 1997 WL 458739, at *6-7 (S.D.N.Y. Aug. 12, 1997); see Lipcon v. Underwriters at Lloyd's, London, 148 F.3d 1285, 1299 (11th Cir. 1998); Hugel v. Corporation of Lloyd's, 999 F.2d 206, 209 (7th Cir. 1993); Manetti-Farrow v. Gucci Am., Inc., 858 F.2d 509, 514 n.5 (9th Cir. 1988); Coastal Steel Corp. v. Tilghman Wheelabrator, Ltd., 709 F.2d 190, 203 (3d Cir. 1983), abrogated on other grounds, Lauro Lines v. Chasser, 490 U.S. 495, 501, 104 L. Ed. 2d 548, 109 S. Ct. 1976 (1989); Maritime Ins. Co. v. M/V "Sea Harmony", 1998 U.S. Dist. LEXIS 6294, No. 97 Civ. 3818, 1998 WL 214777,

2000 U.S. Dist. LEXIS 12945, *12; Copy. L. Rep. (CCH) P28,149

> breach (if capable of
> remedy) is not remedied
> within 30 days of a written
> notice specifying the
> breach and requiring its
> remedy.

Agreement at 11, P 13.1(a).

These provisions of the Agreement plainly gave Direct Mail reason to know that one of the reasons motivating MBNA Direct to enter the contract was a desire to confer a pecuniary benefit on related MBNA companies. See Roby, 996 F.2d at 1358-59. Also, because the Agreement explicitly provided that the data supplied by Direct Mail could be used for the benefit of related MBNA companies, it was entirely foreseeable that the related companies might issue [*13] instructions as to the use of the data and thereby become bound up in any disputes premised upon allegations of improper usage. See Manetti-Farrow, 858 F.2d at 514 n.5; but see Dayhoff Inc. v. H.J. Heinz Co., 86 F.3d 1287, 1296 (3d Cir. 1996).

Moreover, because Direct Mail's claims ultimately hinge on rights and duties defined by the Agreement, as discussed below, principles of mutuality and fairness suggest that defendants should be entitled to assert the forum selection clause contained in that same Agreement in defending those claims. See Albany Ins. Co. v. Banco Mexico, 1998 U.S. Dist. LEXIS 16292, No. 96 Civ. 9473, 1998 WL 730337, at *3 (S.D.N.Y. Oct. 19, 1998), aff'd mem., 182 F.3d 898 (2d Cir. 1999), and cert. denied, 528 U.S. 1080, 120 S. Ct. 801, 145 L. Ed. 2d 675 (2000); but see Frietsch v. Refco, Inc., 56 F.3d 825, 827-28 (7th Cir. 1995) (mutuality applies only if plaintiff would be entitled to assert clause against defendant in foreign forum); In re Lloyd's Am. Trust Fund Lit., 954 F. Supp. at 669-70 (same).

Therefore, because the MBNA companies were sufficiently "closely [*14] related" that it was "foreseeable" that they would be bound, defendants MBNA Corporation and MBNA America Bank, N.A. may properly assert the forum selection clause in their defense. In addition, because the claims against all defendants are "integrally related," and because Harte-Hanks has set forth its consent to personal

jurisdiction in the courts of England, see Harte-Hanks Mem. at 2, defendant Harte-Hanks may also assert the clause in its defense. See Bonny v. Society of Lloyd's, 3 F.3d 156, 162-63 (7th Cir. 1993) (collecting circuit cases); Manetti-Farrow, 858 F.2d at 514 n.5.

B. Claims asserted in the action

Next, this Court must inquire whether the forum selection clause encompasses Direct Mail's claims of federal and British copyright infringement, misappropriation of trade secrets, and intentional interference with business relationships. The fact that Direct Mail pleads United States claims is not dispositive, since "[HN4]it defies reason to suggest that a plaintiff may circumvent forum selection . . . clauses merely by stating claims under laws not recognized by the forum selected in the agreement." Roby, 996 F.2d at 1360. [*15] Rather, whether the clause encompasses these claims depends on the language of the clause itself, see id. at 1361, the interpretation of which is a question of federal law, see Jones v. Weibrecht, 901 F.2d 17, 19 & n.1 (2d Cir.1990); see also John Wyeth & Bro. Ltd. v. Cigna Int'l Corp., 119 F.3d 1070, 1074 (3d Cir. 1997).

Were the forum selection clause broadly or narrowly written, this inquiry would be quite simple. For example, where a clause applied by its terms to "any suits or causes of action arising directly or indirectly from this AGREEMENT," the U.S. Court of Appeals for the Second Circuit concluded that the clause encompassed a federal antitrust claim premised on allegations that the defendant had terminated the contract because the plaintiff had refused to participate in a price-fixing plan. See Dense v. Interstate Battery Sys., 683 F.2d 718, 720 (2d Cir. 1982); see also Roby, 996 F.2d at 1361 (forum selection clauses applicable to claims "arising out of" contractual relationship were "not restricted to pure breaches of the contracts containing the clauses" but also covered related securities [*16] and antitrust claims). By contrast, where a clause applied more narrowly to "litigation between the parties concerning the alleged breach of this Agreement or the meaning, effect, application and/or interpretation of its terms," the court found that the clause encompassed the plaintiff's breach of contract claim but not a tort claim of fraudulent inducement. See Bon Jour Group, Ltd. v. Elan-Polo, Inc., 1997 U.S. Dist. LEXIS 10283, No. 96 Civ. 6705, 1997 WL 401814, at *2 (S.D.N.Y. July 16, 1997).

2000 U.S. Dist. LEXIS 12945, *8; Copy-1- Rep: (CCH) P28,149

at *2 (S.D.N.Y. May 1, 1998).

[HN3]In discerning whether [*9] parties are "closely related," the U.S. Court of Appeals for the Second Circuit has looked to whether the non-signatory "[is an] intended beneficiary entitled to enforce" the clause in question. Roby v. Corporation of Lloyd's, 996 F.2d 1353, 1358 (2d Cir. 1993) (alterations in original). "As Professor Corbin has said, a third party will have an enforceable right 'if the promised performance will be of pecuniary benefit to him and the contract is so expressed as to give the promisor reason to know that such benefit is contemplated by the promisee as one of the motivating causes of his making the contract.'" Id. at 1359 (quoting 4 Arthur L. Corbin, Corbin on Contracts § 776, at 18 (3d ed. 1967)); see also Lipcon, 148 F.3d at 1299 ("While . . . , third-party beneficiaries to a contract would, by definition, satisfy [this] requirement[] . . . , a third-party beneficiary status is not required.'") (quoting Hugel, 999 F.2d at 209); Coastal Steel, 709 F.2d at 203. Thus, in Roby, the forum selection clause contained in contracts between Lloyd's and its investors was found to apply to investors' claims [*10] against the syndicates that competed for investments within Lloyd's, in light of the broad language of the clause and the syndicates' pecuniary interest in uniform resolution of the claims. See id.

In the present case, the language of the forum selection clause is not nearly as broad as the language in Roby. See Roby, 996 F.2d at 1359 (clause encompassed "any dispute and/or controversy of whatsoever nature arising out of or relating to the [investor's] membership of, and/or underwriting of insurance business at, Lloyd's"). However, a number of other clauses in the Agreement between Direct Mail and MBNA Direct indicate that the signatories intended the contract to benefit related MBNA companies. To begin with, the preamble to the Agreement sets forth the following motivation for entering into the contract:

> (A) MBNA carries on the business of supplying services and products to companies within the group of companies to which it belongs
>
> (B) MBNA wishes to receive and [Direct Mail] is willing to provide processed marketing data for use by MBNA Group Companies for marketing purposes upon

the terms and conditions of this Agreement

Agreement at 2, [*11] preamble. Elsewhere, the Agreement defines "MBNA Group Company" to mean "any undertaking which is a parent undertaking in relation to MBNA International Bank Limited or any subsidiary undertaking of such parent undertaking (as such expressions are defined in section 258 of the Companies Act 1985)." Id. at 3, P 1. [1]

> [1] Direct Mail does not dispute that both MBNA Corporation and MBNA America Bank, N.A. are "parent undertaking[s]" pursuant to section 258 of the Companies Act 1985. See Companies Act, 1989, ch. 40, Part I, § 21(1) (Eng.) (amending Part VII of Companies Act 1985).

The Agreement makes this motivation even more explicit in the provisions governing MBNA Direct's usage of the information Direct Mail agreed to provide:

> MBNA hereby agrees and undertakes that it will:
>
> 9.1 use the Data only for the purpose of the Programmes;
>
> 9.2 not use the Data for the benefit of any third party *other than an MBNA Group Company* (unless agreed in writing by both parties from time to time);
>
> 9.3 not sell [*12] assign or sub-let the whole or any part of the Data to any third party.

Agreement at 8, PP 9.1-9.3 (emphasis added). Finally, the Agreement also provides that breaches of confidence by related MBNA companies would constitute grounds for termination of the Agreement:

> EITHER party shall be entitled to terminate this Agreement immediately by notice in writing to the other if:
>
> > (a) that other is guilty of any breach of any of the terms of this Agreement or any confidentiality agreement between [Direct Mail] and any MBNA Group Company which

The present clause falls somewhere between these two extremes and provides simply, "THIS Agreement shall be governed by and construed in accordance with English law and the parties hereto agree that the English courts shall have exclusive jurisdiction." Agreement at 13, P 16. Certainly, this clause would encompass a breach of contract claim; however, Direct Mail has not pled such a claim.

[HN5]Nonetheless, "[a] forum selection clause should not be defeated by artful pleading of claims not based on the contract containing the clause if those claims grow out of the contractual relationship, or if 'the gist' of those claims is a breach of that relationship." Anselmo v. Univision Station Group, Inc., 1993 U.S. Dist. LEXIS 428, *6, No. 92 Civ. 1471, 1993 WL 17173, [*17] at *2 (S.D.N.Y. Jan. 15, 1993) (quoting Bense, 683 F.2d at 720). Thus, the circuit courts have held that a contractually-based forum selection clause will also encompass tort claims if the tort claims "ultimately depend on the existence of a contractual relationship" between the parties, Coastal Steel, 709 F.2d at 203, or if "resolution of the claims relates to interpretation of the contract," Manetti-Farrow, 858 F.2d at 514, or if the tort claims "involve the same operative facts as a parallel claim for breach of contract," Lambert v. Kysar, 983 F.2d 1110, 1121-22 (1st Cir. 1993); see generally Terra Int'l, Inc. v. Mississippi Chem. Corp., 119 F.3d 688, 694-95 (8th Cir. 1997).

Regardless of the differences in terminology, one common thread running through these various formulations is the inquiry whether the plaintiff's claims depend on rights and duties that must be analyzed by reference to the contractual relationship. "[HN6]Regardless of the duty sought to be enforced in a particular cause of action, if the duty arises from the contract, the forum selection clause governs the action." Hugel, 999 F.2d at 209; [*18] see Warnaco Inc. v. VF Corp., 844 F. Supp. 940, 949 (S.D.N.Y. 1994). Viewed through this lens, Direct Mail's claims all fall within the scope of the forum selection clause.

First, analysis of the copyright infringement claims will inevitably require reference to rights and duties defined in the Agreement, since the Agreement was essentially a license that governed MBNA Direct's use of Direct Mail's databases on behalf of itself and related MBNA companies. [2] See John Wyeth & Bro. Ltd., 119 F.3d at 1076; Omron Healthcare, Inc. v. Maclaren

Exports, Ltd., 28 F.3d 600, 601-02 (7th Cir. 1994); Evolution Online Sys., Inc. v. Koninklijke Nederland N.V., 41 F. Supp. 2d 447, 450-51 (S.D.N.Y. 1999); Warnaco, 844 F. Supp. at 949; Young Women's Christian Assoc. v. HMC Entertainment, Inc., 1992 U.S. Dist. LEXIS 14713, No. 91 Civ. 7943, 1992 WL 279361, at *4 (S.D.N.Y. Sept. 25, 1992). Second, in order to prevail on its misappropriation claim, Direct Mail will have to demonstrate that defendants "used [its] trade secret in breach of an agreement, a confidential relationship, or duty, or as a result of discovery by improper [*19] means," Hudson Hotels Corp. v. Choice Hotels Int'l, 995 F.2d 1173, 1176 (2d Cir. 1993), abrogated on other grounds, Nadel v. Play-by-Play Toys & Novelties, Inc., 208 F.3d 368, 380 n.9 (2d Cir. 2000). Analysis of this element will similarly depend on the rights and duties set forth in the Agreement. Third, the tortious interference claim is premised on MBNA America's alleged unauthorized transmittal of Direct Mail's databases. See Compl. PP 50-56. As such, this claim is grounded in the alleged impairment of Direct Mail's copyright and will also require analysis of the rights and duties defined by the Agreement. Indeed, courts have consistently held that the federal copyright statute preempts tortious interference claims for precisely this reason. See, e.g., Computer Assocs. Int'l, Inc. v. Altai, Inc., 982 F.2d 693, 717 (2d Cir. 1992).

> 2  The facts of this dispute are therefore distinct from the facts of Corcovado Music Corp. v. Hollis Music, Inc., 981 F.2d 679 (2d Cir. 1993). In that case, plaintiff and defendants had been assigned rights by, respectively, a composer and publisher who had entered into a contract for the transfer of the copyrights to five songs. Plaintiff brought suit alleging that defendants' receipt of payments after the expiration of the original term copyrights violated plaintiff's copyright renewal rights. Defendants moved to dismiss the complaint on the basis of a forum selection clause in the original contract between the composer and publisher that purportedly required that any disputes be resolved in the courts of Brazil. See id. at 680-81. The district court granted the motion to dismiss, and on appeal the Second Circuit reversed. The Second Circuit reasoned that none of the parties to the litigation had signed the original contract, the contract was asserted only in defense against a bona fide copyright claim, and the suit was more analogous to an

action to quiet title than a dispute founded on the original contract. See id. at 681-83.

However, the Second Circuit in Corcovado explicitly distinguished an earlier patent infringement decision in which a forum selection clause was enforced, on the grounds that the earlier suit was "an action for breach of contract masquerading as patent infringement," the suit "was between the same two parties who drafted the forum-selection clause," and the suit "centered on the interpretation of the document containing that clause." Id. at 682 (discussing Warner & Swasey Co. v. Salvagnini Transferica S.p.A., 633 F. Supp. 1209, 1211-12 (W.D.N.Y.), aff'd on basis of opinion below, 806 F.2d 1045 (Fed. Cir. 1986)). Similarly, in the present case, Direct Mail was a signatory to the Agreement and MBNA America was an intended beneficiary of that Agreement. In its complaint, Direct Mail refers to the Agreement repeatedly as the predicate to its claims. In addition, because the Agreement was essentially a licensing arrangement, the present action sounds in contract as much as in copyright. Although MBNA America's precise role in the matter is disputed, MBNA IBL has largely conceded its own role, see Barningham Decl. PP 4, 10, and a finding of copyright infringement would be tantamount to a finding of a breach of the Agreement's provisions governing the ownership and use of data for the benefit of related MBNA companies. See Warner & Swasey, 633 F. Supp. at 1211-12.

[*20] Therefore, the forum selection clause encompasses all of the claims asserted by Direct Mail in this action. See Coastal Steel, 709 F.2d at 193, 202-03 (clause applicable to "any dispute arising" encompassed related tort claims).

C. Reasonableness

Determining that the forum selection clause encompasses the parties and claims in this action does not settle the matter, however, since "[HN7]a mandatory forum-selection clause does not 'oust the jurisdiction' of the court, but rather requires the court to determine whether the party resisting enforcement of the clause has

shown the clause to be unreasonable or unfair under the circumstances." Evolution Online Sys., Inc. v. Koninklijke PTT Nederland N.V., 145 F.3d 505, 510 (2d Cir. 1998). [HN8]Forum selection clauses are unreasonable or unjust:

> (1) if their incorporation into the agreement was the result of fraud or overreaching; (2) if the complaining party will for all practical purposes be deprived of his day in court due to the grave inconvenience or unfairness of the selected forum; (3) if the fundamental unfairness of the chosen law may deprive the plaintiff of a remedy; or (4) if the clauses contravene [*21] a strong public policy of the forum state.

Roby, 996 F.2d at 1363 (quotation omitted).

Direct Mail does not argue that the forum selection clause was procured by fraud and overreaching. Moreover, Direct Mail is an English corporation that has already brought suit against Equifax in England, this dispute hinges on a licensing Agreement entered by Direct Mail with another English party, and the complaint asserts a claim of English copyright infringement that may be fully vindicated in the courts of England. Therefore, enforcement of the clause would be neither unjust nor unreasonable, and the clause should be enforced.

CONCLUSION

For the reasons set forth above, defendants' motion to dismiss the complaint is granted, and the complaint is dismissed for lack of jurisdiction subject to the condition that defendants consent in writing to the personal jurisdiction of the courts of England within 20 days. See Boosey & Hawkes Music Publishers Ltd. v. Walt Disney Co., 145 F.3d 481, 491 (2d Cir. 1998); [*22] Bonny, 3 F.3d at 162-63.

Dated: New York, NY

September 6, 2000

Sidney H. Stein, U.S.D.J.

LEXSEE



Cited
As of: Oct 26, 2007

ROLAND CAVILLE, Plaintiff, -against- MALIBU TOYS, INC., Defendant.

03 Civ. 9727 (SAS)

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF
NEW YORK

2004 U.S. Dist. LEXIS 12514

July 6, 2004, Decided
July 7, 2004, Filed

DISPOSITION:   [*1] Defendant's motion for transfer
denied.

CASE SUMMARY:

PROCEDURAL POSTURE: Plaintiff patent holder
sued defendant candy distributor alleging infringement of
his patent through the sale and distribution of a certain
illuminated candy product. The distributor moved for a
change of venue to the Central District of California
pursuant to 28 U.S.C.S. § 1404(a).

OVERVIEW: The patent holder, a French citizen,
owned a patent for a combined dancing light
lollypop-pacifier holder, which was an invention to hold
and simultaneously illuminate translucent lollipops or
other similar candies. The patent holder distributed his
candy products through a company incorporated and
principally doing business in New York City. The
distributor was a California corporation with its principal
place of business in California. The court found that
although this action could have been brought in the
Central District of California the distributor had not made
a sufficient showing to justify transfer. The fact that the
patent holder frequently traveled to New York and his
United States distributor was located there established the
legitimacy of his choice of New York. Although the

distributor and its witnesses would undoubtedly be
inconvenienced by litigation in New York, careful
consideration of the needs of both parties and their
respective witnesses advised against transfer. The factors
of situs of operative facts, judicial economy, interest of
justice, and relative ease and sources of proof were
neutral factors and did not favor either party.

OUTCOME: The distributor's motion to transfer the
action was denied.

LexisNexis(R) Headnotes

Civil Procedure > Venue > Federal Venue Transfers >
General Overview
[HN1]See 28 U.S.C.S. § 1404(a).

Civil Procedure > Venue > Federal Venue Transfers >
General Overview
[HN2]With regard to transfer a case to another federal
district, a defendant must make a "convincing showing"
that the action would be better litigated elsewhere.
Relevant factors include the: (1) deference accorded to a
plaintiff's choice of forum; (2) convenience to witnesses
and parties; (3) situs of operative facts; (4) interests of

justice and judicial economy; (5) relative ease of access to sources of proof; (6) availability of process to compel unwilling witnesses; (7) relative means of the parties; and (8) forum's familiarity with the governing law. Of these factors, a plaintiff's choice of forum is usually given the greatest weight, but when the plaintiff is a nonresident and the operative facts bear little connection to the chosen forum, the plaintiff's choice is shown less deference.

*Civil Procedure > Venue > Federal Venue Transfers > General Overview*
*Civil Procedure > Venue > Motions to Transfer > General Overview*
[HN3]With regard to transfer of a case to another federal district, unless the balance is strongly in favor of the defendant, the plaintiff's choice of forum should rarely be disturbed.

*Copyright Law > Civil Infringement Actions > Jurisdiction & Venue > General Overview*
*Patent Law > Jurisdiction & Review > Personal Jurisdiction & Venue > General Overview*
[HN4]28 U.S.C.S. § 1400(b) states that any civil action for patent infringement may be brought in the judicial district where the defendant resides.

*Civil Procedure > Venue > Federal Venue Transfers > General Overview*
*Civil Procedure > Venue > Motions to Transfer > General Overview*
[HN5]In general, a court should not disturb a plaintiff's choice of forum unless the balance of the factors weighs strongly in favor of transfer. Where the forum selected by the plaintiff is not where he resides, the degree of deference given to a plaintiff's choice of a non-home forum depends on the motivations behind that choice. A court must give greater deference to a plaintiff's choice of a non-home forum where that choice was motivated by legitimate reasons, including the plaintiff's convenience and the ability of the plaintiff to obtain jurisdiction over the defendant. Courts should give "diminishing deference" to a plaintiff's choice of a non-home forum to the extent that it was motivated by tactical advantage, such as forum shopping.

*Civil Procedure > Venue > Motions to Transfer >*

*General Overview*
[HN6]With regard to the change of venue, the court dismisses from consideration the convenience of witnesses who are located outside both the current and transferee forums.

*Patent Law > Jurisdiction & Review > Personal Jurisdiction & Venue > General Overview*
[HN7]Courts have held that the situs of operative facts in an infringement action is the jurisdiction where the product was designed, developed, and marketed.

*Civil Procedure > Jurisdiction > Subject Matter Jurisdiction > Jurisdiction Over Actions > Concurrent Jurisdiction*
[HN8]Where two courts have concurrent jurisdiction over an action involving the same parties and issues, courts will follow a "first filed" rule whereby the court which has possession of the action decides it.

*Civil Procedure > Venue > Federal Venue Transfers > General Overview*
[HN9]Substituting one convenience for another cannot support a transfer of venue.

*Civil Procedure > Venue > Federal Venue Transfers > General Overview*
[HN10]A court should consider the relative means of the parties where a disparity exists between the means of the parties in determining venue.

*Civil Procedure > Venue > Federal Venue Transfers > General Overview*
*Patent Law > Jurisdiction & Review > Personal Jurisdiction & Venue > General Overview*
[HN11]With regard to a transfer of venue, patent law is federal law and any district court may handle a patent case with equal skill.

COUNSEL: For Roland Caville, Plaintiff: Howard C. Miskin, Esq., Stoll, Miskin, Hoffman & Badie, New York, NY.

For Malibu Toys, Inc., Defendant: David M. Dahan, Esq., Frank J. Colucci, Esq., Colucci & Umans, New York, NY.

JUDGES: SHIRA A. SCHEINDLIN, U.S.D.J.

OPINION BY: SHIRA A. SCHEINDLIN

OPINION

OPINION AND ORDER

SHIRA A. SCHEINDLIN, U.S.D.J.:

Roland Caville brings this suit against Malibu Toys, Inc. ("Malibu") alleging infringement of one or more claims of Caville's patent [1] through the sale and distribution of a product called the "Flashin' Lix" ("Malibu's product"). Malibu now moves for a change of venue to the Central District of California pursuant to section 1404(a). [2] For the following reasons, Malibu's motion to transfer is denied.

> 1   United States Patent Number 6,135,606 for Combined Dancing Light Lollypop-Pacifier Holder, Ex. A to Complaint ("'606 Patent"). See also Complaint ("Compl.") P 6.
> 2   28 U.S.C. § 1404(a).

[*2] I. BACKGROUND

A. The Parties

Caville is a French citizen residing and principally doing business in Hong Kong, China. [3] Caville owns the rights to the '606 Patent, which is an invention to hold and simultaneously illuminate translucent lollipops or other similar candies. [4] Caville distributes his candy products embodying the '606 Patent through Yanova, Inc. ("Yanova"), a company incorporated and principally doing business in New York City. [5] Yanova's co-owners and only employees are New York residents Lance Kushner and Glenn Rudin. [6]

> 3   See Compl. P 4.
> 4   See '606 Patent.
> 5   See Declaration of Lance Kushner, co-president of Yanova, in Opposition to Defendant's Motion to Transfer Venue ("Kushner Decl.") PP 2-6.
> 6   See Id. PP 3-5.

Malibu is a California corporation with its principal place of business in Chatsworth, California. [7] All of Malibu's employees reside in the Central District of

California. [8]

> 7   See 3/17/04 Declaration of Kami Gillmour-Bryant, owner of Malibu Toys, in Support of Motion to Transfer Venue ("3/17/04 Gillmour-Bryant Decl.") P3.

[*3]

> 8   See Defendant's Reply Brief in Further Support of the Motion to Transfer Venue ("Def. Reply") at 7. Malibu is owned by Kami Gillmour-Bryant and Lydia Lopez and employs three other people.

Malibu is in the business of purchasing and selling candy. [9] Although its 2003 calendar year sales were slightly more than $ 1,000,000, it ended the year with a net loss. [10] All of its products are manufactured in China and then shipped to a warehouse in California, from which they are then delivered to Malibu's customers. [11] Two such purchasers, Target and Toys 'R Us, have retail stores that allegedly sell Malibu's products in New York. [12] In addition, Malibu exhibited but did not sell any of its products at the annual International Toy Fair in February of 2004, which was held in New York City. [13]

> 9   See Defendant's Memorandum in Support of Motion by Malibu Toys, Inc. to Transfer Venue ("Def. Mem.") at 2; see also 3/17/04 Gillmour-Bryant Decl. P 5.
> 10  See 3/17/04 Gillmour-Bryant Decl. P 12.

[*4]

> 11  See Id.
> 12  See 5/4/04 Supplemental Declaration of Kami Gillmour-Bryant in Further Support of Defendant's Motion to Transfer Venue ("5/4/04 Gillmour-Bryant Decl.") P 2; see also Def. Reply at 3.
> 13  See 5/4/04 Gillmour-Bryant Decl. P 3; see also Def. Reply at 4.

B. Facts

In his Complaint, Caville alleges that Malibu's product embodies and thus infringes the '606 Patent. [14] Caville further avers that because Malibu had "knowledge of the '606 Patent," Malibu's infringement was "deliberate, willful, and wanton." [15]

> 14  See Compl. P 13.
> 15  Id. P 14.

To prove his claim, Caville intends to call the

following witnesses: Mark Merryweather, an independent consultant who resides in Connecticut, to describe "the sales and marketing of [Malibu's allegedly] infringing products;" [16] Kushner, co-president of Yanova, to describe "the extent of damages [Yanova] and Caville have [*5] suffered;" [17] Rodolfo Fernandez and Blas Castor Perez, inventors of the '606 Patent who reside in North Carolina, to "testify about the scope of the patent-in-suit;" [18] and representatives of Frankford Candy & Chocolate Company ("Frankford"), located in Philadelphia, Pennsylvania, "to testify at trial on the issue of damages incurred ...." [19]

> 16  Declaration of Roland Caville in Opposition to Defendant's Motion to Transfer Venue ("Caville Decl.") P 5.
> 17  Plaintiff's Memorandum of Law in Support of Plaintiff's Opposition to Defendant's Motion to Transfer Venue ("Pl. Mem.") at 16; see also Kushner Decl. P 6.
> 18  Caville Decl. P 6; see also Pl. Mem. at 14-16.
> 19  Pl. Mem. at 14 ("Philadelphia ... is a short drive away from the Southern District of New York."). Although Caville does not explicitly state where Frankford's representatives reside, Caville suggests that because the company is located in Philadelphia, its employees similarly reside within the Philadelphia metropolitan area.

[*6] Malibu also expects to call various witnesses to testify in its defense: [20] Helene Bartels, Malibu's Vice President of Sales, will "testify about sales and claimed damages;" [21] Winnie Lam, Malibu's Director of Operations, will "testify about the qualities of the subject item; about when and where items were shipped out of the warehouse and purchasing of [Malibu's] products;" [22] Brad Thayer, an employee of a warehouse used by Malibu, will testify "as to what was received and where and when it was shipped to customers;" [23] Andrew Lewis and Bob Kelly, Malibu's accountant and bookkeeper respectively, will testify on the issue of damages; [24] and Daryoush Aryapour, owner of Aryapour Designs, will testify on the issue of "design and packaging." [25] With the exception of Thayer (who appears to reside elsewhere in California), all of Malibu's witnesses reside within the Central District of California. [26]

> 20  See 3/17/04 Gillmour-Bryant Decl. PP 6-10.
> 21  Id. P 6.
> 22  Id.

> 23  Id. P 5.
> 24  See id. PP 9-10; see also Declaration of Andrew Lewis, Malibu's accountant, in Support of Malibu Toys, Inc.'s Motion to Transfer Venue ("Lewis Decl.") P 2; see generally Declaration of Bob Kelly, Malibu's bookkeeper, in Support of Reply Brief to Malibu Toys, Inc.'s Motion to Transfer Venue ("Kelly Decl.").

[*7]

> 25  3/17/04 Gillmour-Bryant Decl. P 10; see also Declaration of Daryoush Aryapour, independent contractor, in Support of Reply Brief to Malibu Toys, Inc.'s Motion to Transfer Venue ("Aryapour Decl.") P 1.
> 26  See Lewis Decl. P 2; see also Def. Reply at 7.

## II. LEGAL STANDARD

Section 1404 provides: [HN1]"For the convenience of the parties and witnesses, in the interests of justice, a district court may transfer any civil action to any other district or division where it might have been brought." [27] [HN2]The defendant must make a "convincing showing" that the action would be better litigated elsewhere. [28] Relevant factors include the: (1) deference accorded to plaintiff's choice of forum; (2) convenience to witnesses and parties; (3) situs of operative facts; (4) interests of justice and judicial economy; (5) relative ease of access to sources of proof; (6) availability of process to compel unwilling witnesses; (7) relative means of the parties; and (8) forum's familiarity with the governing law. [29] Of these factors, plaintiff's choice of forum is usually given the greatest [*8] weight, but when the plaintiff is a nonresident and the operative facts bear little connection to the chosen forum, plaintiff's choice is shown less deference. [30]

> 27  28 U.S.C. § 1404(a).
> 28  Alonso v. Saudi Arabian Airlines Corp., 1999 U.S. Dist. LEXIS 5826, No. 98 Civ. 7781, 1999 WL 244102, at *6 (S.D.N.Y. 1998); see also Gulf Oil v. Gilbert, 330 U.S. 501, 508, 91 L. Ed. 1055, 67 S. Ct. 839 (1947) ([HN3]"Unless the balance is strongly in favor of the defendant, the plaintiff's choice of forum should rarely be disturbed.").
> 29  See Berman v. Informix Corp., 30 F. Supp. 2d 653, 657 (S.D.N.Y. 1998); see also Gulf Oil, 330 U.S. at 508.
> 30  See Invivo Research Inc. v. Magnetic Resonance Equip. Corp., 119 F. Supp. 2d 433,

438 (S.D.N.Y. 2001); *see also Berman,* 30 F. Supp. 2d at 657-59.

## III. DISCUSSION

Although this action could have been brought in the Central District of California, [31] for the reasons that follow, [*9] Malibu has not made a sufficient showing to justify transfer.

> 31 *See* 28 U.S.C. § 1400(b) ([HN4]"Any civil action for patent infringement may be brought in the judicial district where the defendant resides ....").

## A. Deference Accorded to Plaintiff's Choice of Forum

[HN5]In general, a court should not disturb a plaintiff's choice of forum "unless the balance of the factors weighs strongly in favor of transfer." [32] Where, as here, the forum selected by the plaintiff is not where he resides,

> the degree of deference given to plaintiff's choice of a non-home forum depends on the motivations behind that choice. A court must give greater deference to a plaintiff's choice of a non-home forum where that choice was "motivated by legitimate reasons, including plaintiff's convenience and the ability of [plaintiff] to obtain jurisdiction over the defendant." Courts should give "diminishing deference" to a plaintiff's choice of a non-home forum "to the extent that it was motivated by tactical [*10] advantage," such as forum shopping. [33]

> 32 *Renaissance Cosmetics v. Development Specialists,* 277 B.R. 5, 18 (S.D.N.Y. 2002) (citation omitted)
> 33 *Id.* (quoting *Iragorri v. United Techs. Corp.,* 274 F.3d 65, 72 (2d Cir. 2001)).

There are several legitimate reasons for Caville to bring suit in New York. *First,* he frequently travels to New York for business. [34] *Second,* Yanova, Caville's distributor of products embodying the '606 Patent, resides

and principally does business in New York. [35] *Third,* the majority of Caville's witnesses are within the subpoena power of this Court. Thus, although he is a foreign plaintiff, these reasons establish the legitimacy of Caville's choice of New York. There is no basis for concluding that his selection of this forum is motivated by tactical advantage and, thus, some deference is warranted.

> 34 *See* Caville Decl. P 4.
> 35 Further supporting the legitimacy of Caville's ties to and choice of New York as a forum is the fact that he is one of three Yanova shareholders. *See* Caville Decl. P 3; *see also* Kushner Decl. P 4.

[*11] B. Convenience of the Witnesses and Parties

> 36
>
> 36    Although Caville and Malibu dispute Yanova's role in this analysis, I am treating Yanova as if it were an additional plaintiff. That Malibu moved for transfer of venue before Caville moved to amend his complaint to add Yanova as a party should not preclude consideration of Yanova as a plaintiff in this analysis.

Although Malibu and its witnesses will undoubtedly be inconvenienced by litigation in New York, careful consideration of the needs of both parties and their respective witnesses advises against transfer.

## 1. Inconvenience to Witnesses

Caville names several key witnesses who, as residents of New York, Connecticut, and Pennsylvania, will be inconvenienced by litigation in California. [37] That Caville's witnesses are located either in or within relatively close proximity to New York counsels against transfer.

> 37 *See supra* pp. 4-5.

[*12] Moreover, Caville expects that Fernandez and Perez, inventors of the '606 Patent and residents of North Carolina, will "testify to the scope of the patent-in-suit." [38] Although Malibu correctly states that courts have accorded less significance to the inconvenience of witnesses who reside outside both the current and transferee forums, [39] the convenience of Fernandez and Perez lends mild support to Caville's choice of forum.

Page 5

The testimony of these witnesses is critical to Caville's case and travel from North Carolina to New York is somewhat more convenient than travel from North Carolina to California.

> 38  *Id.*
>
> 39  *Cf. e.g., Wechsler v. Macke Int'l Trade, Inc.,* 1999 U.S. Dist. LEXIS 19800, No. 99 Civ. 5725, 1999 WL 1261251, at *6 (S.D.N.Y. Dec. 27, 1999) ([HN6]"The court dismisses from consideration the convenience of witnesses who are located outside both the current and transferee forums.") (citations omitted).

Malibu counters with its own list of witnesses who, it claims, will be inconvenienced by litigation in [*13] New York. [40] However, transfer of this action to California would merely shift the inconvenience from Malibu to Caville. Because "exchanging the burdens of inconvenience from one party to the other is not a basis for transfer," [41] Malibu's argument fails. Thus, this factor slightly favors Caville.

> 40  *See supra* pp. 5-6.
>
> 41  *Hypoxico, Inc. v. Colo. Altitude Training LLC,* 2003 U.S. Dist. LEXIS 11862, No. 02 Civ. 6191, 2003 WL 21649437, at *8 (S.D.N.Y. July 14, 2003).

## 2. Convenience of the Parties

The convenience of the parties also favors denying transfer. Because Caville frequently does business in New York, there is a strong possibility that his appearances for this litigation could be combined with business trips. New York is thus more convenient for Caville than California.

New York is also more convenient for Yanova, because Yanova resides and principally does business in this jurisdiction. Moreover, Yanova only employs two people, both of whom are its owners. Because litigation in California would require [*14] both of these employees to travel, that inconvenience could significantly impact its business.

On the other hand, Malibu is a California company and claims that defending this action in New York would be burdensome. While this may be so, Malibu has chosen to exhibit and sell its product in New York, which makes suit in this district reasonably foreseeable.

## C. The Situs of Operative Facts

[HN7]Courts have held that the situs of operative facts in an infringement action is the jurisdiction where the product was designed, developed, and marketed. [42] Because Malibu's product was designed and developed in China and because Malibu markets its product throughout the United States, most of the operative facts occurred in China and, thus, this factor favors neither party.

> 42  *See Bionx,* 1999 U.S. Dist. LEXIS 8031, 1999 WL 342306, at *4 (holding that locus of operative facts was where product allegedly infringing plaintiff's patent had been designed, developed, and marketed); *see also Coloplast A/S v. Amoena Corp.,* 1992 U.S. Dist. LEXIS 17587, No. 92 Civ. 3432, 1992 WL 346359, at *2 (S.D.N.Y. Nov. 18, 1992) (holding operative events were where alleged infringement, manufacture, and sales had occurred).

[*15] Malibu argues that California is the situs of the operative facts, because the "allegedly infringing products were indisputably designed, developed, packaged, and marketed" in California. [43] This argument fails for a number of reasons. *First,* it is not clear that Malibu's product was in fact designed and developed in California. Malibu does not even suggest that the factories in China are manufacturing its product pursuant to its instructions. Indeed, Malibu readily admits that it is in the business of "purchasing and selling candy." [44] *Second,* it is not clear that the candy is packaged in California. Malibu states that its product is shipped to a warehouse, from which it is then shipped to its customers. Malibu makes no mention of packaging or re-packaging the product it sells. *Third,* while it is likely true that Malibu markets its product in California, Malibu also does so in many other markets. For example, Malibu concedes that it attended the International Toy Fair to exhibit, and thus market, its product in New York. It also admits that Toys 'R Us and Target may have sold its product in New York.

> 43  Pl. Reply at 3.

[*16]

> 44  3/17/04 Gilhmour-Bryant Decl. P 5.

## D. Judicial Economy

This factor is also neutral. Malibu claims that the Southern District of New York is overburdened. [45]

Caville presents evidence that more cases were filed in the Central District of California than in the Southern District of New York in 2003. [46] It is thus not clear that trial efficiency favors either forum.

> 45  See Def. Mem. at 11 (citing Beverage Marketing Corp. v. Emerald Coast Spring Water Co., 697 F. Supp. 767, 771 (S.D.N.Y. 1988) ("It is unlikely that any court bears as crushing a burden as does the Southern District of New York.")).
>
> 46  See Pl. Mem. at 19-20; see also Exhibit B to Declaration of Gloria Tsui-Yip, Caville's counsel, in Opposition to Defendant's Motion to Transfer Venue ("Tsui-Yip Decl.") P 3.

Malibu asserts that judicial economy favors it because "there is a pending litigation between the parties [*17] on the patent-in-suit in the Central District of California." [47] This argument, however, lacks merit. [HN8]"Where two courts have concurrent jurisdiction over an action involving the same parties and issues, courts will follow a 'first filed' rule whereby the court which has possession of the action decides it." [48] Malibu filed its action on March 2, 2004 - well after Caville filed his action in New York. [49] It would be illogical and unfair to allow the moving party to shore up its motion to transfer by filing a subsequent action in anticipation of making a transfer motion.

> 47  Def. Mem. at 12.
> 48  800-Flowers, Inc. v. Intercontinental Florist, Inc., 860 F. Supp. 128, 131 (S.D.N.Y. 1984).
> 49  See Def. Mem. at 12. See generally Compl.

### E. Interests of Justice

This factor does not favor either party. California has an interest in rendering a judgment relating to Malibu which principally does business and is incorporated in California. Because Malibu sells its product in New [*18] York, New York also has an interest in rendering a judgment in favor of or against Malibu. Although New York has little interest in rendering a judgment in favor of or against Caville, a foreign plaintiff, this state does have such an interest in doing so with regard to Yanova, a company that principally does business and is incorporated in New York.

### F. Relative Ease and Sources of Proof

This factor again does not favor either party. "The location of relevant documents and ease of access to sources of proof is typically dependent on the locus of the operative facts." [50] The circumstances in this case are no exception. First, the situs of the operative facts is predominately China. Second, Caville states that all of his documents regarding the '606 Patent will come from either Hong Kong or Yanova's offices in New York. While Malibu's documents are undoubtedly located in California, [HN9]substituting one convenience for another cannot support a transfer of venue.

> 50  Wechsler, 1999 U.S. Dist. LEXIS 19800, 1999 WL 1261251, at *8 (quotations omitted).

### [*19] G. Availability of Process to Compel Unwilling Witnesses

Although this factor slightly favors Malibu because it has more unwilling witnesses than Caville, it does not overcome all of the previously discussed factors favoring the denial of transfer. Kelly, Lewis, and Aryapour, have stated that they will not voluntarily appear in New York. [51] By the same token, Kushner, co-owner of Yanova, suggests he would not voluntarily travel to California. [52]

> 51  See Kelly Decl. P 2; Lewis Decl. P 2; Daryoush Decl. P 2.
> 52  See Pl. Mem. at 13; see also Kushner Decl. P 9 ("It would be a major burden for me to travel to Los Angeles for trial. It would especially be a hardship if both Glenn Rudin and I travel to Los Angeles and both of us attend the trial. Our business would suffer materially.").

### H. Relative Means of the Parties

[HN10]A court should consider the relative means of the parties "where a disparity exists between the means of the parties in determining venue." [53] While this factor again [*20] mildly favors Malibu, it similarly does not rise to the level of warranting transfer. Although Malibu was founded in 2000 and had a net loss in 2003, Malibu has exhibited and sold its product in New York. [54] This fact weakens Malibu's argument that it does not have the means to conduct litigation in New York.

> 53  Everest Capital Ltd. v. Everest Funds Mgmt. LLC., 178 F. Supp. 2d 459, 467 (S.D.N.Y. 2002).
> 54  See generally 3/17/04 Gillmour-Bryant Decl.

### I. Forum's Familiarity with the Governing Law

[HN11]"Patent law is federal law and any district court may handle a patent case with equal skill." [55] This factor is therefore neutral.

> 55    *Wechsler*, 1999 U.S. Dist. LEXIS 19800, 1999 WL 1261251, at *9 (quotations and citations omitted).

### J. Summary of Venue Issues

Malibu has failed to meet its burden to demonstrate that [*21] this action would be better litigated in the Central District of California. Although the availability of process to compel unwilling witnesses and the relative means of the parties slightly favor Malibu, these factors are outweighed by the deference accorded to Caville's choice of forum and the convenience that conducting litigation in New York will afford Caville and his witnesses.

### IV. CONCLUSION

For the foregoing reasons, Malibu's motion to transfer this action to the Central District of California is denied. The Clerk of the Court is directed to close this motion [# 19 on the docket sheet]. A conference is scheduled for July 14, 2004, at 4:30 p.m. in Courtroom 15C.

SO ORDERED:

Shira A. Scheindlin

U.S.D.J.

Dated: July 6, 2004

LEXSEE



Analysis
As of: Oct 26, 2007

WILLIAMS ADVANCED MATERIALS, INC., Plaintiff, v. TARGET
TECHNOLOGY COMPANY, LLC, Defendant.

03-CV-276-A

UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF
NEW YORK

2007 U.S. Dist. LEXIS 56189

August 1, 2007, Decided
August 1, 2007, Filed

**PRIOR HISTORY:** Williams Advanced Materials, Inc. v. Target Tech. Co., LLC, 2007 U.S. Dist. LEXIS 28018 (W.D.N.Y., Apr. 16, 2007)

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff, a licensee and alleged infringer, sued defendant patent owner, seeking a declaration that three licensed patents and a fourth patent were invalid and unenforceable. The patent owner counterclaimed. Before the court was an appeal by the patent owner from an order by a magistrate judge transferring venue to the Southern District of California.

**OVERVIEW:** There were two related lawsuits pending simultaneously--this action in the Western District of New York (New York action) and an action in the Central District of California (California action). The issue was whether the New York action should be transferred to California. The patent owner argued that the magistrate erred when he determined that transfer was warranted under 28 U.S.C.S. § 1404(a). The court stated that the magistrate correctly determined that the threshold requirement was met as this action could have been brought in the Central District of California. He also identified the factors relevant to a motion to transfer

under § 1404. However, by failing to give proper consideration to the first-to-file rule, he committed clear error. The court found that there were no special circumstances and that a balance of convenience did not weigh in favor of transferring the action. The licensee simply failed to overcome the strong presumption of priority created by the first-to-file rule. Further, even if the balance of convenience tipped slightly in favor of transferring this action, the court would have declined to do so as the motion was obviously motivated by judge-shopping.

**OUTCOME:** The appeal was granted, the magistrate judge's order was reversed, and the motion to transfer venue (joined by the licensee) was denied.

LexisNexis(R) Headnotes

*Civil Procedure > Judicial Officers > Magistrates > Pretrial Orders*
*Civil Procedure > Appeals > Standards of Review > Clearly Erroneous Review*
[HN1]An order to change venue is a non-dispositive order that is reviewed under a clearly erroneous or contrary to law standard. 28 U.S.C.S. § 636(b)(1)(A);

Fed. R. Civ. P. 72(a). A magistrate judge's order is clearly erroneous where on the entire evidence, the district court is left with the definite and firm conviction that a mistake has been committed.

*Civil Procedure > Venue > Motions to Transfer > Convenience of Parties*
*Civil Procedure > Venue > Motions to Transfer > Convenience of Witnesses*
*Civil Procedure > Venue > Motions to Transfer > Interests of Justice*
[HN2]See 28 U.S.C.S. § 1404(a).

*Civil Procedure > Venue > Motions to Transfer > Convenience of Parties*
*Civil Procedure > Venue > Motions to Transfer > Interests of Justice*
*Evidence > Procedural Considerations > Burdens of Proof > Allocation*
[HN3]In considering a motion to transfer venue under 28 U.S.C.S. § 1404(a), the threshold inquiry is whether the action could have been brought in the transferee district, 28 U.S.C.S. § 1404(a). If that requirement is met, a court should consider the following factors to determine whether the convenience of the parties or the interests of justice weigh in favor of transfer: (1) the plaintiff's choice of forum, (2) the convenience of witnesses, (3) the location of relevant documents and relative ease of access to sources of proof, (4) the convenience of parties, (5) the locus of operative facts, (6) the availability of process to compel the attendance of unwilling witnesses, and (7) the relative means of the parties. Motions for transfer lie within the broad discretion of the courts and are determined upon notions of convenience and fairness on a case-by-case basis. The moving party bears the burden of demonstrating that transfer is warranted.

*Civil Procedure > Venue > Motions to Transfer > General Overview*
*Evidence > Inferences & Presumptions > Presumptions*
*Evidence > Inferences & Presumptions > Rebuttal of Presumptions*
[HN4]The "first-to-file" rule provides that where two courts have concurrent jurisdiction over an action involving the same parties and the same issues, the court where the action was "first filed" has priority over the second action. It is a rule of judicial economy that creates a strong presumption in favor of the forum of the

first-filed suit. A party seeking to overcome the presumption must show that there are special circumstances which justify giving priority to the second action. The first-to-file rule applies when there is substantial overlap between the two competing cases in that they have identical or substantially similar parties and claims.

*Civil Procedure > Venue > Motions to Transfer > General Overview*
[HN5]The first-to-file rule relates to where the actual dispute was first filed, not where a particular party was first brought into the litigation. It is the date where the action between the primary parties was first filed that governs, not the date on which the movant first became a party to the litigation.

*Civil Procedure > Venue > Motions to Transfer > General Overview*
[HN6]In the context of the "first-to-file" rule, to overcome the strong presumption of priority, movants must show that special circumstances exist or that the balance of convenience favors giving priority to the second action. The U.S. Court of Appeals for the Second Circuit has identified two situations where special circumstances have been found sufficient to justify a departure from the first-filed rule of priority. The first is the so-called "customer action" where the first-filed suit is against a customer of the alleged infringer while the second suit involves the infringer himself. The second special circumstance occurs where forum shopping alone motivated the choice of the situs for the first suit.

*Civil Procedure > Venue > Motions to Transfer > General Overview*
*Civil Procedure > Venue > Motions to Transfer > Convenience of Parties*
*Civil Procedure > Venue > Motions to Transfer > Convenience of Witnesses*
[HN7]To determine whether the balance of convenience warrants a departure from the first-filed rule, a court applies the same factors as in deciding whether transfer is appropriate under 28 U.S.C.S. § 1404(a).

*Civil Procedure > Venue > Motions to Transfer > General Overview*
[HN8]The purpose of 28 U.S.C.S. § 1404(a) is not to

allow judge-shopping by litigants. Forum shopping may be inferred where the reasons for choice are wholly frivolous.

*Civil Procedure > Venue > Motions to Transfer > General Overview*

[HN9]A plaintiff's choice of forum is to be given substantial weight and should not be disturbed unless the balance of convenience and justice weigh heavily in favor of transfer, especially where the plaintiff's chosen forum is its principal place of business. A plaintiff's choice of forum is given less deference when the plaintiff is a nonresident and the operative facts bear little connection to that forum.

*Patent Law > Jurisdiction & Review > Personal Jurisdiction & Venue > General Overview*

[HN10]In a patent infringement action, the locus of operative facts is where the research, design and development of the infringing product occurred.

COUNSEL: [*1] For Williams Advanced Materials Inc., Plaintiff: Christopher E. Blank, Ronald S. Kareken, John D. Cook, Thomas B. Cronmiller, LEAD ATTORNEYS, Hiscock & Barclay LLP, Rochester, NY; Douglas J. Nash, Hiscock & Barclay, Syracuse, NY.

For Target Technology Company, LLC, Defendant: Cheryl Smith Fisher, LEAD ATTORNEY, Magavern, Magavern & Grimm, Buffalo, NY; Kurt N. Jones, LEAD ATTORNEY, Woodard, Emhardt, Moriarty, McNett & Henry LLP, Indianapolis, IN.

For Target Technology Company, LLC, Counter Claimant: Cheryl Smith Fisher, LEAD ATTORNEY, Magavern, Magavern & Grimm, Buffalo, NY; Kurt N. Jones, LEAD ATTORNEY, Woodard, Emhardt, Moriarty, McNett & Henry LLP, Indianapolis, IN.

For Cinram International, Inc. individually and as successor in interest to Warner Advanced Media Operations and Wea Manufacturing, ThirdParty Defendant: Ivan S. Kavrukov, Tonia A. Sayour, LEAD ATTORNEYS, Cooper & Dunham, LLP, New York, NY.

For Deluxe Media Services, Inc., Evatone, Inc., High Speed Video, Inc., International Disc Manufacturer, Inc., JVC Disc America Company, National Film Laboratories

doing business as Crest National Optical Storage Media, Replitech, Inc., Symcon, Takasaki Corp. of America, Tapematic USA, [*2] ThirdParty Defendants: John D. Cook, Hiscock & Barclay LLP, Rochester, NY.

For Cinram International, Inc. individually and as successor in interest to Warner Advanced Media Operations and Wea Manufacturing, ThirdParty Defendant: Tonia A. Sayour, Cooper & Dunham, LLP, New York, NY.

For National Film Laboratories, Deluxe Media Services, Inc., Evatone, Inc., High Speed Video, Inc., International Disc Manufacturer, Inc., JVC Disc America Company, Replitech, Inc., Symcon, Tapematic USA, Takasaki Corp. of America, Cinram International, Inc., individually and as successor in interest to Warner Advanced Media Operations and Wea Manufacturing, Evatone, Inc., High Speed Video, Inc., International Disc Manufacturer, Inc. JVC Disc America Company, National Film Laboratories, Replitech, Inc., Symcon, Tapematic USA, Takasaki Corp. of America, Counter Claimants: John D. Cook, Hiscock & Barclay LLP, Rochester, NY.

For Target Technology Company, LLC, Counter Defendant: Cheryl Smith Fisher, LEAD ATTORNEY, Magavern, Magavern & Grimm, Buffalo, NY; Kurt N. Jones, LEAD ATTORNEY, Woodard, Emhardt, Moriarty, McNett & Henry LLP, Indianapolis, IN.

JUDGES: Richard J. Arcara, CHIEF JUDGE.

OPINION BY: Richard J. Arcara

OPINION

    DECISION AND ORDER

INTRODUCTION

    Currently [*3] before the Court is an appeal by defendant Target Technology Company, LLC ("Target"), from an order by Magistrate Judge Jeremiah J. McCarthy transferring venue to the Southern District of California. For the reasons stated, the appeal is granted, Magistrate Judge McCarthy's order is reversed and the motion to transfer venue is denied.

BACKGROUND

    There are currently two related lawsuits pending simultaneously in two different district courts -- this

action in the Western District of New York ("New York action") and an action in the Central District of California ("California action"). The issue before this Court is whether this New York action should be transferred to California. In order to address that issue, some background into the relationships of the parties and the procedural history of each case is required.

## A. The Parties

The key parties to both the New York action and the California action are identical. Williams Advanced Materials, Inc. ("Williams") is the plaintiff in the New York action and the primary defendant in the California action. Williams is a New York State corporation with its principal place of business in Buffalo, New York. Williams is a producer and supplier of [*4] metals and metal alloys, including "sputtering targets." Williams sells its "sputtering targets" to its customers who use them to manufacture Digital Video Discs ("DVDs").

Target is the primary defendant in the New York action and the plaintiff in the California action. Target is a Delaware corporation with its principal place of business in Irvine, California. Target is the owner of several patents which are directed to the use of silver-based alloys in the semi-reflective layer of DVDs.

The remaining parties to the lawsuits are the DVD manufacturers who purchase sputtering targets from Williams. Thirteen of those DVD manufacturers are being sued by Target in this action, and all of them (except one) [1] are also being sued by Target in the California action. [2]

> 1   Lightening Media is not named as a defendant in the California action.
> 2   It is also noted that a number of DVD manufacturers named in the California action have not been sued in this action.

Prior to the commencement of litigation proceedings, Target had licensed three of its patents to Williams: United States Patent Nos. 6,007,889 ("'889 patent"), 6,280,811 ("'811 patent") and 6,451,402 ("'402 patent"). Pursuant to that license agreement, [*5] Williams produced silver-based sputtering targets and sold those sputtering targets to its customers (DVD manufacturers). Those DVD manufacturers then used the sputtering targets to create a silver-based semi-reflective layer of a DVD.

While the license agreement was still in effect, Target learned that Williams had developed a new product, "Sil-X". Target believed that "Sil-X" infringed on its existing patents. Target contacted Williams's customers and threatened suit if those customers used Sil-X in the manufacture of DVDs.

## B. New York Action

In response to those threats of litigation, Williams brought suit in the Western District of New York in April 2003. Williams sought a declaratory judgment against Target declaring the three licensed patents and a fourth patent, U.S. Patent No. 6,544,616 ("'616 patent"), invalid and unenforceable. Williams alleged that Target's patents were anticipated or made obvious by the prior art. Williams also asserted that Target had engaged in inequitable conduct before the Patent Trademark Office ("PTO") and alleged unfair competition under the Lanham Act and New York's General Business Law. Target brought counterclaims against Williams for patent infringement [*6] and breach of the license agreement.

Fearing that Target's threats of infringement would harm its business, Williams also moved for a preliminary injunction to enjoin Target from bringing suit against its customers. On August 12, 2004, this Court denied Williams's motion for a preliminary injunction. [3] The case was then referred to Magistrate Judge Jeremiah J. McCarthy [4] for pretrial proceedings.

> 3   That order was affirmed by the Court of Appeals for the Federal Circuit on August 3, 2005, without opinion.
> 4   The matter was initially referred to Magistrate Judge H. Kenneth Schroeder, Jr., but later transferred to Magistrate Judge McCarthy.

## C. The California Action

While this action was pending in New York, Target was prosecuting U.S. Patent No. 6,790,503 ("the '503 patent") before the PTO. The '503 patent also relates to the use of silver-based alloys in the manufacture of DVDs, and was developed from the continuing application of Target's first patent, the '889 patent. The '503 patent issued on September 14, 2004. On that same date, Target brought suit against Williams and twenty-one of its customers in the Central District of California alleging infringement of the '503 patent. In its complaint, [*7] Target advised the California District

Page 4

Court that the action was related to the instant proceeding in the Western District of New York. Despite Target's clear recognition of the relatedness of both proceedings, Target chose to commence litigation concerning the '503 patent in California, as opposed to consolidating it with the then-pending New York action. Williams did not move to transfer the California case to New York. Instead, the parties proceeded with extensive discovery in the California action, followed by dispositive motions.

### D. Motions to Transfer

On June 20, 2006, Target filed a third-party complaint in the New York action against thirteen of Williams's customers alleging infringement of the four patents initially at issue in that litigation (the '889 patent, the '811 patent, the '402 patent, and the '616 patent), the '503 patent which is at issue in the California action, and five additional patents: U.S. Patent Nos. 6,764,735; 6,841,219; 6,852,384; 6,896,947 and 6,905,750 (collectively, the "Target patents"). Target alleges that each of the third-party defendants has infringed "one or more" of its ten patents. With the exception of one entity, all of the third-party defendants [*8] in the New York action were already being sued by Target in the California action. [5] Five of those thirteen defendants are located in California, the remaining eight are dispersed throughout the United States and Canada.

> 5   As stated *supra* note 1, Lightening Media is named as a third-party defendant in the New York action but is not named as a defendant in the California action.

On November 10, 2006, third-party defendant Cinram International, Inc. ("Cinram"), filed a motion in the New York action to transfer venue to the Central District of California. On that same date, Williams moved to join in that motion on behalf of itself and all of the third-party defendants, Target opposed the motion. On April 16, 2007, Magistrate Judge McCarthy issued an order granting the motion to transfer venue. Target appealed the transfer order to this Court and on June 15, 2007, the Court heard oral argument on the appeal. [6]

> 6   Following argument, Cinram moved to submit a supplemental motion addressing some of the issues raised by the Court. That motion is granted and the Court has considered the arguments made in that filing. However, for the reasons stated herein, the Court finds those arguments

unpersuasive.

In [*9] the meantime, on February 6, 2007, United States District Judge David O. Carter, who is presiding over the California action, filed a decision and order denying motions for summary judgment in the California action and scheduled trial for June 11, 2007. On May 7, 2007, one month before trial was scheduled to commence, Target filed a motion to transfer the California action to the Western District of New York. On May 25, 2007, Judge Carter issued an order delaying resolution the transfer motion pending this Court's ruling on Target's appeal. [7]

> 7   Judge Carter also adjourned trial to August 2008 following his decision to permit intervention by Sony DADC, U.S., Inc.

### DISCUSSION

[HN1]An order to change venue is a non-dispositive order that is reviewed under a "clearly erroneous or contrary to law" standard. See 28 U.S.C. § 636(b)(1)(A); Fed.R.Civ.P. 72(a); Hirsch v. Zavaras, 920 F. Supp. 148, 150 (D. Colo. 1996); Pennick v. Stracher, No. 90-CV-849, 1992 U.S. Dist. LEXIS 3729, 1992 WL 697636 (N.D.N.Y. Mar. 27, 1992). A magistrate judge's order is "clearly erroneous" where "on the entire evidence,' the [district court] is 'left with the definite and firm conviction that a mistake has been committed.'" Easley v. Cromartie, 532 U.S. 234, 243, 121 S. Ct. 1452, 149 L. Ed. 2d 430 (2001) [*10] (quoting United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S. Ct. 525, 92 L. Ed. 746 (1948)).

Target argues that Magistrate Judge McCarthy erred when he determined that transfer was warranted under 28 U.S.C. § 1404(a), which provides:

> [HN2]For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought.

See 28 U.S.C. § 1404(a).

[HN3]In considering a motion to transfer venue under § 1404(a), the threshold inquiry is whether the action could have been brought in the transferee district. Id. See also In re Hanger Orthopedic Group, Inc. Sec.

2007 U.S. Dist. LEXIS 56189, *10

Lit., 418 F. Supp. 2d 164 (E.D.N.Y. 2006). If that requirement is met, the Court should consider the following factors to determine whether the convenience of the parties or the interests of justice weigh in favor of transfer: (1) the plaintiff's choice of forum, (2) the convenience of witnesses, (3) the location of relevant documents and relative ease of access to sources of proof, (4) the convenience of parties, (5) the locus of operative facts, (6) the availability of process to compel the attendance of unwilling witnesses, and (7) the relative means [*11] of the parties. See D.H. Blair & Co., Inc. v. Gottdiener, 462 F.3d 95, 106-07 (2d Cir. 2006); see also Invivo Research, Inc. v. Magnetic Resonance Equipment Corp., 119 F. Supp. 2d 433, 436 (S.D.N.Y. 2000) (listing additional relevant factors). Motions for transfer lie within the broad discretion of the courts and are determined upon notions of convenience and fairness on a case-by-case basis. In re Cuyahoga Equip. Corp., 980 F.2d 110, 117 (2d Cir. 1992); Linzer v. EMI Blackwood Music Inc., 904 F. Supp. 207, 216 (S.D.N.Y.1995). The moving party bears the burden of demonstrating that transfer is warranted. Invivo Research, Inc, 119 F. Supp. 2d at 436.

## A. First-to-File Rule

The Magistrate Judge correctly determined that the threshold requirement was met as this action could have been brought in the Central District of California. He also identified the factors relevant to a motion to transfer under § 1404. However, the Magistrate Judge erred in failing to address the applicability of the "first-to-file" rule.

[HN4]The "first-to-file" rule provides that where two courts have concurrent jurisdiction over an action involving the same parties and the same issues, the court where the action was "first [*12] filed" has priority over the second action. See D.H. Blair & Co., 462 F.3d at 106; City of New York v. Exxon Corp., 932 F.2d 1020, 1025 (2d Cir. 1991); 800-Flowers, Inc. v. Intercontinental Florist, Inc., 860 F. Supp. 128, 131 (S.D.N.Y. 1994). It is a rule of judicial economy that creates a "strong presumption in favor of the forum of the first-filed suit." 800-Flowers, 860 F. Supp. at 132. A party seeking to overcome the presumption must show that "there are special circumstances which justify giving priority to the second action." Exxon Corp., 932 F.2d at 1025 (internal quotation omitted).

The first-to-file rule applies when there is substantial overlap between the two competing cases in that they have "identical or substantially similar parties and claims." See In re Cuyahoga, 980 F.2d at 116-17. There can be no doubt that there is a substantial overlap between the two actions at issue. Both actions involve the same key parties and issues. Both actions involve allegations of patent infringement by Target against Williams, and allegations of patent invalidity by Williams against Target. While only one patent is at issue in the California action, the New York action involves that [*13] same patent, plus nine others. All ten patents are part of the same patent family. Movants concede that the claims and defenses in both actions are "related, and in some instances, . . . identical." See Decl. of Tonia A. Sayour, Dkt. 149, at P 10. They also agree that discovery obtained from one lawsuit is relevant to the other. Because both actions involve "identical or substantially similar parties and claims," it is clear that the presumption created by the first-to-file rule applies.

Cinram argues that the Court should treat the California action as the "first filed" dispute because that is the action in which it (Cinram) was first sued. The Court rejects this creative but unsupported legal theory. [HN5]The first-to-file rule relates to where the actual dispute was first filed, not where a particular party was first brought into the litigation. See Kerotest Mfg. Co. v. C-O-Two Fire Equipment Co., 342 U.S. 180, 182-83, 72 S. Ct. 219, 96 L. Ed. 200, 1952 Dec. Comm'r Pat. 407 (1952) (affirming a stay of a second-filed action even though the plaintiff in second suit was not joined as a defendant in first-filed action until after second suit was initiated). It is the date where the action between the primary parties was first filed that governs, [*14] not the date on which the movant first became a party to the litigation. See Arris Int'l, Inc. v. Hybrid Patents, Inc. (In re Com21, Inc.), 357 B. R. 802, 807 (Bankr. N. D. Cal, 2006). Accordingly, the fact that Cinram was first sued in the California action is of no consequence for the purposes of the first-to-file rule.

By failing to give proper consideration to the first-to-file rule, Magistrate Judge McCarthy committed clear error. Properly applied, the rule creates a "strong presumption" that the case should remain in this District, where the dispute between Williams and Target was first filed.

## B. Special Circumstances and the Balance of Convenience

{HN6}To overcome the strong presumption of priority in favor of this District, movants must show that special circumstances exist or that the balance of convenience favors giving priority to the California action. See Country Home Products, Inc. v. Schiller-Pfeiffer, Inc., 350 F. Supp. 2d 561, 569-570 (D. Vt. 2004).

The Second Circuit has identified two situations where special circumstances have been found sufficient to justify a departure from the first-filed rule of priority. The first is the so-called 'customer action' where the first-filed suit is against a customer of the alleged [*15] infringer while the second suit involves the infringer himself. See William Gluckin & Co. v. Int'l Playtex Corp., 407 F.2d 177, 178 (2d Cir. 1969). That exception is clearly inapplicable as Williams brought this suit against Target in part to *avoid* having its customers sued.

The second special circumstance occurs "where forum shopping alone motivated the choice of the situs for the first suit." Id. The Court has no information to suggest that forum shopping motivated Williams's decision to initiate litigation in this District. However, for the reasons discussed below, the Court finds that the instant motion to transfer is motivated by improper forum shopping. Therefore, not only does this circumstance fail to overcome the presumption of priority in favor of this District, it actually provides further support for maintaining priority here.

The moving parties argue that transfer is warranted because a "balance of convenience" favors giving priority to the California action. {HN7}To determine whether the balance of convenience warrants a departure from the first-filed rule, the court applies the same factors as in deciding whether transfer is appropriate under 28 U.S.C. § 1404(a). See Schnabel v. Ramsey Quantitative Sys., Inc., 322 F. Supp. 2d 505, 514 (S.D.N.Y. 2004).

The [*16] Magistrate Judge found that the convenience of the parties weighed in favor of transfer because all of the parties, except Target, had joined in the motion to transfer this litigation to California. The Court finds that this conclusion was clearly erroneous. The issue is not where the parties *subjectively desire* to litigate this case, but rather, whether the proposed transferee forum is more convenient than the forum where the case was first filed.

New York is clearly the more convenient forum for

Williams and Cinram. Williams is located in this District, and Cinram is a Canadian company with its principal place of business in Olyphant, Pennsylvania. [8] Nevertheless, Williams and Cinram both seek transfer to California. Recognizing that they cannot seriously contend that California is a more convenient forum for *them*, Cinram and Williams instead argue that California is the more convenient forum for *Target* and many of the *other* third-party defendants. Ironically, Target, who is located in the proposed transferee district, opposes the motion to transfer venue to a forum that is more convenient for it.

> [8] Cinram's Canadian operations are based out of Toronto, Ontario, approximately 90 miles [*17] from Buffalo, New York (where this Court sits). Olyphant, Pennsylvania is located outside Scranton, Pennsylvania, approximately 280 miles from Buffalo, New York.

The irony of the parties' respective positions, when viewed in conjunction with the rulings issued from both courts, leads the Court to only one conclusion -- Williams, Cinram and Target are seeking to engage in forum shopping. Target wants the case to remain here because this Court has previously issued a preliminary injunction ruling favorable to it, whereas Williams and Cinram want the action transferred to California where Target has received unfavorable rulings. {HN8}"The purpose of § 1404(a) is not to allow judge-shopping by litigants." Betts v. Atwood Equity Co-op. Exchange, Inc., No. 88-4292-R, 1990 U.S. Dist. LEXIS 8132, 1990 WL 92495, at *1 (D. Kan. Jun. 13, 1990). While the motion is being made under the pretense that it is more convenient for the moving parties, the true motivation behind it is "judge-shopping." This is clear the from the fact that California is not more convenient for Williams, Cinram or a majority of the third-party defendants, [9] yet all of them have joined in the motion to transfer citing convenience as the motivation. See William Gluckin & Co, 407 F.2d at 178 [*18] (observing that forum shopping may be inferred where the reasons for choice are "wholly frivolous"). The Court also notes that the request to join in Cinram's motion was filed by Williams on behalf of itself and all of its customers. To the extent that Williams is litigating this case on behalf of those third-party defendants, it would appear that New York -- where Williams is located -- is the more convenient forum. Not only have the movants failed to show that the balance of convenience tips in their favor, but their

obviously improper motivations provide an adequate basis for denying the motion in its entirety.

9  Eight out of the thirteen third-party defendants are not located in California.

Nor do any of the remaining § 1404 factors favor transfer. With regard to the plaintiff's choice of forum, although Williams's initial decision to litigate in this District is entitled to "substantial weight," see Toy Biz, Inc. v. Centuri Corp., 990 F. Supp. 328, *330 (S.D.N.Y.1998) [HN9]("The plaintiff's choice of forum is to be given substantial weight and should not be disturbed unless the balance of convenience and justice weigh heavily in favor [of transfer] . . . especially where, as here, plaintiff's [*19] chosen forum is its principal place of business."), its newly-acquired desire to litigate in a foreign forum is accorded much less deference, see Invivo Research Inc., 119 F. Supp. 2d at 438 (holding that the plaintiff's choice of forum is given less deference when the plaintiff is a nonresident and the operative facts bear little connection to that forum).

As to the convenience of the witnesses and the ability to compel their attendance, the parties have indicated that there are only two non-party witnesses, neither of whom is subject to compulsory process in the Western District of New York or the Central District of California. Therefore, this factor does not weigh in favor of transfer.

Nor does the location of operative facts favor transfer. [HN10]In a patent infringement action, the locus of operative facts is where the research, design and development of the infringing product occurred. Invivo Research Inc., 119 F. Supp. 2d at 439. The Magistrate Judge found that the locus of operative facts was in California, where some of the DVD manufacturers are located.

Although some of the DVD manufacturers are located in California, many are not. In fact, only five of the thirteen third-party defendants [*20] are located in California. The rest are dispersed throughout the United States and Canada. Because there is no single location where all of the infringing DVDs are manufactured, this factor does not weigh in favor of transfer.

More importantly, the locus of operative facts in this case is New York. Although the infringing end-product is a DVD containing a semi-reflective layer made of a

specific silver alloy, it is the silver alloy that makes infringement possible. That silver alloy is derived from sputtering targets that were researched, designed and developed by Williams in this District. [10]

10  Some of the operative facts also may have occurred in Indiana, since that is the location where Target's owner, Han Nee, appears to have conceived of the invention. See Invivo Research, Inc., 119 F. Supp. 2d at 439 ("Operative facts in a patent infringement action include facts relating to the design, development, and production of a patented product."). This is not to suggest that Indiana is a more appropriate forum, but rather to demonstrate the lack a strong nexus with California.

In sum, the Court finds that there are no special circumstances and that a balance of convenience does not weigh [*21] in favor of transferring this action to California. Movants have simply failed to overcome the strong presumption of priority created by the first-to-file rule. Further, even if the balance of convenience tipped slightly in favor of transferring this action, the Court would decline to do so as the motion is obviously motivated by improper judge-shopping.

C. Change in Circumstances

Finally, movants argue that a "change in circumstances" justifies transferring this case to California. They argue that discovery largely has been completed in that California action and that transfer of this action to California will permit the entire matter to be tried much earlier than if the case were to remain in this District.

The Court rejects that argument. At the outset, the Court notes that the posture of the California case has changed even since this motion was filed. Although trial was initially scheduled to commence in June 2007, it has been adjourned to August 2008 following Judge Carter's decision to permit intervention by Sony DADC U.S., Inc. Movants' argument regarding completion of discovery in the California case is unpersuasive given their concession that the same discovery material pertains [*22] to both actions. Furthermore, while the Court recognizes that the California litigation is farther along, it is important to recognize that the California action involves only one patent, whereas the New York action involves that same patent, plus nine others. Transferring this larger action to

Page 8

2007 U.S. Dist. LEXIS 56189, *22

California would certainly disrupt the proceedings in that case. There is simply no reason to believe that litigation relating to the entire ten patents would conclude any more quickly in California than New York. The movants' speculative assertion to the contrary provides an insufficient basis disrupting the "first-to-file" rule. [11]

> [11] In fact, it is very possible that in the interests of judicial economy, Judge Carter may] grant Target's pending motion to transfer the California action here.

## CONCLUSION

Upon review of the relevant factors and after considering the totality of circumstances in this case, the Court finds that Magistrate Judge McCarthy's decision to transfer venue was clearly erroneous and contrary to law. Accordingly, the motion to change venue is denied. [12]

The parties are directed to appear on September 20, 2007 at 9:00 a.m. for a status conference.

> [12] There has been no appeal of [*23] Magistrate Judge McCarthy's order granting motions for a more definitive statement as to which patents are infringed by which products. Accordingly, that portion of Magistrate Judge McCarthy's April 16, 2007 order remains intact.

SO ORDERED.

s/ Richard J. Arcara

CHIEF JUDGE

UNITED STATES DISTRICT COURT

DATED: August 1, 2007