UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

BRASSICA PROTECTION PRODUCTS LLC,

                Plaintiff,

-against-

CAUDILL SEED & WAREHOUSE CO., INC. d/b/a
CAUDILL SEED CO.,

                Defendant.

07 Civ. 7844 (SAS)

DECLARATION OF
ANTONY TALALAY IN
OPPOSITION TO MOTION
TO TRANSFER, STAY, OR
DISMISS

ANTONY TALALAY declares as follows:

1. I am Chief Executive Officer of Brassica Protection Products LLC ("Brassica"), plaintiff in this action. I submit this declaration in opposition to the motion of defendant Caudill Seed & Warehouse Co., Inc. ("Caudill") to transfer, stay, or dismiss Brassica's action. Unless otherwise stated, the facts set forth in this declaration are based upon my personal knowledge.

2. Brassica is a Delaware limited liability company located in Baltimore, Maryland. Brassica was formed in 1997 to engage in the business of, among other things, the development and promotion of chemoprotective products such as fresh cruciferous sprouts, functional foods, dietary supplements and ingredients for inclusion in foods and dietary supplement based upon the extraction and processing of glucosinolates or isothiocyanates from cruciferous seeds or sprouts. The company has sought to exploit commercially the discoveries of Dr. Paul Talalay, a Professor of Pharmacology and Director of the Laboratory for Molecular Sciences at The Johns Hopkins University School of Medicine ("Johns Hopkins") and his colleagues. Dr. Talalay is a founder of Brassica.

The Inventions

3.    Following more than 20 years of research led by Dr. Talalay, scientists at Johns Hopkins identified and quantified the components in broccoli and other cruciferous vegetables that boost the human body's enzyme systems, detoxifying carcinogens before they can cause damage to cells and contributing to our understanding of the ability of diets rich in vegetables and fruits, particularly cruciferous vegetables, to prevent cancer. These discoveries have been recognized worldwide. This research led to the subsequent discovery that selection and growing of small plants (sprouts) and seeds could provide much higher and more consistent amounts of these protective compounds. Johns Hopkins and the scientists who made this discovery were issued a series of US (and international) patents beginning in 1998. These patent rights were exclusively licensed to Brassica in 1998.

4.    Pursuant to the license from Johns Hopkins, Brassica expended significant resources in developing the proprietary technology and expertise to extract the active ingredients from seeds and thus make them available for introduction as food ingredients and supplements. Although Brassica refers to the primary active ingredient as sulforaphane glucosinolate, or under its trademark SGS, Caudill, in its motion to the Court, uses the generic scientific designation glucoraphanin, or "GR." For ease of reference, I will also use Caudill's term, GR, in this declaration.

The Agreement and its Forum Provision

5.    Brassica and Caudill entered into the Agreement that forms the basis of the dispute in this Court in December 2004. In accordance with the Agreement, Brassica sublicensed its technology, Know-How, and patent rights to GR-containing products to Caudill. A true and correct copy of the Agreement, without exhibits, is attached to this declaration as Exhibit 1.

6. The Agreement contains an exclusive forum selection provision, in section 14.5, that requires the parties to litigate in the state and federal courts in New York City. I was involved in the negotiations leading up to the Agreement, and this provision was discussed during those negotiations. At the time, neither party wanted to find itself in litigation in the location of the other's principal location of business, and both parties selected New York as the appropriate forum.

Caudill's Declaration

7. I have reviewed the declaration submitted by Caudill's CEO, Dan Caudill, in support of the motion to dismiss. I will not attempt here to address all of the statements made by Mr. Caudill. In light of Caudill's pending motion, however, I would like to set the record straight on the following facts.

8. Mr. Caudill is simply wrong in stating that "the parties have never met in New York" (paragraph 9 of his declaration). Following a series of contract performance problems, including the reported contamination of a large batch of Caudill's GR product, Mr. Caudill and I met in New York, at the offices of Brassica's counsel, on August 23, 2006. The discussions at that meeting were memorialized in a letter of the same date to Mr. Caudill. He countersigned the letter on behalf of Caudill; a true and copy is attached as Exhibit 2. As the Court can see, the first paragraph of the letter references the parties' Agreement and the second paragraph states that it "summarizes the discussions held today at the offices of Bingham McCutchen LLP concerning the Agreement."

9. Mr. Caudill also states in paragraph 9 of his declaration that Brassica and Caudill "have had regular meetings in Louisville, in the past." He fails to say that the two companies'

regular meetings also took place in Baltimore and other places, including trade shows and customer locations and seed growing facilities in California.

10. In paragraph 6 of his declaration, Mr. Caudill declares that "all of Caudill's sales activities occurs in Louisville," Kentucky. It is my understanding, however, that most of Caudill's sales activities for dietary supplement ingredients take place outside Kentucky, at customers' places of business and industry meetings / trade shows. Over the past two years, I have personally seen Caudill personnel, including Mr. Caudill, at industry meetings / trade shows in Las Vegas, Nevada, Baltimore, Maryland, and Anaheim, California. In the dietary supplement business, most of the sales activities for manufacturers and distributors are focused on the trade shows and related events, and I am not aware of any such events taking place in Kentucky since entering into our Agreement with Caudill.

11. In paragraph 11 of his declaration, Mr. Caudill acknowledges that both Brassica and Caudill began their relationship under the Agreement collaboratively, "seeking to work toward a common goal of developing a GR-containing" supplement. (Indeed, as a result of that collaborative work under the Agreement, Caudill is now manufacturing and distributing the same GR-containing products that are the subject of Brassica's infringement and breach of contract action in this Court.) Mr. Caudill states that Brassica made "unreasonable" demands, including requiring Caudill "to meet requirements that far exceed any requirements of any federal regulations applicable to the Caudill products." I realize that this is not the time to put before the Court the evidence on this subject, but I would note that the Agreement itself expressly required Caudill to comply with current Good Manufacturing Practices (sections 1.13, 3.1, and 3.2), and that the federal regulations he references were the FDA's proposed regulations with respect to

dietary supplements. Those regulations have gone into effect and should soon govern Caudill's operations.

12.  In paragraph 12 of his declaration, Mr. Caudill states that after receiving notice from Brassica of Caudill's breaches of the Agreement, "Caudill tried in good faith to resolve the issues" raised by Brassica. In fact, during the 30-day cure period that followed Brassica's notice and opportunity to cure, and following the transmission to Caudill of the audit results which found many deficiencies in their cGMP procedures, Caudill took no steps (to my knowledge) to cure the performance problems. While Caudill did attempt to negotiate a new, different license arrangement, and obtained a one-week extension of the Agreement's termination date solely for that purpose, Caudill's only communication to Brassica with respect to the breach notice arrived in the late afternoon of the last day of the Agreement. A true and correct copy of that letter is attached as Exhibit 3. Other than denying that Caudill was in material breach, Mr. Caudill took the position (on the last page) that the Agreement had not in fact been terminated and therefore Caudill would continue its operations.

13.  At no time prior to the entry into the Agreement with Caudill, during the term of the Agreement, or prior to commencing its lawsuit in Kentucky did Caudill ever state to Brassica that Caudill did not believe the licensed patents were in any way invalid or unenforceable. Indeed, over the years I was told by Mr. Caudill that prior to entering agreements with Brassica, he had received opinions from other attorneys confirming the validity and enforceability of the patents and that he believed they were an important part of our relationship that would provide him competitive insulation.

14.  Mr. Caudill's statements at the close of his declaration with respect to the "hardship" his company would face with a trial in New York may be evaluated in the context of

his normal business activity, among other things. While Mr. Caudill may prefer not to travel, I have witnessed numerous times when he and his associates have been away from their Kentucky office for extended periods of time, including outside the US, and have continued to manage their business.

15. First, and as I mentioned earlier in this declaration, Mr. Caudill is often out of the office attending trade shows and industry meetings. Several weeks ago, for example, I attended the Supply Side Expo trade show in Las Vegas that took place over the course of 3 business days. At that show I saw Mr. Caudill as well as his research director, Mr. Ashurst, and his marketing director, Mr. Lyons (the same three individuals that Mr. Caudill suggests might be required to attend "much, if not all, of the trial"). In September, the Natural Products Expo trade show was held in Baltimore for three days, and was attended by Mr. Caudill.

16. In addition, I know Mr. Caudill attended the International Seed Federation's World Seed Conference in New Zealand in May of this year. The convention took place over several business days, and with the travel involved, I would assume Mr. Caudill was not in his office for at least a week. In March of this year I attended the three-day International Sprout Growers Association convention in Tokyo, Japan. I met both Mr. Caudill and Mr. Ashurst there. It was my understanding that Mr. Ashurst traveled on business in Asia before and after the convention. Again, it is difficult to make a trip to Asia in less than a week.

17. I made at least one long trip with Mr. Caudill to visit Brassica and Caudill customers and suppliers in China, Japan and Korea, which lasted more than a week (and during which Mr. Caudill continued to conduct his business).

18. In addition, I would assume that Caudill's manufacture of GR-containing products in Germany requires extended travel by Mr. Ashurst.

19. Mr. Caudill also describes patent-related issues that Mr. Ashurst, Mr. Lyons, and Mr. Caudill may testify about at trial, in paragraph 13 of his declaration. While I cannot address what any of these Caudill employees might say regarding such issues, I would note that all of them have knowledge regarding Caudill's performance of the Agreement and the material breaches that Brassica cited in its notice and opportunity to cure. Assuming they are required to testify in New York anyway, pursuant to the forum selection provision in the Agreement, it would make sense to have their testimony regarding the patents heard in the same legal action.

20. With respect to witnesses identified by Brassica who do not work for Caudill, none of them (other than Caudill's consultant, Perry Bratton) reside in Kentucky, including Sterigenics in Illinois, which irradiated Caudill's GR products in 2006, Texas A & M University (in Texas), and Crown Iron Works in Minnesota which performed manufacturing of those GR products at Caudill's request, LA Naturals in Indiana, a Caudill customer that received GR products from Caudill that were not labeled properly under the Agreement, and Vitamin Shoppe in New Jersey, another Caudill customer.

21. Mr. Caudill says, in paragraph 8, that Brassica has "designated Caudill the exclusive seed supplier" for Brassica's licensees, and that Brassica "directs its licensees to purchase over 100,000 pounds of seeds annually from Caudill's Louisville warehouse." Although our seed agreement is not part of the dispute here, his statements are not correct. First, Caudill's exclusive license is limited to sales to Brassica's licensed sprout growers in the US and Canada (though we have none in Canada) who grow fresh broccoli sprouts for consumption. Caudill does not have an exclusive license either with respect to sales of seeds to other licensees in the US and Canada or sales to anyone outside the US and Canada. Second, Brassica has little or no involvement in the seed purchases by United States sprout growers beyond advising that Caudill is their exclusive supplier. Brassica does not direct their purchases and, absent the

occasional problem, the seed purchases by US sprout growers are all handled directly by Caudill staff.

22. Finally, with respect to Brassica's business activities: Brassica has no office, employees, or place of business in Kentucky. Brassica is not, and never has been, licensed to do business in Kentucky. Brassica does not maintain a mailing address or telephone listing in Kentucky. Brassica does not ship products, directly or indirectly, into Kentucky. Brassica does not own or use any real estate in Kentucky. Brassica does not in the regular course of business advertise in Kentucky. Any products purchased through Brassica's website are shipped from Maryland. Brassica does not engage in any systematic or continuous business activity in Kentucky. Indeed, our only business activity relating to Kentucky is the seed agreement with Caudill. Brassica derives revenue (as a licensor) from that agreement and recently purchased seed from Caudill. Brassica, however, has made no claims in this action with respect to the seed agreement.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on November 27, 2007.

_____
ANTONY TALALAY

8