# Exhibit 4

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

------------------------------------------------------------------ x
BRASSICA PROTECTION PRODUCTS LLC,                : Index No. 602664/07

        Plaintiff,                                                       :

      - against -                                                       :

CAUDILL SEED & WAREHOUSE CO., INC. d/b/a         : **COMPLAINT**
CAUDILL SEED CO.,                                                :

        Defendant.                                                    :
------------------------------------------------------------------ x

Plaintiff BRASSICA PROTECTION PRODUCTS LLC, by and through its attorneys BINGHAM McCUTCHEN LLP, as and for its COMPLAINT against defendant CAUDILL SEED & WAREHOUSE CO., INC. d/b/a CAUDILL SEED CO., hereby says the following:

## THE PARTIES

1.     Plaintiff Brassica Protection Products LLC ("BPP") is a Delaware limited liability company engaged in the business of, among other things, the development and promotion of certain chemoprotective dietary supplement products based upon the extraction and processing of glucosinolates or isothiocyanates from cruciferous seeds, sprouts, and fresh cruciferous sprouts and chemoprotective foods. BPP maintains its principal place of business in Baltimore, Maryland.

2.     Defendant Caudill Seed and Warehouse Co., Inc. ("CSC") is a corporation organized and existing under the laws of the State of Kentucky, engaged in the business of development and sale of sprouting seeds and natural foods.

ACTIVE/72147189.1

3. This dispute arises from a written agreement relating to obligations from a transaction covering in the aggregate in excess of $1 million. In their written agreement, plaintiff BPP and defendant CSC chose the application of New York law, submitted to the jurisdiction of this Court, and designated the New York Secretary of State as their non-exclusive agent for service of process in any proceeding brought in this Court.

## SUMMARY OF ALLEGATIONS

4. This is an action in law and equity to recover royalties owed by CSC to BPP and to enjoin CSC preliminarily and permanently from manufacturing and distributing products that utilize BPP's confidential information, know-how, or patent rights, or that bear BPP's trademarks.

5. By Sublicense, Manufacture and Distribution Agreement as of December 6, 2004 (the "Agreement"), BPP granted CSC a non-exclusive sublicense to use the BPP patents, patent rights, and know-how, and a license to use certain BPP trademarks, for the purpose of manufacturing, distributing and selling certain products in the United States and Canada, which consist of or comprise extracts of glucosinolates or isothiocyanates from cruciferous seeds or sprouts, hereinafter referred to as "SGS-containing products."

6. In accordance with the December 6, 2004 agreement, BPP conveyed its confidential and proprietary information regarding SGS-containing products to CSC.

7. CSC agreed to manufacture the SGS-containing products in accordance with current good manufacturing practices ("cGMP" or "GMP") and written specifications, as established by BPP.

8. Because of CSC's material breaches of the Agreement, including CSC's failure to manufacture SGS-containing products in accordance with GMP and contractual quality control

ACTIVE/72147189.1

specifications, BPP notified CSC by letter dated June 8, 2007 that the Agreement would be terminated on July 12, 2007, unless CSC cured its breaches of the Agreement.

9. During the 30-day cure period, CSC did not seek to cure its breaches of the Agreement and instead sought and requested a short extension of time delaying the effective date of the termination of the Agreement for the sole purpose of negotiating a possible new sublicense agreement with BPP. BPP agreed to defer the termination date for nine days, but strictly for that purpose. The letter agreeing to the extension stated: "If on or before July 20, 2007, BPP and CSC do not enter into a new . . . agreement, then the [June 8, 2007] Letter shall continue in effect and the Effective Date [of termination] shall be July 21, 2007.

10. CSC and BPP did not enter into a new sublicense agreement.

11. The Agreement terminated on July 21, 2007.

12. On July 20, 2007, CSC transmitted a letter to BPP in which CSC denied that it had materially breached the Agreement, denied that CSC is subject either to the contractual quality control specifications or to GMP standards and regulations, and stated that it intended to continue its operations -- including its manufacture and distribution of SGS-containing products -- under the Agreement, notwithstanding BPP's termination of the Agreement.

13. CSC's continued manufacture, distribution, and sale of SGS-containing products constitutes an improper, unauthorized use of BPP's confidential information, patents, trademarks, and business reputation -- causing irreparable harm to BPP, and is in direct breach of the post-termination provisions of the Agreement. In particular, the Agreement provides that upon termination of the Agreement, all rights granted to CSC revert to BPP "and CSC shall cease the production, manufacture, distribution, sale, use or advertisement" of the SGS-containing products.

14. The Agreement permits CSC to sell its existing inventory of SGS-containing products during the 90-day period following termination of the Agreement, but only if CSC promptly delivers a schedule of its existing inventory to BPP, and BPP then declines to purchase that inventory. CSC has failed to deliver a schedule of its existing inventory to BPP and therefore has no right to sell its inventory of the SGS-containing products.

15. CSC has not paid BPP the contractually specified royalty payments for the second quarter of 2007 or the prorated minimum royalty payment due under the Agreement. These payment obligations cover the period that the Agreement was in effect. In addition, CSC is indebted to BPP for CSC's unauthorized, ongoing manufacture and distribution of SGS-containing products despite the July 21, 2007 termination of the Agreement.

## FACTS

### The JHU License

16. Following more than 20 years of academic research, medical scientists at Johns Hopkins University School of Medicine were able to identify and quantify the components in broccoli and other cruciferous vegetables that boost the human body's enzyme systems detoxifying carcinogens before they can cause damage to cells. This research led to the subsequent discovery that the amounts of these protective compounds were highly variable in plants, but that selection and growing of small plants (sprouts) could provide much higher and more consistent amounts. Johns Hopkins and the scientists who made this discovery were issued a series of US (and international) patents starting in 1998. As described in paragraph 18, below, the patent rights were exclusively licensed to BPP in 1998.

17. The patented glucosinolates and isothiocyanates from cruciferous sprouts and seeds are among the strongest inducers of Phase 2 detoxifying enzymes found in plants and also contain long-lasting antioxidant and anti-inflammatory activities.

66. Section 10.2(a) of the Agreement provides in relevant part that BPP may terminate it for an "Event of Default which CSC has not cured to the reasonable satisfaction of BPP . . . within 30 days of BPP's written notice" to CSC.

67. Section 10.3 states that "[e]ach of the following events shall constitute an 'Event of Default' by CSC" including:

> (e) <u>Quality Control</u>: material breach of an obligation relating to the Laboratory or manufacture of the Product;
>
> (f) <u>Material Breach</u>: any other material breach of this Agreement.

68. By letter dated June 8, 2007, BPP notified CSC that CSC was in default under both of the above provisions. The BPP letter (the "Default Notice") enclosed a copy of the Audit Report. In addition to the breaches relating to the manufacturing standards, facilities, product specifications, and records -- as described in the Audit Report, the Termination Letter listed more than a dozen other material breaches relating to labeling, use of health claims, product samples, marketing, customer communication files, and failure to comply with specific obligations, confirmed by CSC in the August 23, 2006 letter, regarding irradiation, inventory, and labeling of the Product. A true and correct copy of the Default Notice, without its enclosures, is attached to the Complaint as Exhibit F. Most of the breaches listed in the Default Notice had been the subject of previous, but failed, efforts by BPP to obtain CSC's compliance.

69. In accordance with the Agreement, the Default Notice stated that the termination of the Agreement would not occur if within 30 days from the notice "CSC cures the Events of Default to the reasonable satisfaction of BPP...."

70. In the 30 days that followed the Default Notice (the "Cure Period"), CSC did not tell BPP that CSC would cure or attempt to cure any of the Events of Default set forth in the Default Notice.

-17-

BPP with a third party certification that the products have been manufactured, filled, stored, shipped and handled in accordance with specifications, proposed by BPP, that incorporated the Dietary Supplement Regulations.

77. At 4:57 pm (EDT) on July 20, 2007, Welsh sent Wittlin a letter signed by Caudill on CSC letterhead, and addressed to BPP, which purported to take issue with all aspects of BPP's Default Notice, with one exception relating to insurance. A true and correct copy of the CSC letter is attached to the Complaint as Exhibit H.

78. The CSC July 20, 2007 letter states that, contrary to the Agreement and CSC's own prior statements and conduct, CSC was not subject to either the Specifications or the Dietary Supplement Regulations. Seemingly oblivious to its own inconsistencies, CSC stated that CSC would continue to manufacture and sell the Product because, in CSC's view, the Agreement had not been terminated.

79. In accordance with the Agreement, the Default Notice, and BPP's July 11, 2007 letter, the Agreement terminated on July 21, 2007.

### Reversion of Rights to BPP

80. Section 10.4(a) of the Agreement provides that upon termination of the Agreement, "all rights herein granted to CSC shall revert to BPP and CSC shall cease the production, manufacture, distribution, sale, use or advertisement of the Product."

81. Section 10.4(b) and (c) of the Agreement permit CSC to sell its existing inventory of SGS-containing products during the 90-day period following termination of the Agreement, but only if CSC promptly delivers a schedule of its existing inventory to BPP, and BPP then declines to purchase that inventory. CSC has failed to deliver a schedule of its existing inventory to BPP and therefore has no right to sell its inventory of the SGS-containing products.

82. Under section 10.4(c) of the Agreement, CSC agreed that it would not promote or advertise the Product following the termination of the Agreement.

83. Section 10.4(d) of the Agreement requires that, upon termination of the Agreement, CSC shall return the "Confidential Information" of BPP defined in Section 13.2 of the Agreement as "such party's proprietary, technical information, marketing information, scientific data, "confidential" marked or designated information, and all other information which a reasonable person would treat confidentially."

**Unpaid Royalties**

84. CSC agreed to make quarterly royalty payments to BPP pursuant to section 5.2 of the Agreement. CSC has failed to pay BPP the April - June 2007 royalty payment. This also constitutes an Event of Default under the Agreement.

85. CSC agreed to pay a minimum royalty to BPP of $100,000 for the year ending December 6, 2007, less the amount CSC has paid in actual royalties for the same period. With the termination of the Agreement effective July 21, 2007, CSC owes -- and has not paid -- BPP a prorated minimum royalty amount of $56,600.

### *As and For a First Cause of Action Against Defendant*
**(Breach of Contract)**

86. Plaintiff BPP repeats and realleges each and every allegation in paragraphs 1 through 85 of this Complaint as if fully set forth herein.

87. The Agreement constituted a valid and binding contract between BPP and CSC.

88. BPP fully and faithfully performed all its obligations under the Agreement.

89. CSC materially breached the terms of the Agreement and did not cure or attempt to cure its defaults in accordance with the terms of the Agreement.

ACTIVE/72147189.1

90. CSC further breached its obligation to pay the contractually specified royalty payments for the second quarter of 2007 and the prorated minimum royalty payments due under the terminated Agreement.

91. As a direct and proximate result of the foregoing, BPP has suffered damages in an amount to be determined at trial, but in no event less than $60,000.

### As and For a Second Cause of Action Against Defendant
(Breach of Contract)

92. Plaintiff BPP repeats and realleges each and every allegation in paragraphs 1 through 91 of this Complaint as if fully set forth herein.

93. The Agreement constituted a valid and binding contract between BPP and CSC.

94. BPP fully and faithfully performed all its obligations under the Agreement, including conveying its proprietary and confidential information regarding SGS-containing products to CSC, and permitting CSC to use BPP's patents, trademarks, Know-How and other intangible property and rights.

95. CSC has breached the post-termination provisions of the Agreement by failing, without justification, to cease the production, manufacture, distribution, sale, use or advertisement of the Product, constituting an unauthorized use of BPP's proprietary and confidential information, patents, trademarks, Know-How and other intangible property and rights.

96. CSC has further breached the post-termination provisions of the Agreement by failing to return BPP's Confidential Information in accordance with Section 10.4(d) of the Agreement.

97. As a direct and proximate result of the foregoing, BPP is now suffering and will continue to suffer irreparable injury.

### *As and For a Third Cause of Action Against Defendant*
### (Unjust Enrichment)

98. Plaintiff BPP repeats and realleges each and every allegation in paragraphs 1 through 97 of this Complaint as if fully set forth herein.

99. BPP conveyed its proprietary and confidential information regarding SGS-containing products to CSC, relying on CSC's promise that upon termination of the Agreement, all rights granted to CSC would revert to BPP "and CSC shall cease the production, manufacture, distribution, sale, use or advertisement of the Product."

100. CSC has retained and continues the use of BPP's proprietary and confidential information, patents, trademarks, Know-How and other intangible property and rights despite the termination of the Agreement.

101. As a direct and proximate result of the foregoing, CSC has been unjustly enriched at BPP's expense, and in equity and good conscience CSC should make restitution to BPP, in an amount to be determined at trial.

### *As and For a Fourth Cause of Action Against Defendant*
### (Trademark Infringement under 15 U.S.C. § 1125(a)))

102. Plaintiff BPP repeats and realleges each and every allegation in paragraphs 1 through 101 of this Complaint as if fully set forth herein.

103. BPP has applied for registration of its SGS logo (referenced herein as "SGS logo") with the United States Patent and Trademark Office ("USPTO"), which was filed on October 27, 2005. In addition, the Brassica Protective Product logo (the "BPP® logo") is registered upon the Principal register of the USPTO as United States Registration No. 2,252,002, and was issued on June 8, 1999.

104. CSC continues to use and sell SGS-containing products bearing the SGS logo, including the promotion and sale of such products on CSC's website http://www.yoursgs.com/.

-22-

A true and correct copy of two pages from the CSC website is attached to the Complaint as Exhibit I. CSC's ongoing use of the SGS logo in conjunction with the sale of SGS-containing products infringes the rights of BPP in the SGS logo.

105.  CSC's use of the SGS logo in connection with SGS-containing products is likely to cause confusion, mistake or deception as to the source, origin or sponsorship of CSC's goods in that the public and others are likely to wrongly believe that CSC's goods are genuine BPP goods, and are sponsored by, or approved by, or licensed by, or affiliated with or in some way legitimately connected with BPP, all to BPP's irreparable harm.

106.  BPP has no control over the quality of goods sold by CSC, and because of the confusion as to the source, origin or sponsorship engendered by CSC, BPP's valuable goodwill in respect to the SGS logo will be diminished.

107.  Upon information and belief, despite the fact that CSC has knowledge that the trademark laws of the United States protect the SGS logo, CSC is nevertheless willfully infringing the SGS logo.

108.  As a direct and proximate result of the foregoing, BPP is now suffering and will continue to suffer irreparable injury. BPP has also suffered damages as a result of CSC's trademark infringement, in an amount to be determined by the Court.

### As and For a Fifth Cause of Action Against Defendant
(Tarnishment under 15 U.S.C. § 1125(a))

109.  Plaintiff BPP repeats and realleges each and every allegation in paragraphs 1 through 108 of this Complaint as if fully set forth herein.

110.  CSC deceptively promotes, offers for sale and sells SGS-containing products, affixed with the SGS logo, that are not genuine BPP goods, but nevertheless falsely represents those goods to be genuine BPP goods.

ACTIVE/72147189.1

111. More specifically, CSC deceptively promotes, offers for sale and sells SGS-containing products bearing the SGS logo as genuine BPP goods, when those goods are of a lesser quality because they are not manufactured in accordance with BPP's quality control requirements.

112. As a direct and proximate result of the foregoing, BPP is now suffering and will continue to suffer irreparable injury. BPP has also suffered damages as a result of CSC's conduct, in an amount to be determined by the Court.

### *As and For a Sixth Cause of Action Against Defendant*
**(Misappropriation of Proprietary and Confidential Information)**

113. Plaintiff BPP repeats and realleges each and every allegation in paragraphs 1 through 112 of this Complaint as if fully set forth herein.

114. CSC has obtained BPP's proprietary and confidential information pursuant to the Agreement.

115. BPP has taken reasonable steps to protect its proprietary and confidential information by stating in Section 10.3(d) of the Agreement that CSC is prohibited from using BPP's proprietary and confidential information upon termination of the Agreement.

116. BPP has the right to exclusive ownership, enjoyment, and use of its proprietary and confidential information.

117. CSC is now using BPP's proprietary and confidential information in breach of the post-termination provisions of the Agreement.

118. As a direct and proximate result of the foregoing, BPP is now suffering and will continue to suffer irreparable injury. BPP has also suffered direct and consequential harm as a result of CSC's misappropriation of BPP's proprietary and confidential information and is entitled to damages.

### *As and For a Seventh Cause of Action Against Defendant*
**(New York Unfair Competition - N.Y.G.B.L. §§ 349 and 350)**

119. Plaintiff BPP repeats and realleges each and every allegation in paragraphs 1 through 118 of this Complaint as if fully set forth herein.

120. CSC sells or distributes SGS-containing products to customers in the State of New York and elsewhere. In the course of its business, CSC is engaged in consumer-oriented acts that are misleading in a material way, and that cause injury to BPP.

121. CSC is manufacturing, distributing and selling SGS-containing products bearing the SGS logo even though they are not genuine BPP products and do not adhere to BPP's quality control requirements.

122. Consumers are deceived into believing that the SGS-containing products sold by CSC with the SGS logo are genuine BPP goods but instead receive goods that are of a lesser quality.

123. CSC is also exploiting BPP's proprietary and confidential information in breach of the post-termination provisions of the Agreement and therefore misappropriating a commercial advantage belonging to BPP.

124. As a direct and proximate result of the foregoing, BPP is now suffering and will continue to suffer irreparable injury. BPP has also suffered damages as a result of CSC's unfair competition, in an amount to be determined by the Court.

### *As and For a Eight Cause of Action Against Defendant*
**(Common Law Unfair Competition)**

125. Plaintiff BPP repeats and realleges each and every allegation in paragraphs 1 through 124 of this Complaint as if fully set forth herein.

126. BPP has invested substantial time, effort, resources, and money in its SGS logo and in maintaining its proprietary and confidential information.

127. CSC improperly uses the SGS logo and BPP's proprietary and confidential information.

128. Upon information and belief, CSC continues to use the SGS logo and BPP's proprietary and confidential information.

129. CSC will gain an unfair advantage in the marketplace by wrongly using the SGS logo and BPP's proprietary and confidential information.

130. CSC's intentional use of the SGS logo operates to confuse and mislead customers.

131. BPP has been, and is likely to be further, damaged by CSC's improper and intentional use of the SGS logo and BPP's proprietary and confidential information.

132. As a direct and proximate result of the foregoing, BPP is now suffering and will continue to suffer irreparable injury. BPP has also suffered damages as a result of CSC's unfair competition, in an amount to be determined by the Court.

**WHEREFORE**, plaintiff Brassica Protection Products LLC respectfully demands judgment as follows:

**ON THE FIRST CAUSE OF ACTION:** for judgment against defendant Caudill Seed & Warehouse Co., Inc. in an amount to be determined by the Court;

**ON THE SECOND CAUSE OF ACTION:** that Defendant, its agents, representatives and all other persons acting in concert with it be enjoined and restrained, during the pendency of this action, and permanently thereafter, from the continued use and exploitation of plaintiff Brassica Protection Products' rights granted to defendant under the Agreement, and further ordering defendant to cease the production, manufacture, distribution, sale, use or advertisement of the Product and further ordering defendant to return the Confidential Information procured under the terms of the Agreement;

ACTIVE/72147189.1

**ON THE THIRD CAUSE OF ACTION:** for judgment against defendant Caudill Seed & Warehouse Co., Inc. in an amount to be determined by the Court;

**ON THE FOURTH CAUSE OF ACTION:** that Defendant, its agents, representatives and all other persons acting in concert with it be enjoined and restrained, during the pendency of this action, and permanently thereafter, from the continued use and exploitation of plaintiff Brassica Protection Products' trademarks and SGS logo, together with damages and an award of plaintiff's reasonable attorneys' fees and costs, in amounts to be determined by the Court;

**ON THE FIFTH CAUSE OF ACTION:** that Defendant, its agents, representatives and all other persons acting in concert with it be enjoined and restrained, during the pendency of this action, and permanently thereafter, from the continued use and exploitation of plaintiff Brassica Protection Products' trademarks or SGS logo, from representing to anyone that any SGS-containing products it sells or distributes are genuine BPP goods and from distributing any SGS-containing products shipped or sold in packaging reflecting the BPP trademark or SGS logo, together with damages and an award of plaintiff's reasonable attorneys' fees and costs, in amounts to be determined by the Court;

**ON THE SIXTH CAUSE OF ACTION:** that Defendant, its agents, representatives and all other persons acting in concert with it be enjoined and restrained, during the pendency of this action, and permanently thereafter, from the continued use and exploitation of plaintiff Brassica Protection Products' confidential and proprietary information previously supplied to defendant under the terminated Agreement by ordering defendant to return plaintiff's proprietary and confidential information and cease the production, manufacture, distribution, sale, use or advertisement of the Product; and for judgment against the defendant in the amount to be determined by the Court;

**ON THE SEVENTH CAUSE OF ACTION:** that Defendant, its agents, representatives and all other persons acting in concert with it be enjoined and restrained, during the pendency of this action, and permanently thereafter, from the continued use and exploitation of plaintiff Brassica Protection Products' proprietary and confidential information previously supplied to defendant under the terminated Agreement and Plaintiff Brassica Protection Products' trademarks and SGS logo and for judgment against defendant Caudill Seed & Warehouse Co., Inc. in an amount to be determined by the Court and for trebling of damages if the Court finds that the Defendant willfully or knowingly violated N.Y.G.B.L. § 349 and § 350, and plaintiff's reasonable attorneys' fees and costs, in amounts to be determined by the Court;

**ON THE EIGHTH CAUSE OF ACTION:** that Defendant, its agents, representatives and all other persons acting in concert with it be enjoined and restrained, during the pendency of this action, and permanently thereafter, from the continued use and exploitation of plaintiff Brassica Protection Products' proprietary and confidential information previously supplied to defendant under the terminated Agreement and Plaintiff Brassica Protection Products' trademarks and SGS logo and for judgment against defendant Caudill Seed & Warehouse Co., Inc. in an amount to be determined by the Court.