# EXHIBIT HH

# EXHIBIT F

Exhibit HH

Case 1:07-cv-07844-SAS   Document 32-7   Filed 02/19/2008   Page 2 of 26

# SUBLICENSE, MANUFACTURE AND DISTRIBUTION AGREEMENT

## BY AND BETWEEN

## BRASSICA PROTECTION PRODUCTS LLC

## AND

## CAUDILL SEED & WAREHOUSE CO., INC.

## d/b/a CAUDILL SEED CO.

1.8. "CSC Patents and Know-How" means (a) all U.S. and foreign patents and patent applications issued to, or filed by, CSC or any of its Affiliates pertaining to the methods or processes by which a powder or other substance containing extracted or purified glucosinolate or isothiocyanate is created; (b) the inventions disclosed and claimed on all of the issued patents and patent applications referred to in clause (a) and all continuations, divisions and reissues based thereon; and (c) all data and proprietary rights of any type whatsoever (other than patents or patent applications), in any tangible or intangible form whatsoever, that is owned (or to the extent owned) by CSC or any of its Affiliates or that CSC or any of its Affiliates has the unrestricted right to use, that is relevant to the production, manufacture, storage, filling, packaging and shipping of the Product, including, without limitation, technology, inventions, practices, methods, techniques, specifications, drawings, plans, formulations, formulae, knowledge, skill, experience, technical and non-technical data, test data (including test or stability data), results of studies, technical drawings and related copyrights, consumer and market research data and other similar information.

1.9. "Disability" means the inability of Dan Caudill to perform his duties as the chief executive officer of CSC as a result of incapacity, despite any reasonable accommodation required by law, due to bodily injury, disease or any other physical or mental illness, which inability continues for a period of ninety (90) days within any one hundred eighty (180) day period.

1.10. "Event of Default" shall have the meaning set forth in Section 10.3.

1.11. "FDA" means the United States Food and Drug Administration and any successor agency or authority thereto.

1.12. "Finished Product" means capsules, tablets, pills or similar delivery conveyors that contain extracted or purified glucosinolate or isothiocyanate that (a) are not a food and (b) do not require the approval of the FDA or any other U.S. or Canadian government agency or authority in order to be sold in the retail market (other than approvals relating to Product claims and Labeling), which are produced and/or manufactured using BPP Know-How and the BPP Patents or Patent Rights.

1.13. "GMP" means current good manufacturing practices applicable in the United States and Canada.

1.14. "Gross Sales" means gross sales revenues and fees derived from sales of Ingredient Product or Finished Product, as the case may be, by CSC or its Affiliates.

1.15. "Indemnitee" shall have the meaning set forth in Section 12.3.

1.16. "Indemnitor" shall have the meaning set forth in Section 12.3.

1.17. "Ingredient Product" means extracted or purified glucosinolate or isothiocyanate to be included as an ingredient in a capsule, tablet, pill or similar form that is (a) not a food and (b) does not require the approval of the FDA or any other U.S. or Canadian government agency or authority in order to be sold in the retail market (other than approvals

3

Case 1:07-cv-07844-SAS    Document 32-7    Filed 02/19/2008    Page 7 of 26

relating to Product claims and Labeling), which is produced and/or manufactured using BPP Know-How and the BPP Patents or Patent Rights.

1.18. "Inventory" shall have the meaning set forth in Section 10.4(b).

1.19. "JHU License Agreement" means the License Agreement, effective March 10, 1998, between JHU and BPP, as the same has been amended from time to time.

1.20. "Joint IP" means all data and proprietary rights of any type whatsoever, in any tangible or intangible form whatsoever, that are jointly developed by CSC and BPP in connection with the manufacture, distribution and sale of the Product in accordance with the terms of this Agreement, including, without limitation, trade names, trademarks, copyrights, technology, inventions, practices, methods, techniques, specifications, drawings, plans, formulations, formulae, knowledge, skill, experience, technical and non-technical data, test data (including test or stability data), results of studies, technical drawings and related copyrights, consumer and market research data and other similar information.

1.21. "Labeling" means any and all material used to label either the Product, the Packaging or any promotional materials. All Labeling shall include the number of the applicable patent and appropriate Trademarks.

1.22. "Laboratory" shall have the meaning set forth in Section 3.2.

1.23. "Law" means all federal, state and local laws of the United States, including, without limitation, executive orders and the Act.

1.24. "Losses" shall have the meaning set forth in Section 12.1.

1.25. "Marketing Costs" means all out-of-pocket costs and expenses arising out of, relating to, in connection with or in association with the advertising, marketing, public relations and promotional activities conducted by CSC for the Product and in accordance with the terms of this Agreement.

1.26. "Marketing Plan" shall have the meaning set forth in Section 4.5.

1.27. "Minimum Royalty" shall have the meaning set forth in Section 10.2(a).

1.28. "Net Sales" means Gross Sales less refunds, returns, freight, gross receipts taxes and sales taxes, if separately identified on an invoice.

1.29. "Other IP Rights" shall have the meaning set forth in Section 7.3.

1.30. "Packaging" means all material used in packaging, promotional materials or accompanying the Product, including, without limitation primary containers, cartons, shipping cases and inserts.

1.31. "Product" means (a) Ingredient Product and (b) Finished Product.

4

## ARTICLE 3
## MANUFACTURE OF PRODUCTS

3.1. <u>Standards</u>. CSC agrees to produce or caused to be produced, manufacture or cause to be manufactured, fill, test, package, label, store, ship, supply, dispose and otherwise handle the Product, and to perform its obligations hereunder, in material compliance with applicable Laws, Regulations, GMPs and in strict compliance with the Specifications. CSC shall, at its own expense, maintain any and all licenses, permits and consents (including, without limitation, facility licenses and permits) required by any governmental authority, Laws, Regulations and GMPs necessary or required to produce, manufacture, fill, test, package, label, store, ship, supply, dispose and otherwise handle the Product.

3.2. <u>Manufacturing Facility</u>. CSC shall produce or cause to be produced, manufacture or cause to be manufactured, fill, test, package, label, store, ship, supply, dispose and otherwise handle the Product in strict compliance with the Specifications at its manufacturing facilities located in the Territory and shall cause such facilities to remain qualified by the applicable governmental authorities and in compliance with all applicable Laws, Regulations and GMPs. In order to ensure that the Product meets BPP's strict quality control guidelines, CSC shall test the Product at a laboratory (the "**Laboratory**") that conforms to the specifications, including the specific equipment, set forth on the attached **Exhibit A** unless otherwise approved in writing by BPP.

3.3. <u>Seeds</u>. In connection with the production of the Product, CSC shall use only broccoli seeds which meet the protocol, specifications and guidelines as set forth on **Exhibit B** attached hereto, which may be modified by BPP in its reasonable discretion from time to time upon reasonable notice to CSC.

3.4. <u>Packaging; Expiration Dating</u>. CSC agrees, and will require purchasers of the Product for resale in the retail market, to label and package all Product with Labeling and Packaging approved in advance and in writing by BPP, including with respect to expiration dating and use of Trademarks. In addition, any claims that CSC or any such purchaser intends to make on the Labeling and/or Packaging of the Product with respect to health benefits of the Product must be pre-approved by BPP as required by Section 4.3(b) hereof.

3.5. <u>Warranty</u>. CSC warrants and represents that, at the time of delivery of the Product to a third party, the Product (i) will have been produced, manufactured, filled, tested, packaged, labeled, stored, shipped, supplied, disposed of and otherwise handled in accordance with the Specifications, applicable GMPs, this Agreement and all applicable Laws or Regulations, (ii) will have been produced, manufactured, filled, tested, packaged, labeled and stored in facilities approved by the applicable governmental authorities in the Territory and (iii) will not be adulterated or misbranded under applicable Laws or Regulations.

3.6. <u>Inspection</u>. CSC shall permit BPP representatives to enter CSC's facilities, including, without limitation, the Laboratory, upon reasonable prior notice and at reasonable intervals, during normal business hours for the purpose of making quality assurance audits of those facilities and of the procedures and processes used by CSC in performing its obligations under this Agreement.

6

NYDOCS/1179842.2

3.7. <u>Samples</u>. CSC shall prepare and maintain, or cause to be prepared and maintained, file samples, properly stored, from each lot or batch of Product manufactured and shipped hereunder, in compliance with Laws, Regulations and GMPs pertaining thereto. Within ten (10) days after the end of each month, CSC shall provide BPP with sufficient samples of the Product (identical to the Product placed in the stream of commerce for sale) so that BPP may test the sample Product to confirm (i) CSC's compliance with the terms of this Agreement and (ii) the chemoprotective content of the Product. Promptly following receipt of an invoice therefor, CSC shall reimburse BPP for the direct cost of such testing.

3.8. <u>Product Specifications Amendments</u>. BPP may amend or supplement the Specifications unilaterally at any time for the purpose of complying with Laws, Regulations or GMPs. Upon reasonable prior notice (and subject to CSC's approval, not to be unreasonably withheld), BPP may also amend or supplement the Specifications for any other reasonable business purpose.

3.9. <u>Manufacturing Process; Duty to Report</u>. If an event occurs during the production of any Product batch which is likely to affect the safety, efficacy or regulatory status of the Product, CSC shall notify BPP as soon as reasonably possible. BPP and CSC shall consult with each other as to the disposition of all affected batches of the Product.

3.10. <u>Safety Procedures</u>. CSC shall maintain and enforce safety procedures for the production, manufacture and handling of the Product that comply in all respects with applicable occupational safety and health requirements.

### ARTICLE 4
### MARKETING AND PROMOTION

4.1. <u>Duty to Market</u>. CSC shall use reasonable commercial efforts to market, promote, distribute and sell the Product, using such media as it shall reasonably determine to promote, market, distribute and sell the Product throughout the Territory.

4.2. <u>Restricted Internet Sales</u>. CSC shall have no right to promote, market, distribute or sell the Product via the Internet to any person or entity that is located outside of the Territory.

4.3. <u>Approval Required</u>. (a) No advertisement or other promotion may be broadcast, conducted or otherwise exploited, other than in accordance with the Marketing Plan, described in Section 4.5 below, or with BPP's prior written permission (both as to the advertisement or promotion itself and the manner (e.g., medium or publication) for exploitation). CSC may re-use approved advertisements or promotions (in the form and manner as approved) without having to obtain additional approval from BPP.

(b) Without limiting the foregoing, CSC must obtain BPP's prior express written approval of any claims, including, without limitation, any health claims or claims asserting that the Product is beneficial to a consumer, that CSC intends to make with respect to the Product, whether such claims are oral or written, and whether or not appearing on Labeling,

7